UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

JAYHAWK 910VP, LLC,
     *Plaintiff,*

vs.                                                                    Case No. 18-1153-KGG

WINDAIRWEST, LLC,
     *Defendant.*

## **PRETRIAL ORDER**

A pretrial conference was conducted in this case on October 11, 2019, by U.S. Magistrate Judge Kenneth G. Gale.  The plaintiff, Jayhawk 910VP, LLC, appeared through counsel, Christopher A. McElgunn of Klenda Austerman, LLC.   The defendant, WindAirWest, LLC, appeared through counsel, Mitchell L. Herren and Krystle M. Dalke of Hinkle Law Firm, LLC.

This pretrial order supersedes all pleadings and controls the subsequent course of this case.  It will not be modified except by consent of the parties and the court's approval, or by order of the court to prevent manifest injustice.  Fed. R. Civ. P. 16(d) & (e); D. Kan. Rule 16.2(b).

## 1.     PRELIMINARY MATTERS.

**a.     Subject-Matter Jurisdiction.**  Subject-matter jurisdiction is invoked under 28 U.S.C. § 1332 and is not disputed.

**b.     Personal Jurisdiction.**  The court's personal jurisdiction over the parties is not disputed.

26V5169

**c.** **Venue.** Venue in this court is not disputed.

**d.** **Governing Law.** Subject to the court's determination of the law that applies to the case, the parties believe and agree that the substantive issues in this case are governed by the law of the State of Kansas.

**2.** **STIPULATIONS.**

**a.** The following facts are stipulated:

(1) Plaintiff Jayhawk 910VP, LLC is a Kansas limited liability company, with its offices and principal place of business in the State of Kansas. All members of Plaintiff Jayhawk 910VP, LLC are Kansas citizens.

(2) Defendant WindAirWest, LLC is a Delaware limited liability company that may be served with process at 1746F S. Victoria #245, Ventura, California 93003, or alternatively via its resident agent, Clifton Simonson, at 400 Calle Maduro, Camarillo, California 93010. No member of Defendant WindAirWest, LLC is a Kansas citizen.

(3) On or about April 27, 2016, Plaintiff, as the "Owner," and Defendant, as the "Lessee," entered into an Aircraft "Dry" Lease Agreement ("April 27, 2016 Dry Lease") concerning a Cessna Citation X Model 750 aircraft bearing manufacturer's serial number 750-0110, tail number N910VP ("N910VP"). The term of the April 27, 2016 Dry Lease had a term with an expiration date of May 31, 2017.

(4)     In April 2016, Defendant held an FAA Part 135 Certificate authorizing it to conduct commercial air transportation operations. Defendant took delivery of N910VP under the terms of the April 27, 2016 Dry Lease.

(5)     Defendant paid the first guaranteed charter fee payment of $100,000 under the April 27, 2016 Dry Lease Agreement. Additionally, Defendant installed Wi-Fi in N910VP and remitted lease payments of $35,000 to Plaintiff in both May and June 2016.

(6)     On June 21, 2016, N910VP was at the facilities of Castle & Cooke Aviation Services, Inc. ("Castle & Cooke"), a fixed based operator at the Van Nuys, CA. airport. While at Castle & Cooke, N910VP was damaged when it rolled into other aircraft, significantly damaging N910VP, and the other involved aircraft.  The extensive repairs to N910VP required the aircraft to be moved to the Cessna facility at Textron Wichita, where the aircraft remained from June 2016 through December 2016.

(7)     Defendant continued to pay monthly lease payments of $35,000 to Plaintiff during the time N910VP was out of service for repairs.

(8)     On October 11, 2016, Defendant filed a lawsuit against Castle & Cooke in California state court, *Windairwest, LLC v. Castle & Cooke Aviation Services, Inc.,* Case No. LC104747, Superior Court of California, County of Los Angeles, seeking damages resulting from the damage to N910VP (the "Castle & Cooke Litigation").

(9)     On December 9, 2016, Defendant and Castle & Cooke participated in a mediation, at the conclusion of which, Castle & Cooke's insurer agreed to pay $300,000 to DEFENDANT, but the payment did not resolve the lawsuit.

(10)   On December 14, 2016, Defendant paid Plaintiff $299,652 of the $300,000 payment from Castle & Cooke's insurer. Defendant's payment was applied to the $250,000 of guaranteed charter fee payments, the December lease payment, and a Rolls Royce Corporate Care payment under the April 27, 2016 Dry Lease.  Plaintiff would not release N910VP into service unless these items were paid from Castle & Cooke's insurer's payment.

(11)   After completion of repairs and necessary inspections, on December 22, 2016, N910VP was returned to service with Defendant, and Defendant used N910VP to conduct charter flight operations through the expiration of the April 27, 2016 Dry Lease on May 31, 2017. The repairs and inspections necessary to return N910VP to service were paid or reimbursed by insurers.

(12)   Defendant returned N910VP to Plaintiff at the expiration of the April 27, 2016 Dry Lease.

(13)   At the expiration of the April 27, 2016 Dry Lease, Defendant did not purchase N910VP, and did not purchase the Aircraft after May 31, 2017.

(14)   Plaintiff contended that under the terms of the April 27, 2016 Dry Lease, in the event Defendant did not purchase N910VP, Defendant was required to pay Plaintiff and an additional charter fee of $250,000 upon the expiration of the April 27, 2016 Dry Lease.

(15)   During July 2017, the Parties discussed the payment of the $250,000 additional charter fee, Plaintiff's purchasing a membership interest in Defendant, the terms

4

of which would include the forgiveness of Defendant's payment of half of the additional charter fee. On July 11, 2017, Defendant paid Plaintiff $125,000 of the $250,000 additional charter fee Plaintiff contended was due and owing.

(16)   In June/July 2017, the parties executed a Common Interest Agreement, effective May 1, 2017 so that they could effectively cooperate with each other regarding the Castle & Cooke Litigation, and negotiating  an agreement for Plaintiff's acquiring a membership interest in Defendant. Plaintiff agreed to file suit against Castle & Cooke in California state court to recover for diminution in N910VP's value.

(17)   On August 14, 2017, the Parties entered into N910VP Aircraft "Dry" Lease Agreement ("August 14, 2017 Dry Lease").

(18)   On September 14, 2017, the Parties entered into Side Letter Agreement No. 2, which supplemented the August 14, 2017 Dry Lease and the August 22, 2017 Side Letter Agreement.

(19)   On October 1, 2017, Plaintiff filed suit against Castle & Cooke to recover damages for the diminution of N910VP's value.

(20)   From August 25, 2017, to February 25, 2018, charter flights of N910VP were conducted pursuant to the terms of the August 14, 2017 Dry Lease, the Side Letter Agreement, Side Letter Agreement No. 2, and Defendant's FAA Part 135 Certificate.

(21)   Plaintiff terminated the August 14, 2017 Dry Lease on February 26, 2018, and Plaintiff demanded payment of $125,000 of the remaining additional charter fee under the original April 27, 2016 Dry Lease.

(23)   On May 31, 2018, Plaintiff filed the instant lawsuit alleging Defendant breached the April 27, 2016 Agreement by not paying the remaining $125,000 of the walkaway fee.  Defendant filed its answer and counterclaims on July 24, 2018.

(24)   After filing this lawsuit, Plaintiff finalized settlement of its claim with Castle & Cooke. Plaintiff later paid the then-outstanding balances with Defendant's vendors, with the exception of the invoices from L Squared Aviation in the amount of $21,744.52, the amount of which Plaintiff disputes.

**b.**   The parties have stipulated to the foundational admissibility of the following exhibits for purposes of summary judgment and trial, reserving objections for relevance or hearsay within the document:

(1)   April 27, 2016 N910VP Aircraft "Dry" Lease Agreement

(2)   August 14, 2017 N910VP Aircraft "Dry" Lease Agreement

(3)   August 22, 2017 Side Letter Agreement

(4)   September 14, 2017 Side Letter Agreement No. 2

(5)   May 1, 2017 Common Interest Agreement

(6)   Flight Logs for N901VP Cessna Model 750, SN 750-0110

(7)   Deposition exhibits from the depositions of (a) Robert Kiser, (b) Jeffrey D. Peier, (c) Cliff Simonson, and (d) Heather McCormick

(8)   Documents produced in discovery.

3.     **FACTUAL CONTENTIONS.**

   a.     **Contentions of Plaintiff.**

Plaintiff is a limited liability company that owned a single asset, N910VP.  Plaintiff has two member owners, Jayhawk Aviation, LLC and Winglet Technology, LLC.  Mr. Bob Kiser is Plaintiff's manager.  Plaintiff's purchase of N910VP was financed through Rose Hill, and Rose Hill Bank held a perfected security interest in N910VP.  Throughout Plaintiff's and Defendant's relationship, N910VP was subject to the secured financing arrangement with Rose Hill Bank. The fact that Plaintiff's sole asset was an aircraft is a standard commercial practice regarding the ownership of a business aircraft.

In 2016, Plaintiff was in the market to sell N910VP and began discussions with Defendant regarding Defendant's purchase of N910VP.  Defendant is in the business of conducting commercial air transportation operations under the authority of its FAA Part 135 Certificate, and wanted to use N910VP in its charter flight business. However, Defendant did not want to purchase N910VP, but instead agreed to lease the aircraft for a year along with an option to purchase it at any time during the lease term, or at the end of the lease term.

On April 27, 2016 the parties entered the April 27, 2016 Dry Lease and the April 27, 2016 Aircraft Services Agreement. Shortly thereafter, Defendant took possession of N910VP to begin the process of using it in Defendant's charter flight operations. The agreements had a twelve month term ending May 31, 2017. The terms of the Agreements required Defendant to pay a monthly rent of $35,000.00. The Agreements also obligated

Defendant to make guaranteed charter fee payments of $100,000 on April 26, 2016, July 1, 2016, and September 1, 2016, and a final charter fee payment of $50,000 on November 1, 2016.  Section 2 of the April 27, 2016 Dry Lease provided Defendant an option to purchase N910VP at any time during the lease term for $3.8 million. In the event Defendant elected not to purchase the aircraft, the terms of the April 27, 2016 Dry Lease obligated Defendant to pay an additional charter fee of $250,000.

On May 31, 2017, Defendant returned N910VP to Plaintiff, electing not to purchase the aircraft. Since then, Defendant has paid $125,000 of the $250,000 additional charter fee, but has not paid the remaining balance of $125,000. Defendant's failure to pay the remaining $125,000 is a breach of the April 27, 2016 Dry Lease.

After Defendant returned N910VP to Plaintiff, the parties began discussing a potential transaction by which Plaintiff would acquire a member ownership in Defendant. While the parties were in discussions, they executed an August 14, 2017 Dry Lease, along with two subsequent amendments— an August 22, 2017 Side Letter Agreement, and a September 14, 2017 Side Letter No. 2. Under the terms of the August 14, 2017 Dry Lease, Defendant leased N910VP to operate the aircraft under its FAA Part 135 Certificate. (*Id.* at §1.1) and during the term of the August 14, 2017 Dry Lease, Defendant was required to maintain "operational control" of the aircraft, as defined by the provisions of 14 C.F.R. Part 1.1. (*Id.* at §3.1). The August 14, 2017 Dry Lease had a term of twelve months, but Plaintiff had the right to terminate the agreement at any time upon written notice. (*Id.* at §1.4). During the term of the August 14, 2017, Plaintiff satisfied all its obligations of the

August 14, 2017 Dry Lease and related Side Letters, and at all times, Defendant's agents had full knowledge of N910VP's operations conducted under the agreement.

In February 2018, Plaintiff terminated the August 14, 2017 Dry Lease with proper notice. Although the parties negotiated in an attempt to reach a final agreement for Plaintiff's acquiring a member ownership in Defendant, they reached no agreement, and at no time was there an agreement obligating Plaintiff to acquire an interest in Defendant. Upon Plaintiff's termination of the August 14, 2107 Dry Lease, Defendant had not satisfied its obligation to pay the remaining $125,000 balance of the additional charter fee as required by the April 27, 2016 Dry Lease.

### b.    Contentions of Defendant(s).

WAW does not dispute the existence of a contract between the Parties, but WAW has more than satisfied its obligations under the April 27, 2016 Agreement. WAW further asserts that the April 27, 2016 Agreement was modified by oral agreement, actions of the parties and substantial performance by the parties of the modified terms.

Jayhawk demanded that WAW pay $250,000 in guaranteed charter fee payments under the April 2016 Dry Lease from the $300,000 paid to Defendant by Castle & Cook. WAW disputed that the $250,000 in guaranteed charter fee payments was owed because N910VP was out of service and could not be used for charter operations.  Jayhawk, however, would not release N910VP to WAW unless WAW paid Jayhawk the charter fee payment.

After Jayhawk demanded an additional $250,000 charter fee, Jayhawk expressed an interest in purchasing WAW's Charter Certificate to allow it to directly operate N910VP for charter as partial satisfaction of the $250,000 guaranteed charter fee it asserted was still due.  Consequently, the Parties began negotiations for Jayhawk to purchase a 90% majority membership interest in WAW.  The Parties agreed to let Jayhawk acquire a majority membership interest in WAW and use WAW's Charter Certificate to operate N910VP's charter operations for forgiveness of half of the disputed $250,000 guaranteed charter fee and that WAW would pay $125,000 to Jayhawk in cash to satisfy the remaining ½ of the guaranteed charter fee.

In August 2017, the Parties entered into the August 14, 2017 "Dry Lease" Agreement to satisfy FAA requirements.  The Parties continued to negotiate Jayhawk purchasing a majority membership interest in WAW pending the conclusion of WAW's lawsuit against C&C, after which Jayhawk would acquire the remaining 10% ownership interest of WAW. Jayhawk scheduled a charter flight for N910VP. WAW refused to allow the charter to occur until a further agreement was reached.  The Parties entered into Side Letter Agreement on August 22, 2017, and agreed that while N910VP was in the care, custody, and control of Jayhawk, Jayhawk would be responsible for any indemnification; repairs; risk of loss, damage, and mechanical breakdown; and insurance, subject to offset by any insurance proceeds.  Jayhawk requested that WAW open a bank account in Wichita on which Robert Kiser was a signatory to facilitate N910VP's charter operations run by Jayhawk.  WAW assisted Jayhawk with opening a bank account for Jayhawk's use.

10

Jayhawk began operating charter flights with N910VP on WAW's Charter Certificate on August 25, 2017.   Once Jayhawk began flying N910VP on WAW's Charter Certificate, the Parties' deal was consummated other than the final contractual paperwork.

In Side Letter Agreement No. 2, the Parties stated that N910VP's care, custody, and control was with WAW during the interim operations pending transfer of the majority membership interest in WAW to Jayhawk, but Jayhawk would be responsible for any indemnification; repairs; risk of loss, damage, and mechanical breakdown; and insurance, subject to offset by any insurance proceeds.   The Parties also agreed in Side Letter Agreement No. 2 that the August 14, 2017 Agreement did not shift any liability from Jayhawk to WAW with regard to N910VP.

The Parties expressly agreed to continue to work in good faith to timely conclude the transfer of the majority membership interest in WAW to Jayhawk.  In September and October 2017, the Parties negotiated certain terms related to the Parties' liabilities arising from the majority membership interest transfer.   Jayhawk filed suit against C&C for diminution of value of the plane on October 1, 2017.

With respect to the majority membership interest transfer, the Parties worked towards papering their deal in the Limited Liability Company Membership Interest Purchase Agreement and pursuing their litigation against C&C.  During this time, Mr. Kiser oversaw the day-to-day charter operations of WAW using N910VP, made $40,000/month rent payments to Jayhawk (that had never been agreed to by WAW) from

WAW to cover Jayhawk's bank loan, managed the pilots, and retained all revenue generated from N910VP's charter flights.

From late August 2017, through the end of February 2018, Jayhawk behaved as though it was a managing member of WAW other than not being the Part 135 certificate holder.  However, on February 26, 2018, Jayhawk unilaterally terminated the Parties' arrangement and declared it no longer wanted to charter N910VP or own WAW after the charter operation's last pilot resigned.  Jayhawk demanded payment of $125,000 for the other half of the walkaway fee under the original April 27, 2016 Agreement.  Jayhawk's actions breached Side Letter Agreement No. 2's agreement to continue to work in good faith to timely conclude the majority membership interest transfer.

After Jayhawk terminated the Parties' arrangement, WAW discovered in March that Jayhawk had not paid its expenses and used WAW's vendor accounts without permission. Jayhawk left multiple balances outstanding on WAW's vendor accounts for several months, thereby damaging WAW's reputation with its vendors and in the charter industry. For example, in April 2018, Jayhawk forwarded outstanding invoices from World Fuel to WAW.  WAW disputed that it was responsible for these outstanding balances because the amounts due were for N910VP's charter operations.  World Fuel eventually initiated a debt collection action against WAW.  WAW paid $39,652.08 to settle the collection action with World Fuel.  Jayhawk's conduct also breached the Parties' Side Letter Agreements because Jayhawk was responsible for its own maintenance, repairs, and all liabilities for N910VP.

In January of 2018, N910VP was serviced at the Textron Service Center in Newburgh, New York, and incurred a repair bill of over $101,000.  After paying $75,000 of this bill, Jayhawk placed the remaining amount on WAW's account and later told Textron that WAW was responsible for its payment.  Jayhawk paid the balance in August of 2018, approximately three months after this lawsuit was filed.

As a result of its operation of the charter business from August of 2017 through February of 2018, Jayhawk recorded $58,000 or more in net income and approximately $300,000 or more in cash flow, while WAW owners received nothing, other than responsibility to pay taxes on the charter's 2017 and 2018 income.

## 4.    LEGAL CLAIMS AND DEFENSES.

### a.    Legal Claims of Plaintiff.

Breach of Contract – Defendant elected not to exercise its option to purchase N910VP under Section 2 of the April 27, 2016 Dry Lease Agreement at the end of the lease term, May 31, 2017.  Defendant breached the April 27, 2016 Dry Lease by failing to pay the full amount of the additional charter fee that was then due under Section 2 and paragraph D of Exhibit B of April 27, 2016 Dry Lease.

**b.      Defenses of Defendant.**

Defendant asserts the following defenses:

i)      The Parties entered into a new agreement or accord after WAW returned N910VP to Jayhawk.  The Parties discussed the outstanding $250,000 charter fee payment.  Jayhawk wanted to use WAW's Charter Certificate to operate N910VP's charter flights.  The Parties agreed that Jayhawk could acquire a majority membership interest in WAW and use WAW's Charter Certificate for $125,000.  WAW paid Jayhawk $125,000 and Jayhawk used WAW's Charter Certificate for N910VP's charter operations for approximately six months, thereby allowing Jayhawk to generate revenue and rent payments for Jayhawk's bank loan on N910VP in an amount far exceeding $125,000.

ii)     WAW more than satisfied its obligation for the remaining walkaway fee payment of $125,000 because Jayhawk received $240,000 in rent payments from WAW's bank account even though the Parties did not negotiate a rent payment under the August 14, 2017 Dry Lease Agreement, as well as all gross revenue from the charter operations.

iii)    Jayhawk is estopped from demanding the partial walkaway fee after promising to work in good faith to purchase a majority membership interest in WAW.  Jayhawk used WAW's Charter Certificate without additional payment and used WAW's funds to pay for N910VP's charter

14

operations.  WAW significantly performed to its detriment in reliance on Jayhawk's representations that the $125,000 was no longer owed because Jayhawk wanted to directly operate N910VP on WAW's Charter Certificate for charter flights—and did so for six months.

iv)  Jayhawk's damages, if any, should also be offset by any payments made by WAW on outstanding vendor balances for N910VP's charter operations.

v)  Plaintiff did not open its own accounts with WAW's vendors.  Jayhawk 910VP, LLC's manager, Robert (Bob) Kiser, while holding Jayhawk 910VP, LLC out as WAW, directed its employees or representatives to utilize existing WAW accounts without permission or authorization from WAW to do so.

vi)  WAW informed Textron that it was not responsible for any charges to repairs or maintenance to the airplane.  Plaintiff subsequently represented to Textron that WAW signed the work orders authorizing repairs on the airplane and that Plaintiff was not responsible for the charges.

vii)  Plaintiff lacked authority to charge its services and repairs to WAW's accounts with these vendors.

viii)  Plaintiff did not directly pay WAW's vendors for Plaintiff's charges, nor did Plaintiff reimburse WAW for Plaintiff's charges to WAW's accounts.

ix)     At some point prior to February 26, 2018, Plaintiff apparently decided it was no longer interested in purchasing a majority ownership in WAW; however, Plaintiff failed to notify WAW of its decision until Plaintiff's last pilot resigned.

x)      WAW incorporates its allegations set forth in WAW's Counter Claim Paragraphs numbered 1–25.

xi)     A binding contract, specifically the August 14, 2017, Agreement and Side Letter Agreements, existed between Plaintiff and WAW modifying the obligations of the parties under the April 26, 2016 Dry Lease Agreement.

xii)    The Parties provided sufficient consideration in support of their August 14, 2017, Agreement and Side Letter Agreements.

xiii)   Plaintiff materially breached the Parties' August 14, 2017, Agreement and Side Letter Agreements in which Plaintiff agreed that WAW would not be liable for Plaintiff's business operations, including, but not limited to, charter operations, expenses, maintenance, and pilot and charter coordinator salaries.

16

c.     **Counterclaims of Defendant.**

WAW asserts it is entitled to recover under the following theories and alternative theories:

i)      Jayhawk materially breached the August 14, 2017 Agreement and Side Letter Agreement No. 2 when it unilaterally terminated the Parties' agreement in violation of its express promise to work in good faith to timely complete the majority membership interest transfer in WAW. Jayhawk also violated the August 14, 2017 Agreement and both Side Letter Agreements after it refused to take responsibility and assume all liability for N910VP's charter expenses (Count I of Counter Claim).

ii)     In addition, Jayhawk was unjustly enriched by, including but not limited to the following: (1) using WAW's Charter Certificate to operate N910VP's charter operations without paying WAW for that use and not providing WAW with the net income from the operation; (2) use of WAW's bank account and employees/independent contractors to facilitate N910VP's charter operations; and (3) paying itself $40,000 per month in rent for the airplane, which was not negotiated or agreed between the parties.  Jayhawk accepted multiple benefits from WAW with knowing appreciation, yet failed to pay WAW their value (Count VI of Counter Claim).  At the point in time when Jayhawk knew it was not going to finalize the written purchase agreement, but kept operating the

17

charter business as if it were going to finalize the agreement, it was converting WAW's income and accounts for its own purposes (Count V of Counter Claim).

iii)   Jayhawk misrepresented to WAW's vendors that it had authority to charge N910VP's expenses on WAW's accounts.  As a result of Jayhawk's misrepresentations, WAW was damaged because Jayhawk incurred significant debt on WAW's accounts—again, without permission—and then walked away from its obligation to pay N910VP's expenses when it was no longer convenient to operate N910VP for charter.  When WAW informed its vendors that these were Jayhawk's liabilities, Jayhawk denied responsibility and/or misrepresented that WAW signed off on the repairs because it was operating under WAW's name (Counts II and III of Counter Claim).

iv)   Jayhawk tortuously interfered with WAW's business contracts and relationships because Jayhawk was aware of WAW's vendor arrangements and intentionally misled WAW's vendors into thinking WAW was not paying its bills.  Jayhawk denied responsibility to WAW's vendors for N910VP's charter operation costs incurred on some of WAW vendor accounts.  Jayhawk's actions damaged WAW's reputation and goodwill with these vendors, and the aircraft industry as a whole, by creating the impression that WAW does not pay its bills.  It is true that

Jayhawk has since paid some of its outstanding invoices to WAW's vendors, however, WAW was forced to pay other invoices to avoid collection actions. Jayhawk's delayed payment on a portion of WAW's vendors does not remove the taint from WAW's reputation as being a possible credit-risk (Count IV of Counter Claim).

**d.    Defenses of Plaintiff.**

Plaintiff asserts the following defenses:

i)    Defendant cannot establish all of the essential elements of its counterclaims.

ii)   Defendant has not suffered damages or injury in the nature, extent and amount as alleged in its counterclaims.

iii)  Plaintiff did not breach any agreement between the parties, and substantially performed all material terms of such agreements.

iv)   At all times during the parties' performance of the agreements between them, Plaintiff acted in good faith.

v)    Defendant's counterclaims are barred or limited by estoppel.

vi)   Defendant's counterclaims are barred or limited by waiver.

vii)  Defendant's counterclaims are barred or limited by unclean hands.

viii) Defendant's counterclaims are barred or limited by payment.

ix)   Defendant's counterclaims are barred or limited by its breaches of contract.

x)   Defendant's claimed damages are reduced or offset by the amount Defendant owes Plaintiff on its claim for breach of the April 27, 2016 Dry Lease.

## 5.   DAMAGES AND NON-MONETARY RELIEF REQUESTED.

### a.   Plaintiff's Claims.

On its claim for breach of the April 27, 2016 Dry Lease, Plaintiff seeks (1) judgment in the amount of $125,000, plus prejudgment and post judgment interest, and (2) judgment for its reasonable attorney fees, and cost and expenses incurred in this action, as provided for by Section 13.11 of the April 27, 2016 Dry Lease.

### b.   Defendant's Damages.

i)   WAW seeks $39,652.08 for WAW's payment to World Fuel to cover Jayhawk's fuel bill for N910VP's charter operations and to avoid a collections lawsuit against WAW by World Fuel;

ii)   Wages owed to WAW's chief pilot Steve Lentz in the amount of $21,744.52;

iii)   $240,000 for Jayhawk's lease payments of $40,000 per month for six months, which was not agreed to by WAW;

iv)   At least $250,000 for the value of WAW's Charter Certificate, if it is pulled by the FAA;

v)   $830,000 for WAW's damages to its business and goodwill as a result of Jayhawk's and/or Mr. Kiser's actions;

vi)     Taxes paid by WAW or its members attributable to taxable income generated by Jayhawk's operation of the charter business from August of 2017 to February of 2018; and

vii)    WAW also seeks reasonable attorney's fees, costs, and expenses as set forth in the Parties' August 14, 2017 Agreement.

## 6.   AMENDMENTS TO PLEADINGS.

The parties have no amendments to the pleadings.

## 7.   DISCOVERY.

Under the scheduling order and any amendments, all discovery was to have been completed by September 20, 2019. Discovery is complete, except for the depositions of Lewis Bell, Defendant's former employee or independent contractor, (b) Mark Dodds, Plaintiff's accountant, and (c) Owen M. Dahl, Defendant's retained expert witness. The parties have agreed that these depositions can be conducted up to 45 days before trial. The parties did not depose these witnesses prior to September 20, 2019 because the need to do so could not be determined before the completion of all other discovery, and the depositions of other witnesses that were completed on September 5, 2019. Further, Mr. Bell is not within the subpoena power of the Court. Deposing these witnesses will not otherwise delay these proceedings.

Unopposed discovery may continue after the deadline for completion of discovery so long as it does not delay the briefing of or ruling on dispositive motions or other pretrial preparations. Although discovery may be conducted beyond the deadline for completion

of discovery <u>if</u> all parties are in agreement to do so, under these circumstances the court will <u>not</u> be available to resolve any disputes that arise during the course of such extended discovery.

## 8.    MOTIONS.

### a.    Pending Motions.

There are no pending motions.

### b.    Additional Pretrial Motions.
After the pretrial conference, the parties intend to file the following motions:

(1)    Plaintiff will file a motion for summary judgment on certain of Defendant's counterclaims and affirmative defenses.

The dispositive-motion deadline, as established in the scheduling order and any amendments, is **November 11, 2019**.

Consistent with the scheduling order filed earlier in this case, the arguments and authorities section of briefs or memoranda must not exceed 30 pages, absent an order of the court.

### c.    Motions Regarding Expert Testimony.  All motions to exclude testimony of expert witnesses pursuant to Fed. R. Evid. 702-705, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), or similar case law, must be filed no later than sixty (60) days before trial.

## 9.    TRIAL.

The trial docket setting, as established in the scheduling order and any amendments, is **<u>June 9 , 2020</u>, at 9:00 a.m., in Wichita, Kansas.**  This case will be tried by the court

sitting without a jury, and the parties **have consented** to trial before the United States Magistrate Judge assigned to this case.  Trial is expected to take approximately four days. The court will attempt to decide any timely filed dispositive motions approximately 60 days before trial.  If no dispositive motions are timely filed, or if the case remains at issue after timely dispositive motions have been decided, then the trial judge may enter an order or convene another pretrial conference to set deadlines for filing final witness and exhibit disclosures, exchanging and marking trial exhibits, designating deposition testimony for presentation at trial, motions in limine, and proposed findings of fact and conclusions of law.

IT IS SO ORDERED.

Dated October 11, 2019 at Wichita, Kansas.

/s/ Kenneth G. Gale
Kenneth G. Gale
U. S. Magistrate Judge

**Approved and Submitted on October 4, 2019:**

/s/Christopher A. McElgunn
Christopher A. McElgunn, #13359
KLENDA AUSTERMAN
301 N. Main St., Suite 1600
Wichita, Kansas 67202-4816
Phone: 316.267.0331
Fax: 316.267.0333
E-mail: cmcelgunn@klendalaw.com
*Counsel for Plaintiff*

-and-

/s/ Mitchell L. Herren
Mitchell L. Herren, #20507
Krystle M. Dalke, #23714
HINKLE LAW FIRM LLC
1617 N. Waterfront Parkway, Suite 400
Wichita, KS 67206
Phone: (316) 267-2000
Fax: (316) 630-8466
E-mail: mherren@hinklaw.com
E-mail: kdalke@inklaw.com
*Counsel for Defendant*