IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

JAYHAWK 910VP, LLC,        )
                                    )
              Plaintiff,    )
                                    )     No. 18-11534-KGG
        v.                   )
                                    )
WindAirWest, LLC,          )
                                    )
             Defendant.  )
_____)

## MEMORANDUM & ORDER ON MOTION FOR SUMMARY JUDGMENT

Plaintiff Jayhawk 910VP, LLC (hereinafter "Jayhawk" or "Plaintiff") has

brought a breach of contract claim against Defendant WindAirWest, LLC

("WAW" or "Defendant"), contending that WAW breached the an aircraft lease by

failing to pay the full amount of the additional charter fee that was due because

WAW declined to exercise an option to purchase the aircraft.  WAW brought six

counterclaims against Jayhawk – breach of contract, fraud/intentional

misrepresentation, negligent misrepresentation, tortious interference with contract

and/or business relations, conversion, and unjust enrichment.  WAW contends that

Jayhawk was in material breach of a subsequent agreement, committed fraud,

negligent misrepresentation, tortious interference and conversion arising out of

charges on WAW's vendors' accounts.  WAW also brings an unjust enrichment

claim, contending Jayhawk used WAW's air carrier certificates to operate the charter business while negotiating the final terms of the purchase of WAW.

The dispositive motion currently pending before the Court was brought by Jayhawk as to some of WAW's counterclaims. Jayhawk seeks partial summary judgment on part of the breach of contract claim and summary of judgement dismissing the other claims in their entirety. For the reasons set forth below, Jayhawk's motion is **GRANTED in part** and **DENIED in part**.

## FACTUAL BACKGROUND

Plaintiff Jayhawk 910VP, LLC (hereinafter "Jayhawk") is a Kansas limited liability company, with its offices in Wichita, KS. Jayhawk's sole asset was a Cessna Citation X Model 750 business jet, tail number N910VP ("N910VP"). Jayhawk was formed to purchase N910VP, refurbish it, and sell it. Jayhawk acquired N910VP in 2012. The purchase of N910VP was financed through Intrust Bank and subsequently refinanced through Rose Hill Bank.

Defendant WindAirWest, LLC ("WAW") is a Delaware limited liability company with its offices in Ventura, CA. WAW held an FAA Part 135 Certificate No. 11WA358N, which authorized it to conduct commercial air transportation operations. In 2015, Jayhawk and WAW began negotiating WAW's purchase of N910VP, ultimately agreeing to a lease with an option to purchase. On or about April 27, 2016, Jayhawk (as the "Owner") and WAW (as the "Lessee") entered into an Aircraft "Dry" Lease Agreement ("April 2016 Dry Lease") concerning

N910VP with a term expiring on May 31, 2017. Jayhawk and WAW also entered into an April 27, 2016 Aircraft Services Agreement ("April 2016 Aircraft Services Agreement") pertaining to N910VP. Upon executing the April 2016 Dry Lease and April 2016 Aircraft Services Agreement, WAW took delivery of N910VP to use in its charter flight operations under its FAA Part 135 Certificate.

The April 2016 Dry Lease provided for WAW's payment of monthly Rent, Guaranteed Charter Fees, and Maintenance Program payments. Section 2 of the April 2016 Dry Lease provided WAW an option to purchase N910VP:

> In consideration of the mutual premises herein and for other good and valuable consideration, the receipt and sufficiency of which is acknowledged by Owner, Owner hereby grants to Lessee and exclusive option to purchase the Aircraft on any date during the period from August 1, 2016 to May 31, 2017, for a purchase price in the amount described in paragraph C of Exhibit B (the "Purchase Price"). … In the event that Lessee elects not to exercise its option to purchase the Aircraft, then on May 31, 2017, Lessee shall pay the Owner the amount described in paragraph D of Exhibit B by way of an additional charter fee in consideration of Owner having ceased to market the Aircraft for sale during the Term.

The amount of the additional charter fee referenced in Section 2 is $250,000. When WAW entered into the April 2016 Dry Lease, it intended to exercise the purchase option.

The April 2016 Dry Lease contains a provision regarding WAW having "Operational Control" of N910VP as defined by Federal Aviation Regulations:

> Section 3.1 Operational Control. Pursuant to 14 C.F.R. § 135.25(b) (and any other applicable provisions of the

3

> FARs), Lessee shall have exclusive use of the Aircraft
> during the term.  In Accordance with the provisions of 14
> C.F.R. Part 1.1, with respect to a flight, operational
> control shall mean the exercise of authority over
> initiating, conducting or terminating such flight.
> ('Operational Control').  During the Term, Lessee shall
> have and maintain exclusive operational control of the
> Aircraft.   This Agreement is a 'dry lease' of the Aircraft,
> as that term is understood under the Federal Aviation
> Regulations and applicable federal law, and Lessee
> acknowledges and agrees that Lessee is solely
> responsible for providing its own properly qualified
> flight crew and crew the Aircraft.  Pilots shall, at all
> times, (i) meet all applicable FAA and insurance
> requirements, (ii) be approved in advance by any
> insurance carrier then providing coverage for the Aircraft
> and/or Lessee's operations of the Aircraft (provided that
> any pilot who is qualified to fly the Aircraft under any
> then-applicable open pilot endorsement issued by the
> applicable insurance carrier shall be deemed approved by
> same), and (iii) be properly certified, rated and qualified
> to operate the Aircraft.

(*Id*. at § 3.1).

WAW paid the first guaranteed charter fee payment of $100,000 under the April 2016 Dry Lease.  Rent payments of $35,000 were paid to Jayhawk in May and June 2016.

In June 2016 WAW hangared N910VP at the facilities of Castle & Cooke Aviation Services, Inc. ("Castle & Cooke"), a fixed based operator at the Van Nuys, California, airport.  While hangared there, N910VP rolled into other aircraft, significantly damaging N910VP (the "Castle & Cooke Incident").

Extensive repairs required N910VP to be moved to the Cessna facility at Textron Wichita, where it remained from June 2016 through December 2016 for the necessary repairs. WAW continued to pay monthly lease payments of $35,000 to Jayhawk during the time N910VP was out of service for repairs.

On October 11, 2016, WAW filed a lawsuit against Castle & Cooke seeking damages resulting from the damage to N910VP in California state court, ***WAW, LLC v. Castle & Cooke Aviation Services, Inc.***, Case No. LC104747, Superior Court of California, County of Los Angeles (the "Castle & Cooke Litigation"). On December 9, 2016, WAW and Castle & Cooke participated in a mediation, at the conclusion of which, Castle & Cooke's insurer agreed to pay $300,000 to WAW. The payment did not, however, resolve the lawsuit.

On December 14, 2016, WAW paid Jayhawk $299,652 of the $300,000 payment from Castle & Cooke's insurer. WAW's payment was applied to the $250,000 of guaranteed charter fee payments, the December 2016 rent payment, and a Rolls Royce Corporate Care payment, under the April 2016 Dry Lease. Jayhawk would not release N910VP into service unless these items were paid from Castle & Cooke's insurer's payment.

After N910VP was damaged, Jayhawk claimed that under the terms of the April 2016 Dry Lease, WAW was contractually obligated to pay Jayhawk for any diminution in N910VP's value resulting from the Castle & Cooke Incident. Jayhawk secured valuations showing the damage diminished N910VP's value by at least $650,000.00. WAW took the position in the Castle and Cooke litigation that the damage to N910VP diminished its value by $1 million.

N910VP was returned to service with WAW on December 22, 2016. WAW used N910VP to conduct charter flight operations through the expiration of the April 2016 Dry Lease on May 31, 2017.

On June 2, 2017, WAW returned N910VP to Jayhawk at the expiration of the April 2016 Dry Lease. WAW did not exercise its option to purchase N910VP and ceased the charter operations of N910VP. WAW's stated reasons included that N910VP was worth less because of the damage it sustained and the purchase option price was no longer acceptable; the damage to N910VP and the six months it was out of service caused significant damage to WAW's business, and "the financial difficulty the accident created within the company made this situation somewhat untenable … [a] situation where third party actions had completely turned the business inside out, financially and operationally"; the uncertainty caused pilots to quit, and made WAW unable to hire pilots or "other people [it] needed to hire to run the business correctly"; and the ongoing litigation with Castle & Cooke, "with no imminent resolution in sight" and "dealing with legal matters associated with the business." Jayhawk contended that under the terms of the April 2016 Dry Lease WAW is required to pay Jayhawk an additional charter fee of $250,000 upon the expiration of the April 2016 Dry Lease because it elected not to exercise its option.

Upon return of N910VP to Jayhawk in May 2017, the only aircraft owned by WAW was an Astra aircraft. WAW made the decision it was not going to conduct operations with the Astra. Instead, WAW sold the Astra, and used the proceeds to pay its legal bills incurred in the Castle & Cooke Litigation.

During June and July 2017, Jayhawk and WAW discussed the payment of the $250,000 additional charter fee. A potential agreement discussed was Jayhawk's purchase of a membership interest in WAW, the terms of which would include the forgiveness of WAW's payment of half of the additional charter fee. On July 11, 2017, WAW paid Jayhawk $125,000 of the $250,000 additional charter fee. During the discussions with Jayhawk, WAW wanted an agreement with the following terms: Jayhawk or its principals would acquire a majority membership interest in WAW and at the close of the transaction, WAW would pay the remaining $125,000.00.

The terms of the potential purchase of the majority membership interest in WAW would be part of a mutually agreeable and definitive purchase agreement that would set forth all the terms and conditions regarding purchase of the majority membership interest. As part of any transaction WAW principals would retain any potential recovery or obligation by WAW relating to the Castle & Cooke Litigation.

As part of any agreement, WAW also wanted Jayhawk to intervene in the Castle & Cooke Litigation to assert Jayhawk's claim for diminution in value to the aircraft resulting from the Castle & Cooke incident. WAW and Jayhawk would also work together to resolve the claim against Castle & Cooke, and Jayhawk would be limited to whatever it recovered from Castle & Cooke for its diminution in value claim.

WAW proposed that it would agree that during the time the parties negotiated an agreement for the purchase of the membership interest, N910VP

would remain on WAW's Part 135 Certificate as the principal aircraft and there would be an agreement under which WAW would maintain "operational control" of N910VP. WAW proposed that the charter operations of N910VP would go forward under a managed aircraft operation agreement. Jayhawk would retain all revenue generated from charter operations of N910VP and would be responsible for all costs and expenses regarding the charters of N910VP.

On June 8, 2017, WAW reduced these terms to a proposed "Letter of Intent for Purchase of Membership Intent in WAW," which was delivered to Jayhawk's counsel. On June 21, 2017, Jayhawk's counsel delivered a responsive draft of the Letter of Intent, reflecting changes, editions, and comments to WAW's proposed Letter of Intent. The parties never finalized a letter of intent. WAW claims that after reviewing the proposed Letter of Intent, Jayhawk orally offered to take WAW along with $125,000 payment to offset the $250,000 walkaway fee. WAW accepted Jayhawk's offer and paid Jayhawk $125,000 on July 11, 2017. This oral agreement is contested by Jayhawk.

In June/July 2017, the parties executed a Common Interest Agreement, effective May 1, 2017, in order to effectively cooperate regarding the Castle & Cooke Litigation and negotiate an agreement for the purchase of the membership interest in WAW. Jayhawk agreed to file suit against Castle & Cooke in California to recover for diminution in N910VP's value. The Common Interest Agreement provided WAW, Jayhawk "and their respective counsel agree to cooperate with each other with respect to the following: … (b) the negotiation and potential agreement for the sale of all or part of the membership interests in WAW to

Jayhawk or its principals.  This is referred to herein as the 'Transaction.'"  From June 2017 through December 2017, the parties continued to negotiate terms of an agreement for the sale and purchase of a majority membership interest in WAW.

On August 14, 2017, Jayhawk and WAW entered into a new Aircraft "Dry" Lease Agreement ("August 2017 Dry Lease").  The agreement was for twelve months but could be terminated by Jayhawk at any time. The agreement provided that WAW had operational control of the aircraft.  The agreement required only nominal rent.

On August 22, 2017, Jayhawk and WAW entered into a Side Letter Agreement ("Side Letter No. 1"), which had the following provisions:

> Notwithstanding the provisions of the Lease, the undersigned hereby agree that, while the aircraft described in the Lease is in the care, custody and control of Jayhawk 910VP, LLC, the provisions with respect to any kind of indemnification (e.g., Section 2.1 and 7), risk of loss, damage and mechanical breakdown (e.g., Sections 3.2.4, 4 and 7), maintenance (e.g. Section 3.2.5), insurance (e.g., Section 5) and taxes (e.g. Section 13.10) shall be the responsibility of Jayhawk 910vp, LLC.  It is the understanding and agreement of the parties hereto that execution of the Lease is not intended to shift any liability of any kind whatsoever from Jayhawk 910VP, LLC to WAW, LLC with regard to the Aircraft covered by the Lease.
> * * *
> The parties hereby acknowledge and agree that, notwithstanding the interim Lease being in effect for the purpose of allowing WAW, LLC to place the subject aircraft on its Part 135 Air Carrier Operating Certificate as the principal aircraft, the parties agree that the care, custody and control of the aircraft shall remain with

> Jayhawk 910VP, LLC until such time that WAW, LLC
> majority ownership transfers to Jayhawk Aviation, LLC
> and a replacement lease agreement can be put into effect.

(Ex. 8).  On September 14, 2017, Jayhawk and WAW entered into Side Letter

Agreement No. 2 ("Side Letter No. 2"), which supplemented the August 2017 Dry

Lease and Side Letter No. 1.  Side Letter No. 2 had the following provisions:

> Notwithstanding the provisions of the Lease, the
> undersigned hereby agree that, while the aircraft
> described in the Lease is in the care, custody and control
> of WAW, LLC during interim operations pending
> transfer of majority ownership of WAW, LLC to
> Jayhawk Aviation, LLC, the provisions with respect to
> any kind of indemnification (e.g., Sections 2.1 and 7),
> risk of loss, damage and mechanical breakdown (e.g.,
> Sections 3.2.4, 4 and 7), maintenance (e.g. Section 3.2.5),
> insurance (e.g., Section 5) and taxes (e.g. Section 13.10)
> shall be the responsibility of Jayhawk 910VP, LLC,
> subject in each case to the application of any insurance
> proceeds.  It is the understanding and agreement of the
> parties hereto that execution of the Lease is not intended
> to shift any liability of any kind whatsoever from
> Jayhawk 910VP, LLC to WAW, LLC with regard to the
> Aircraft covered by the lease.
>             * * *
> WAW, LLC, and Jayhawk 910VP, LLC shall continue to
> work in good faith to timely conclude the transfer of
> majority ownership of WAW, LLC to Jayhawk Aviation,
> LLC.

The purpose of the August 2017 Dry Lease, Side Letter No. 1, and Side

Letter No. 2 was (a) N910VP would operate under WAW's Part 135 Certificate

and under WAW's operational control, (b) all expenses, expenditures, and

payments necessary to enable N910VP's charter operations would be Jayhawk's

responsibility, (c) Jayhawk would retain whatever revenue was generated from N910VP's charter flights, and (d) WAW would receive no money from the operations. Under the August 2017 Dry Lease, N910VP's first charter flight on WAW's Part 135 Certificate occurred on August 25, 2017.

From August 25, 2017 to February 25, 2018, charter flights of N910VP were conducted pursuant to the terms of the August 14, 2017 Dry Lease, Side Letter Agreement No. 1, Side Letter Agreement No. 2, and WAW's FAA Part 135 Certificate. In August 2017 a WAW checking account was established. WAW and Jayhawk were authorized to issue and sign checks or payments from the account (the "Bank Account").

The revenue from N910VP's charter flights was deposited into the Bank Account. Expenses, expenditures, and payments necessary to enable N910VP's charter operations were paid from the Bank Account. WAW claims that during this period Jayhawk charged repairs and other expenses to vendors on WAW accounts by misrepresenting to vendor that it had authority to do so. This claim is not assailed (or addressed) factually in Jayhawk's motion, and so will be assumed for the purpose of this motion.

WAW received a "trip sheet," advanced notice of the charter flight, for each charter flight booked for N910VP. WAW's approval and release of each charter flight was necessary before the flight could be conducted.

Invoices and bills for the expenses and obligations necessary for the charter operations of N910VP were sent to or gathered by WAW, then emailed to Jayhawk which then issued payments from the Bank Account. The expenses and

obligations paid from the charter revenue included items such as (a) fuel, (b) maintenance, (c) airport or fixed base operator fees or charges, (d) wages for pilots, and (e) salaries for certain WAW employees. A monthly rent payment of $40,000.00 was made to Jayhawk from the Bank Account equal to the monthly loan payment for the secured financing of N910VP.

On October 1, 2017, Jayhawk filed suit against Castle & Cooke to recover damages for the diminution of N910VP's value.

Jayhawk terminated the August 2017 Dry Lease on February 26, 2018 and demanded payment of the remaining $125,000 due under the original April 2016 Dry Lease. Jayhawk earned income from the charter flights during this period, although it denies it earned a profit.

After Jayhawk terminated the August 2017 Dry Lease on February 26, 2018, WAW had outstanding balances on its vendor accounts from N910VP's charter operations. Vendor World fuel sued WAW for an outstanding balance of $39,652.08 which WAW paid to resolve the suit.

On May 31, 2018, Jayhawk filed the instant lawsuit alleging WAW breached the April 2016 Agreement by not paying the remaining $125,000 of the additional charter fee. WAW filed its answer and counterclaims on July 24, 2018.

After filing this lawsuit, Jayhawk finalized settlement of its claim with Castle & Cooke. Jayhawk later paid the then-outstanding balances with WAW's vendors except invoices from L Squared Aviation in the amount of $21,744.52, the

amount of which Jayhawk disputes. Jayhawk as not paid WAW the amount paid had already paid to settle World Fuel's collections lawsuit.

On May 30, 2018, Jayhawk settled its claim for the diminution in N910VP's value that it brought against Castle & Cooke in California. As part of the settlement terms, Jayhawk agreed it would not pursue any claim against any other party seeking for damages incurred in the Castle & Cooke Incident, including Jayhawk's contract claim for diminution in N910VP's value against WAW.

On November 2, 2018, in the Castle & Cooke Litigation, WAW secured a jury verdict in the amount of $2,464,560.00 on its claim for lost profits resulting from the damage to N910VP plus an attorneys' fee award of $1,849,615.65. This judgment is on appeal.

## LEGAL STANDARD

The rules applicable to summary judgment are well-established and are only briefly outlined here. Federal Rule of Civil Procedure 56(c) directs the entry of summary judgment in favor of a party who "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor. *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006).

When presented with a motion for summary judgment, the Court must decide "whether there is the need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact

because they may reasonably be resolved in favor of either party." ***Anderson v. Liberty Lobby, Inc.***, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). If so, the Court cannot grant summary judgment. ***Prenalta Corp. v. Colo. Interstate Gas Co.***, 944 F.2d 677, 684 (10th Cir. 1991).

The initial burden of proof rests with the movant, who must show the lack of evidence on an essential element of the claim. ***Thom v. Bristol-Myers Squibb Co.***, 353 F.3d 848, 851 (10th Cir. 2003) (citing ***Celotex Corp. v. Catrett***, 477 U.S. 317, 322-23, 325 (1986)). If the initial burden is carried by the movant, the responding may not simply rest on its pleading but must instead set forth specific facts that would be admissible in the event of trial from which a rational trier of fact could find for the nonmovant. *Id*. (citing Fed.R.Civ.P. 56(e).)

Such facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits; conclusory allegations alone will not survive a motion for summary judgment. ***Mitchell v. City of Moore***, 218 F.3d 1190, 1197 (10th Cir. 2000) (citing ***Adler v. Wal-Mart Stores, Inc.***, 144 F.3d 664, 671 (10th Cir. 1998)). All evidence and reasonable inferences will be viewed by the Court in the light most favorable to the party opposing summary judgment. ***LifeWise Master Funding v. Telebank***, 374 F.3d 917, 927 (10th Cir. 2004). The Court will not "evaluate the credibility of witnesses in deciding a motion for summary judgment." ***Seamons v. Snow***, 206 F.3d 1021, 1026 (10th Cir.2000); ***Zia Trust Co. ex rel. Causey v. Montoya***, 597 F.3d 1150, n.2 (10th Cir. 2010).

## ANALYSIS

### I.      Breach of Contract (Count I).

Under Kansas law, the elements of a claim for breach of contract are: "(1) the existence of a contract; (2) sufficient consideration supporting the contract; (3) the plaintiff's performance or willingness to perform in compliance with the contract; (4) the defendant's breach of the contract; and (5) damages to the plaintiff resulting from the breach." *3-B Cattle Co., Inc. v. Morgan*, No. 18-1213-EFM, 2019 WL 7116090, *3 (D. Kan. Dec. 23, 2019). The parties agree that Kansas law should govern this cause of action. (*See* Doc. 40, at 43; *see also* Doc. 29, at 2.)

As to WAW's breach of contract claim, Jayhawk does not seek summary judgment on the allegation that Jayhawk breached the August 2017 Dry Lease, Side Letter No. 1, and Side Letter No. 2, by failing to pay for goods and services procured through WAW's vendor accounts. Rather, Jayhawk argues that it is entitled to summary judgment on WAW's claim that Jayhawk breached the contract between the parties by not consummating the terms of the August 14, 2017, Agreement and Side Letter Agreements to purchase the membership interest in WAW. The covenant from the Side Letter Agreement No. 2 at issue provides that WAW and Jayhawk "shall continue to work in good faith to timely conclude the transfer of majority ownership of [WAW] to [Jayhawk]." (Doc. 36-7, sealed.) Jayhawk argues that with this theory of recovery, WAW is attempting to enforce an agreement to make a contract in the future. (Doc. 33, at 26.)

Agreements to make a contract in the future are not binding unless all the terms and conditions are agreed upon and nothing is left to future negotiations. *See Dougan v. Rossville Drainage Dist.*, 270 Kan. 468, 487-88, 15 P.3d 338 (2000); *Weil and Associates v. Urban Renewal Agency*, 206 Kan. 405, 414, 479 P.2d 875

(1971).) Jayhawk contends the uncontroverted facts establish that the parties "had not agreed on all the terms and conditions of a contract for sale and purchase of an interest" in WAW, thus entitling Jayhawk to summary judgment on this breach of contract claim. (Doc. 33, at 27; Doc. 47, at 38.)

WAW responds that Jayhawk misrepresents the premise of WAW's breach of contract claim. According to WAW, it is not attempting to enforce an agreement to make a contract in the future. Rather, WAW contends that Jayhawk breached the express provision set forth in Side Letter Agreement No. 2 by acting in bad faith. (Doc. 40, at 45.) WAW argues that Jayhawk breached the covenant by unilaterally terminating the parties' relationship and demanding payment for the remaining half of the walkaway fee under the 2016 Dry Lease. (Doc. 40, at 45.)

WAW correctly points out that the duty of good faith has been "described as a duty to do everything necessary to carry out the contract." *Cargill Meat Sols. Corp. v. Premium Beef Feeders, LLC*, 168 F. Supp. 3d 1334, 1345 (D. Kan. 2016). WAW acknowledges that most authority describing "good faith and fair dealing" is in the context of an implied duty of good faith but contends the circumstances before the Court – in which there is an express, written agreement between the parties to work in good faith – are analogous. WAW is correct that the purpose behind the good faith doctrine is to force the parties to perform consistently "with their intentions and expectations which are embodied, expressly and impliedly, in the terms of their agreement. For example, the duty of good faith could be breached by one party exercising its discretion for purposes not reasonably contemplated or assumed as a risk by the other party." (Doc. 40, at 46

16

(quoting ***Bank IV Salina, N.A. v. Aetna Cas. & Sur. Co.***, 810 F. Supp. 1196, 1204 (D. Kan. 1992) (emphasis added)).

WAW contends "it became inconvenient for Jayhawk to continue to work in good faith with WAW towards closing on the Membership Interest Transfer and Jayhawk wanted out.  Such conduct constitutes bad faith."  (Doc. 40, at 46.) WAW continues that Jayhawk's breach of the August 2017 Dry Lease and Side Letters is not because Jayhawk failed to follow through on its promise," but rather because Jayhawk acted in bad faith, making summary judgment improper.  (*Id*.)

WAW also urges support for its breach of contract claim in an alleged oral agreement which was partially executed by the payment of $125,000 of the additional charted fee.  Jayhawk argues that because WAW has realized it "cannot sustain a cause of action based on a contract to make a contract," WAW now contends its claim based upon a separate enforceable oral agreement.  (Doc. 47, at 38.)  According to Jayhawk, WAW's counterclaim and the Pretrial Order both establish that WAW's breach of contract claims allege no agreements other than the August 2017 Dry Lease and Side Letters as a basis for these claims.  (*Id*.)

The existence of an oral agreement is referenced in WAW's Factual Contentions in the Pretrial Order:  "WAW further asserts that the April 27, 2016[,] Agreement was modified by oral agreement, actions of the parties and substantial performance by the parties of the modified terms."  (Doc. 29, at 9.)  The Factual Contentions also state that "[o]nce Jayhawk began flying N910VP on WAW's Charter Certificate, the Parties' deal was consummated other than the final contractual paperwork." (*Id*., at 11).  The oral agreement is specifically plead in the

Pretrial Order as a defense to Jayhawk's claim for the remaining charter free. (Doc. 29, at 14). However, the claim for breach of an oral contract is not plead in the pretrial order as part of WAW's counter claim. While the oral agreement cannot be the basis for a breach of contract counter claim because it was not plead, the facts surrounding that alleged agreement may be relevant to the breach of the express promise of good faith.

Negotiation consists of efforts by the parties to reach an agreement while each party attempts, through bargaining, to secure an agreement that is most advantageous and favorable to itself. "An agreement to negotiate 'does not require either party to engage in an unremitting effort to get to yes.'" (*Id*., at 38-39 (citing *Howtek, Inc. v. Relisys*, 958 F.Supp 46 (D. N.H. 1997) (internal citations omitted)). A duty to negotiate in good faith does not encompass an automatic duty to approve the final deal. *A/S Apothekernes Laboratorium for Specialpraeparater v. I.M.C. Chemical Group, Inc.*, 873 F.2d 155, 159 (7th Cir. 1989).

The process of good faith negotiation, by its very definition, lends itself to the possibility that the parties will not reach an agreement because each party has the legal right to protect its own self-interests. The covenant of good faith "cannot be used to 'require a party vested with a contract right to exercise that right in a manner contrary to that party's legitimate self-interest.'" *Valley Elec'l Consol., Inc. v. TFG-Ohio, L.P.*, No. 16-0751, 2018 WL 794527, *6 (D. Utah Feb. 8, 2018) (quoting *Brehany v. Nordstrom, Inc.*, 812 P.2d 49, 55 (Utah 1991)). *See also Paramount Brokers, Inc. v. Digital River, Inc.*, 126 F.Supp.2d 939 (D. Md. 2000)

(holding that "it is not bad faith to bargain to its own economic advantage"); ***PSI Energy, Inc. v. Exxon Coal USA, Inc.***, 17 F.3d 969, 972 (7th Cir. 1994) (finding that a contractual "obligation to negotiate in good faith is not an obligation to be kind to one's trading partner or to refrain from taking commercial advantage of the contractual provisions one has negotiated").

Jayhawk argues that, in this context, WAW, as a matter of law, "cannot establish a material fact issue regarding its claim for breach of contract based upon any perceived deficiencies in Jayhawk's contract negotiations." (Doc. 47, at 40.) The Court does not agree. To the contrary, based on the record presented, the Court cannot find that Jayhawk has established, as a matter of law, that there is no genuine issue of material fact as to whether fulfilled its express promise to act in good faith. As such, the Court will weigh the evidence presented by the parties at trial. This portion of Jayhawk's Motion for Summary Judgment is, therefore, **DENIED**.

## II.     **Fraud & Negligent Misrepresentation (Counts II & III).**

Pursuant to Kansas law, the elements of fraud are as follows:

> (1) There was an untrue statement of fact made by the insured or an omission of material fact, (2) the insured knew the statement was untrue, (3) the insured made the statement with the intent to deceive or recklessly with disregard for the truth, (4) the insurer justifiably relied on the statement, and (5) the false statement actually contributed to the contingency or event on which the policy is to become due and payable.

*Chism v. Protective Life Ins. Co.*, 290 Kan. 645, 654-55, 234 P.3d 780 (2010) (citations omitted).  Kansas law follows the Second Restatement of Torts for the elements of negligent misrepresentation:

> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

> (2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

>> (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

>> (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

> (3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

*Mahler v. Keenan Real Estate, Inc.*, 255 593, 604, 876 P.2d 609 (1994).

The Court will address WAW's claims for fraud and negligent misrepresentation together because they rely on the same allegations – that

Jayhawk, through its agents, misrepresented to WAW's vendors that Jayhawk had authority to charge goods and services such as fuel, repairs, landing fees, on these vendors' accounts. (Doc. 8, at ¶ 35.) WAW contends that Jayhawk made the misrepresentations in order to induce WAW's vendors to allow Jayhawk to charge on the vendor accounts and that the vendors relied on this misrepresentation. (*Id.*, at ¶¶ 32-39). WAW further alleges that Jayhawk made false representations to WAW's vendors or supplied them with false information without exercising reasonable or competence in obtaining or communicating the information and that the vendors relied on that false information, allowing Jayhawk to purchase goods and services on the vendors' accounts.

Jayhawk concedes that WAW's contentions "recite the essential elements" for fraudulent inducement and negligent misrepresentation. (Doc. 33, at 27 (citing **Chism** and **Mahler**, *supra*).) Even so, Jayhawk argues the claims must fail as a matter of law because WAW is "essentially attempt[ing] to assert a claim on behalf of its vendors." (*Id.*, at 27-28.) According to Jayhawk, the claims must fail as a matter of law because "[t]here is no contention … that Jayhawk made false statements to [WAW] regarding Jayhawk's authority to purchase goods and services on [WAW's] accounts, or that [WAW] relied upon these false statements to allow Jayhawk to purchase goods and services on its vendors' accounts." (*Id.*, at 28.)

WAW responds that Jayhawk "overlooks WAW's other claims detailing Jayhawk's falsehood." (Doc. 40, at 52.) According to WAW,

> Jayhawk falsely represented to WAW that the remaining
> $125,000 of the walkaway fee under the 2016 Dry Lease
> was no longer owed as a result of the Membership
> Interest Transfer.  Furthermore, Kiser, acting on behalf of
> Jayhawk, intentionally or negligently determined it no
> longer wanted the majority membership interest in
> WAW, yet failed to inform WAW of its intent to end the
> Parties' relationship until Jayhawk had usurped all the
> remaining value from WAW's assets.  Jayhawk's actions
> constitute fraud, or at the very least, negligent
> misrepresentation, which were directed at WAW.

(*Id.*, at 52-53.)

The Court agrees with Jayhawk that WAW "concedes summary judgment be granted on the alleged fraud and negligent misrepresentation claims" regarding the vendors.  (Doc. 47, at 30 (citing Doc. 40, at 52-61).)  The Court also agrees that WAW has now asserted, for the first time, a new claim for "promissory fraud." This claim boils down to WAW's allegation that Jayhawk fraudulently represented its intent to purchase a majority interest in WAW when it never had the intention to do so.

WAW is precluded from now making this new claim because it was not pled in the Counter Claim nor included in the Pretrial Order.  (*See generally* Doc. 29.) The Pretrial Order specifically states that it "supersedes all pleadings and controls the subsequent course of this case."  (*Id.*, at 1.)  *See **Hullman v. Bd. of Trustees of Pratt Community College***, 732 F. Supp. 91, 93 (D. Kan. 1990), aff'd, 950 F.2d 665 (10th Cir. 1991) (citing Fed.R.Civ.P. 16(e)).  Because it failed to include this claim in the Pretrial Order, WAW is precluded from now asserting it to avoid summary

judgment.  The Court thus **GRANTS** Jayhawk's request for summary judgment as to WAW's Claims II and III, Fraud & Negligent Misrepresentation.

### III.    Tortious Interference with Contract or Business Relationships (Count IV).

Under Kansas law, the elements of tortious interference with a contract are:

(1) the contract;

(2) the wrongdoer's [Jayhawk's] knowledge thereof;

(3) [Jayhawk's] intentional procurement of its breach;

(4) the absence of justification; and

(5) damages resulting therefrom.

*Burcham v. Unison Bank Corp., Inc.*, 276 Kan. 393, 423, 77 P.3d 130 (2003). The elements of a claim for tortious interference with existing or prospective business relationships under Kansas law are:

(1) the existence of a business relationship or expectancy with the probability of future economic benefit to [WAW];

(2) knowledge of the relationship or expectancy by [Jayhawk];

(3) that, except for the conduct of [Jayhawk], [WAW] was reasonably certain to have continued the relationship or realized the expectancy;

(4) intentional misconduct by [Jayhawk];

(5) damages suffered by [WAW] as a direct or proximate result of [Jayhawk's] misconduct.

*Macke Laundry Service, Ltd. Partnership v. Mission Assocs., Ltd*., 19
Kan.App.2d. 553, 561, 873 P.2d. 219, 225 (1994).

WAW's tortious interference with contract or business relations relies upon
the same allegations as its fraud claims – that Jayhawk charged goods, repairs, fuel,
fees, and other services to WAW's vendors' accounts without WAW's
authorization or permission.  (Doc. 33, at 29 (citing Doc. 8).)  WAW further
alleges that Jayhawk's actions were improper "and lacked justification" because
they breached the August 2017 Dry Lease, Side Letter No. 1, and Side Letter No.
2.  (*Id.* (citing Doc. 8, at ¶¶ 54, 56.   WAW does not allege that any of its vendors
breached any contract with WAW, nor does it allege it lost any business
relationship with a vendor; WAW merely contends Jayhawk incurred debts without
authority and then failed to pay amounts due and owing to these vendors.  (*Id*.)

Jayhawk is entitled to summary judgment on WAW's claims for tortious
interference with contract or business relationship because WAW has failed to
allege, and cannot establish, that any of its vendors breached any contract with
WAW.  WAW has not alleged, and cannot establish, that it has actually lost any
vendor relationships.  "A resulting breach of contract or actual loss of business
relationship is an essential requirement for any theory for tortious interference"
under Kansas law.  *Classic Comm., Inc., v. Rural Tel. Serv. Co.*, 956 F.Supp. 910,
921 (D. Kan. 1997) (holding that an "action for tortious interference with contract
does not extend to claims of adverse impact or increased burden which fall short of
inducing or causing actual breach.").

WAW argues the application of California state law, which has somewhat different elements to the claim for intentional interference with contractual relations. (*See* Doc. 40, at 56 (citing ***UMG Recordings, Inc. v. Global Eagle Entm't. Inc.***, 117 F. Supp. 3d 1092, 1115 (C.D. Cal. 2015) (holding that "a plaintiff must allege: '(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage.'" (internal quotation omitted).) WAW continues that Jayhawk's argument that WAW "cannot recover under a theory of tortious interference because it failed to show an actual breach of contract or actual loss of a business relationship" is misguided "because California law does not support Jayhawk's position." (Doc. 40, at 56.) Unfortunately for WAW, however, the Pretrial Order clearly states the parties' stipulation that "the substantive issues in this case are governed by the law of the State of Kansas."1 (Doc. 29, at 2.) Even so, WAW's proof of any disruption to a contractual relationship is equally lacking under California, and the Court cannot

---

1 Jayhawk contends that even "[a]ssuming California applies, as a matter of law, [WAW's] alleged injury and damages described above cannot support a claim for tortious interference with a contract or business relationship" because the alleged damages are too speculative. (Doc. 47, at 34-35.) Under California law, the general rule is "damages which are speculative, remote, imaginary, contingent, or merely possible cannot serve as a legal basis for recovery." ***Piscitelli v. Friedenberg***, 87 Cal.App.4th 953, 989, 105 Cal.Rptr.2d 88 (2001). Rather, "[a]n award of damages must be predicated on something more than mere possibilities." ***Regalado v. Callaghan***, 3 Cal.App.5th 582, 602, 207 Cal.Rptr.3d 712 (2016). That stated, ***Piscitelli*** and ***Regalado*** deal with the standard for a fact-finder to award damages at trial. This standard is not applicable an attempt or failure to prove damages as a matter of law as an element of a cause of action at the summary

perceive a theory under these facts that the debts incurred were "designed to induce a breach or disruption of the contractual relationship."

Under Kansas law, a party bringing a claim for tortious interference with a contract or for tortious interference with existing or prospective business relationships is required to prove intentional conduct designed to induce a breach the contract or disrupt the business relationship. *See Classic Comm., Inc.*, 956 F.Supp., at 921 (citation omitted); *Burcham*, 276 Kan., at 423; *Macke Laundry Service*, 19 Kan.App.2d., at 561. It is uncontested that Jayhawk unilaterally terminated the August 2017 Dry Lease and the Parties' agreement with respect to its majority membership interest in WAW. In doing so, Jayhawk precluded WAW from using N910VP as the primary aircraft on its Part 135 Certificate. WAW contends that Jayhawk's actions have significantly damaged WAW's ability to move forward in its relationships with its current vendors, its reputation, and its credit history. (Doc. 40, at 57.) WAW has not, however, proven an "intentional act designed to induce a breach or disruption of the contractual relationship." The facts merely establish that Jayhawk accessed the vendors at issue to fly the aircraft the parties had contracted to fly.

For the reasons stated herein, the Court finds that Jayhawk is entitled to summary judgment as to WAW's Count IV for Tortious Interference with Contract or Business Relationships. This portion of Jayhawk's motion is, therefore, **GRANTED**.

## IV.    Conversion (Count V).

judgment stage.

Under Kansas law, conversion is "the unauthorized assumption or exercise of the right of ownership over goods or personal chattels belonging to another to exclusion of the other's rights." ***Werdann v. Mel Hambleton Ford, Inc.***, 32 Kan.App.2d 118, 124, 79 P.3d 1081 (2003) (citation omitted), rev. denied 277 Kan. 928 (2004); *see also* ***Bomhoff v. Nelnet Loan Services, Inc***. 279 Kan. 415, syl. ¶2, 109 P.3d 1241 (2005). "An action for conversion will not lie for the recovery of an ordinary debt or account." ***Temmen v. Kent–Brown Chev. Co.***, 227 Kan. 45, Syl. ¶ 3, 605 P.2d 95 (1980). WAW again argues the application of California law to this cause of action, but the Court again notes that the Pretrial Order includes the stipulation that "the parties believe and agree that the substantive issues in this case are governed by the law of the State of Kansas." (Doc. 29, at 2.)

WAW alleges that Jayhawk charged goods and services to WAW's vendors' accounts without WAW's authorization and in breach of the August 2017 Dry Lease, Side Letter No. 1, and Side Letter No. 2. (*See* Doc. 8, at ¶¶ 54, 61, 62.) WAW further contends that, "[a]t the time [Jayhawk] was consuming these goods and services for his [sic] Charter operations, WAWE was the true owner of its vendor accounts." (*Id*., at ¶ 60). It continues that Jayhawk "intentionally exercised ownership of WAW's vendor accounts and consumed good and services for N910VP without authorization and to the exclusion of WAW. (*Id*., at ¶ 61).

Jayhawk argues it is entitled to summary judgment on the conversion claim "because there is no material fact issue that any actions by Jayhawk excluded a vendor account from [WAW]." (Doc. 33, at 30.) There is no evidence that the loss

of vendor accounts has impeded WAW's operations.  To the contrary, the evidence is that the only thing keeping WAW from conducting charter operations is locating an aircraft.  Further, Jayhawk correctly asserts that WAW's vendor accounts are intangible property.  Under Kansas law, intangible, as well as tangible, personal property may be the subject of a claim for conversion.  That stated, the intangible property must be merged with tangible property capable of being converted, such as a document or certificate.  Restatement (Second) of Torts §242.

It is true, as WAW argues, that to establish "a claim of conversion under California law, a plaintiff must show 'ownership or right to possession of property, wrongful disposition of the property right and damages.'"  (Doc. 40, at 58 (citing ***Kremen***, 337 F.3d at 1029).)  Like Kansas law, "California law recognizes conversion claims based on a wide variety of personal property, including intangible property such as customer lists and confidential information."  ***Colonial Life & Acc. Ins. Co. v. Stentorians-L.A. County Black Fire Fighters***, No. 13-9235-CAS-FFMx, 2014 WL 794571, *7 (C.D. Calif. Feb. 24, 2014) (citation omitted).

Further, California courts hold that "[p]roperty is a broad concept that includes 'every intangible benefit and prerogative susceptible of possession or disposition.'"  ***Kremen***, 337 F.3d at 1030 (citation omitted).  Thus, pursuant to California law, a court must consider the following factors in determination of whether a property right exists:

> First, there must be an interest capable of precise definition; second, it must be capable of exclusive

> possession or control; and third, the putative owner must
> have established a legitimate claim to exclusivity.

*Id.* Unlike Kansas law, however, there is no requirement under California law of

the existence of a tangible document showing evidence of the plaintiff's ownership

before recovery will be allowed for conversion of intellectual property. *Id.*, at

1031-34.

> California does not follow the Restatement's strict
> requirement that some document must actually represent
> the owner's intangible property right. On the contrary,
> courts routinely apply the tort to intangibles without
> inquiring whether they are merged in a document and,
> while it's often possible to dream up some document the
> intangible is connected to in some fashion, it's seldom
> one that represents the owner's property interest.

*Id.*, at 1033.

According to WAW, "[r]eliable vendors and distribution networks qualify as

intangible assets" owned by WAW. (Doc. 40, at 59.) WAW continues that

> Jayhawk used WAW's name and goodwill to access
> WAW's vendor accounts. Jayhawk charged N910VP's
> charter expenses on WAW's line of credit. Jayhawk
> could not have charged N910VP's charter services on
> WAW's accounts using Jayhawk's name. To the
> contrary, WAW's accounts with its vendors were created
> solely for WAW's use.

(*Id.*) Thus, WAW contends that Jayhawk "wrongfully possessed and used WAW's

intellectual property to the exclusion of WAW," making summary judgment

inappropriate as to this claim. (*Id.*)

Again, however, the parties stipulate in the Pretrial Order that the substantive issues in this case are governed by Kansas law. (Doc. 29, at 2.) Even assuming the applicability of California law, Jayhawk is correct that WAW's conversion claim still fails because it "has not brought forward any evidence or created a material fact issue that Jayhawk's actions resulted in the 'disposition' of the vendor accounts, loss of any vendor account, or otherwise caused WAW injury or damage." (Doc. 47, at 36.) Absent this essential element of the conversion claim, Jayhawk is entitled to summary judgment on this claim. As such, this portion of Jayhawk's motion is **GRANTED**.

## V.     Unjust Enrichment (Count VI).

The essential elements of a claim for unjust enrichment under Kansas law are: (1) WAW conferred a benefit upon Jayhawk, (2) Jayhawk was aware, or had an appreciation of, the benefits, (3) under circumstances making it inequitable for Jayhawk to retain the benefit without payment of its value. *T.R. Inc. of Ashland v. Brandon*, 32 Kan. App. 2d 649, Syl. 4, 655, 87 P. 3d 331 (2004).) Also under Kansas law, "[u]njust enrichment falls under the category of quantum meruit and restitution, and these 'are not available theories of recovery when a valid, written contract addressing the issue exists.'" *Swimwear Solution, Inc. v. Orlando Bathing Suit, LLC*, 309 F.Supp.3d 1022, 1037 (D. Kan. 2018) (citations omitted). Further, "Kansas does not allow an unjust enrichment claim where contractual remedies are available." *Id.*, at 1039 (citation omitted).

WAW's claim for unjust enrichment (Count VI) alleges that Jayhawk used the WAW 135 air carrier certificates to operate its charter business "while

negotiating the final terms of [its] purchase of WAW." (Doc. 8, at ¶ 65.) WAW further alleges that such use resulted in a benefit to Jayhawk in the form of charter revenue, Jayhawk was aware of the benefit it was receiving, and it would be "inequitable" for Jayhawk "to retain the benefit of the use and profits from WAW's 135 air certificate without payment to WAW of the value." (*Id.*, at ¶¶ 66-68).

It is uncontested that WAW contends there is a valid, existing agreement controlling the charter operations of N910VP under the 135 air certificate, the August 2017 Dry Lease, Side Letter No. 1, and Side Letter No. 2. Jayhawk correctly points out that "[u]nder Kansas law, any remedies are controlled by the parties' rights and obligations under this agreement." (*Id.*).

That stated, WAW states that its unjust enrichment claim "is an alternative argument in the event this Court determines there was no binding agreement between Jayhawk and WAW regarding the Membership Interest Transfer." (Doc. 40, at 47.) As discussed above, however, because this alleged oral agreement is not disclosed or identified in any pleadings or the Pretrial Order, WAW is precluded from now asserting it.

WAW also contends in its response brief that Jayhawk was unjustly enriched via the benefits it derived from the charter operations of N910VP, including the payment of rent from charter revenues and maintaining charter operations under WAW's 135 air certificate. As Jayhawk correctly points out,

> [a]ll of these alleged 'benefits' are the result of the charter operations under the August 2017 Dry Lease and Side Letters. Without the August 2017 Dry Lease, there

31

would have been no charter operations using N910VP, and Jayhawk would not have received any of these alleged benefits. In such case, if Jayhawk properly performed under the terms of the August 2017 Dry Lease and Side Letters, it properly received and enjoyed these alleged benefits and they were hardly 'unjust' since they are contemplated by the terms of the August 2017 Dry Lease. If Jayhawk breached the August 2017 Dry Lease and Side Letters, [WAW] has contract remedies. Thus, the parties' rights, obligations, and remedies regarding the charter operations under the August 2017 Dry Lease are controlled by this contract, and [WAW] has no claim for unjust enrichment.

(*Id*., at 41-42.) The Court agrees and **GRANTS** summary judgment as to WAW's claim or unjust enrichment (Count VI).

IT IS THEREFORE ORDERED that Jayhawk's Motion for Summary Judgment (Doc. 32) is **DENIED** as to Count I – Breach of Contract.

IT IS FURTHER ORDERED that Jayhawk's Motion for Summary Judgment (Doc. 32) is **GRANTED** as to Count II – Fraud; Count III – Negligent Misrepresentation; Count IV – Tortious Interference with Contract; Count V – Conversion; and Count VI – Unjust Enrichment.

**IT IS SO ORDERED**.

Dated this 7th day of April, 2020.

s/ KENNETH G. GALE
KENNETH G. GALE
United States Magistrate Judge