05/21/2021     JAYHAWK v. WINDAIRWEST     18-1153     625

1                   IN THE UNITED STATES DISTRICT COURT
                            DISTRICT OF KANSAS
2

3   JAYHAWK 910VP,

4              PLAINTIFF,

5        VS.                         DISTRICT COURT
                                    CASE NUMBER
6   WINDAIRWEST, LLC,                18-1153
                                    VOLUME 4
7              DEFENDANT.

8

9                   TRANSCRIPT OF PROCEEDINGS

10

         On the 21st day of May, 2021 at 9:03 a.m. came on
11  to be heard in the BENCH TRIAL in the above-entitled and
    numbered cause before the HONORABLE KENNETH J. GALE,
12  Magistrate Judge of the United States District Court for
    the District of Kansas, Sitting in Wichita.
13       Proceedings recorded by mechanical stenography.
         Transcript produced by computer.
14

15  APPEARANCES
16
         The Plaintiff, Jayhawk 910VP, appeared by and
17  through:
         Mr. Christopher McElgunn
18       Klenda Austerman
         301 N. Main
19       Suite 1600
         Wichita, Kansas 67202
20
         The Defendant, WindAirWest, LLC, appeared in
21  person, by and through:
         Mr. Scott Schillings
22       Ms. Krystle Dalke
         Hinkle Law Firm -- East Wichita Office
23       1617 N. Waterfront Parkway
         Suite 400
24       Wichita, KS 67206

25

05/21/2021    JAYHAWK v. WINDAIRWEST    18-1153    626

```
 1          (The following proceedings commenced at 9:08 a.m.

 2      and were requested transcribed:)

 3        COURTROOM DEPUTY:  All rise.

 4      United States District Court for the District of

 5 Kansas is now in session.  The Honorable Kenneth Gale,

 6 presiding.

 7        THE COURT:  Thank you.

 8      Please be seated.

 9      Good morning.

10        MR. SCHILLINGS:  Good morning.

11        MR. KISER:  Good morning.

12        THE COURT:  And, Mr. Kiser, you are still under

13 oath.

14        THE WITNESS:  Yes, sir.

15        THE COURT:  And, Mr. McElgunn, you may continue.

16        MR. MCELGUNN:  Excuse me, I forgot to -- I'm

17 sorry, Your Honor.

18      Thank you.

19                    ROBERT KISER,

20 recalled as a witness on behalf of the Plaintiff, having

21 been previously and duly sworn, testified further as

22 follows:

23              CONTINUED DIRECT EXAMINATION

24 BY MR. MCELGUNN:

25 Q.    Mr. Kiser, we left off yesterday by you describing
```

1  some parts of what I'll refer to as the eclipse meeting

2  that occurred on August 21st.

3  **A.      Yes.**

4  Q.      Okay.  I want to back up just a little bit.

5       When did WindAirWest and Jayhawk begin to discuss

6  the fact that Jayhawk -- the potential for Jayhawk

7  getting involved in pursuing a claim against Castle &

8  Cooke?

9  **A.      Um, sometime during the spring of 2017 prior to**

10 **the end of the Dry Lease.**

11 Q.      Now, with regard to the accident at Castle & Cooke

12 did you -- did you believe that you had some form of

13 claim against WindAirWest for breach of the 2016 Dry

14 Lease?

15 **A.      Yes, I did.**

16 Q.      And what sections were your -- did you -- if any,

17 did you have an understanding concerning which that claim

18 arose?

19 **A.      4.2 and 7.0.**

20 Q.      And that would be a claim for diminution in the

21 value of 910VP, correct?

22 **A.      Plus restoration of the aircraft.**

23          THE COURT:  I'm sorry 4.2 and what was the other

24 section?

25          MR. MCELGUNN:  Seven, Your Honor.

05/21/2021    JAYHAWK v. WINDAIRWEST    18-1153    628

1           THE WITNESS:  Yeah.

2           THE COURT:  Thank you.

3  BY MR. MCELGUNN:

4  Q.    Now, if you brought a claim against WindAirWest,

5  where do you believe you would have been able to file

6  that claim?

7  **A.    Here in Wichita, Kansas.**

8  Q.    Okay.  If you brought a claim against Castle &

9  Cooke, what was your understanding of where you would

10 have to file that lawsuit?

11 **A.    L.A. County in California.**

12 Q.    So with regard to getting involved in any

13 litigation then, it was either litigate in California or

14 perhaps litigate in -- in -- in Kansas, depending on

15 which direction you went?

16 **A.    Correct.**

17 Q.    Now, did Jayhawk at that time have the financial

18 resources -- let me step back.

19       Exhibit 422.

20       Now, did WindAirWest request Jayhawk to -- let me

21 get to the -- there we go.

22       Did WindAirWest request Jayhawk to make a -- give

23 a notice of claim to Castle & Cooke's insurer, USAIG, of

24 a claim that Jayhawk had against Castle & Cooke for

25 diminution in value?

05/21/2021    JAYHAWK v. WINDAIRWEST    18-1153    629

1  **A.     There was discussions along those lines.  We were**

2  **trying to preserve our rights in both venues at the time.**

3  Q.     Okay.  And I want to walk you through this email,

4  and I'm starting at kind of the message from me to

5  Chandler White, USAIG, on April 24th 2017.

6         And the letter says that -- or my email says, I

7  have attached a letter that follows up on my February

8  27th, 2017 letter making claim for diminution in -- and

9  that's the serial number for 910VP, right?

10 **A.     Correct.**

11 Q.     And so would you agree that at least by

12 February -- as early as February 27th you were following

13 through with getting potentially involved with a claim

14 against Castle & Cooke?

15 **A.     Yes.**

16 Q.     Now, the date of that email, following up

17 on -- on -- on the Notice of Claim in February 2017 is in

18 April of 2017, and we received a response from Chandler

19 White of USAIG on May 26th, and without getting into it,

20 the Court will be able to see from the document, that

21 he's acknowledging that we did file -- we did present a

22 Notice of Claim and he may have misunderstood it.

23        And then you forwarded that information on May

24 31st to Mr. Simonson and others at WindAirWest, correct?

25 **A.     Yes.**

05/21/2021    JAYHAWK v. WINDAIRWEST    18-1153    630

1  Q.    Okay.  So at least based upon that email string,

2  your involvement -- or Jayhawk's involvement in the

3  dispute with Castle & Cooke began as early as perhaps

4  February and continued -- 2017 -- and continued at least

5  into May, correct?

6  **A.    Yes.**

7  Q.    Now, going into May of 2017 you provided some

8  testimony earlier about the 2016 lease was expiring and

9  you testified that there was some -- some discussion to

10 see if an arrangement could be struck for WindAirWest to

11 continue with some type of lease arrangement that would

12 financially work for both parties.  And emails are in the

13 record.

14      Mr. Simonson emailed you that -- that he was

15 return -- that WindAirWest was returning the aircraft.

16 And at that time, what did you understand about

17 the -- the status of the operations of WindAirWest with

18 regard to employees and -- and other aspects?

19 **A.    It was -- it was my understanding that operations**

20 **were about to cease.**

21 Q.    Did you have any understanding -- what was your

22 understanding with regard to employees and their status

23 with WindAirWest at that time?

24 **A.    I was being told by Lewis Bell that --**

25      MR. SCHILLINGS:  I'm going to object to hearsay.

05/21/2021    JAYHAWK v. WINDAIRWEST     18-1153     631

1              THE WITNESS:  It was my understanding --

2              THE COURT:  Well, yeah, I think that that is

3    probably right.  I'm not sure what you're asking him.

4        If you are asking him what Bell told him about

5    that, then I guess that would be hearsay.  So sustained.

6              MR. MCELGUNN:  I'm going to ask him about his

7    understanding.  I think he can testify to the basis of

8    his understanding.  Whether that statement is true is not

9    being offered for that.

10             THE COURT:  Why is his understanding relevant?

11             MR. MCELGUNN:  Because it fits in with the

12   timeline and it's goes to the negotiations and actions of

13   the parties.  I'll limit it to his understanding.

14             THE COURT:  I'll hear it and decide whether it

15   is relevant on that issue.

16             MR. MCELGUNN:  Right.

17   BY MR. MCELGUNN:

18   Q.    What was your understanding, though, about the

19   status of employees, just your understanding at that

20   time?

21   **A.    That the remaining pilots were no longer**

22   **available, other than Steve Lentz and I -- and it was**

23   **even my understanding that Steve Lentz, Lewis Bell, Jason**

24   **Cain, everyone associated with the operation had been let**

25   **go.**

05/21/2021    JAYHAWK v. WINDAIRWEST    18-1153    632

1  Q.    Now, was that your understanding, was that

2  significant to you at that time?

3  **A.    Yes, it was.**

4  Q.    And why was it significant?

5  **A.    Because that only left one option in terms of**

6  **recovery of the guaranteed lease payment.**

7  Q.    And what was that option?

8  **A.    To collect the $250,000 owed.**

9  Q.    And now there was some discussions between you and

10  Mr. Bell about some arrangement by which Jayhawk and

11  WindAirWest would continue some type of lease

12  arrangement, correct?

13  **A.    Yes.**

14  Q.    Did those discussions change or morph into other

15  potentials?

16  **A.    Yes.**

17  Q.    And what were -- and what were those?

18  **A.    Well, initially the conversation was more focussed**

19  **about WindAirWest continuing to operate the airplane and**

20  **generate revenue -- charter revenue but they had already**

21  **let go their -- my understanding, they had already let go**

22  **the pilots so there was no crew available**

23  **and -- and -- and Clif responded that, you know, he**

24  **wasn't going to go forward with a lease extension but so**

25  **that only left one -- one scenario that seemed viable and**

1  **that was for Jayhawk to step in and start operating the**

2  **aircraft.**

3  Q.    Now there's testimony about the June 8th, 2017

4  proposed Letter of Intent.  And the email is in the -- is

5  in the record.

6        And you had two -- you had two disagreements with

7  this, at least two disagreements with the proposal in

8  the -- in the Letter of Intent, correct?

9  **A.    Yes.**

10  Q.    And I'm leading a little bit because it's

11  in -- in -- already in the record and I want to make sure

12  that I don't take up the time that we have left for the

13  day.

14        What were -- what was the two fundamental

15  disagreements that you had?

16  **A.    Um, primarily it was the diminution claim, and how**

17  **that was going to be resolved.**

18  Q.    And --

19  **A.    And then, secondarily, it was trying to mitigate**

20  **the ongoing losses that would be generated by simply**

21  **holding 910VP.**

22  Q.    Was there -- do you have any -- any concern about

23  how the payment of the guarantee charter fee was going to

24  be handled?

25  **A.    Yes, I did.**

05/21/2021    JAYHAWK v. WINDAIRWEST     18-1153    634

1  Q.     And what was your concern?

2  **A.     That I would never receive it.**

3  Q.     Exhibit 66 is the Common Interest Agreement.

4  We've had testimony about the document and I just want to

5  go to your signature.

6         You signed that on July 14th, 2017, correct?

7  **A.     Yes.**

8  Q.     And why did you sign it on that date rather than

9  earlier?

10 **A.     Um, because I -- I was needing and thought it was**

11 **appropriate to have a good faith payment from WindAirWest**

12 **to join the litigation and have to litigate in**

13 **California.**

14 Q.     And did you receive that payment?

15 **A.     I received $125,000 payment a few days prior to**

16 **this.**

17 Q.     Exhibit 517 is an email to you -- from you to

18 Mr. Simonson and Mr. Bentley and at this point in time it

19 appears the parties are discussing the potential

20 transaction by which Jayhawk would acquire some interest

21 in WindAirWest, correct?

22 **A.     Um, that first sentence there it is specifically**

23 **addressing the ongoing conversations about operating**

24 **910VP under the WindAirWest charter certificate to**

25 **mitigate Jayhawk's losses at that time.**

05/21/2021    JAYHAWK v. WINDAIRWEST    18-1153    635

1  Q.     And the next paragraph talks about Jeff Peier

2  drafting interim Dry Lease Agreement that moves any

3  reference to financial consideration to a separate

4  appendix or schedule.  By doing so, we clearly and

5  unambiguously make the Dry Lease Agreement a no-cost

6  agreement with WindAirWest.

7         And -- and you agree that in your arrangement with

8  WindAirWest with regard to the operation of 910VP was to

9  be at no cost to WindAirWest, correct?

10 **A.     That is correct, that was an expectation that they**

11 **communicated.**

12 Q.     All right.  And would it also be -- what about

13 risk of loss, any type of those obligations?

14 How -- what -- was that part of the no-cost arrangement

15 with WindAirWest?

16 **A.     Yes.  Jayhawk had to assume all risk and exposure**

17 **related to operating the aircraft.**

18 Q.     And then you explain that it's quite common to

19 redact the appendix or schedule with financial details

20 for confidentiality.  And you agree with that, right?

21 **A.     Yes.**

22 Q.     That would be the schedules attached to the Dry

23 Lease?

24 **A.     Yes.**

25 Q.     And I want you to explain the discussions or

05/21/2021    JAYHAWK v. WINDAIRWEST    18-1153    636

1  information -- or the information regarding the next

2  sentence:  We would not fly or operate the aircraft

3  during the Interim Dry Lease Agreement until LLC

4  ownership transfer occurs.

5       What was the status of the discussions amongst the

6  parties regarding operating the aircraft under the

7  Interim Dry Lease?

8  A.     At that moment in time I don't think either one of

9  us were prepared to operate the airplane under the

10 WindAirWest Certificate but we were trying to act in good

11 faith and negotiate the Interest Purchase Agreement and

12 then, in parallel, you try to get everything in place to

13 start generating revenue with 910VP.

14 Q.     In your first sentence you talk about the Dry

15 Lease agreement to facilitate listing the aircraft as a

16 principal aircraft while the LLC ownership interest

17 transfer occurs.  In your mind, was there something

18 significant about at least getting the aircraft on the

19 Part 135 Certificate?

20 A.     Yes, I was led to believe that the Astra had been

21 removed from the Certificate and that 910VP needed to be

22 identified as the primary aircraft, you know, in

23 accordance with the regulatory requirements for

24 operational control.

25 Q.     Now, ultimately, on August 14th, 2017 the

1   parties -- that is Exhibit 5, excuse me -- executed the

2   August 14th, 2017 Dry Lease, correct?

3   **A.      Yes.**

4   Q.     And there -- there are some emails that show that

5   at or about this time or perhaps in advance there was

6   already some actions regarding putting pilots in place,

7   those type of things.

8          Can -- can you explain to the Court why that was

9   being done in advance of or at or about the time of the

10  August 14th Dry Lease?

11  **A.      We fully anticipated starting charter operations**

12  **with 910VP under the discussions that had led up to that**

13  **point to generate revenue and this was just one step in**

14  **the process of preparing to operate the airplane.   Excuse**

15  **me.**

16  Q.     Put up on the screen Exhibit 6, which is the first

17  Side Letter.

18         And I want to put in front of you or emphasize and

19  identify the first part of the third paragraph where the

20  parties hereby acknowledge and agree that

21  notwithstanding the interim lease being in effect for the

22  purpose of allowing WindAirWest to place the subject

23  aircraft on its Part 135 Air Carrier Operating

24  Certificate as the principal aircraft, and then the

25  parties agree that -- that custody and control of the

1  aircraft would remain with Jayhawk until such time as

2  there would be an agreement and transfer of the -- of the

3  membership interest, ownership interest.

4       With regard to the first phrase, first part clause

5  of the sentence, The parties hereby acknowledge and agree

6  that notwithstanding the interim lease being in effect

7  for the purpose of allowing WindAirWest to place the

8  subject aircraft on the operating certificate, is that

9  consistent with your recollection of the deal between the

10  parties?

11  **A.      Yeah, to follow through with -- with, you know,**

12  **putting the airplane on the certificate and generating**

13  **charter we had to have a Dry Lease Agreement that could**

14  **be shown to the Flight Standards District Office to**

15  **legitimize the operation of the airplane under the**

16  **certificate.  Under the WindAirWest 135 Certificate.**

17  Q.      And the Side Letter, second full paragraph refers

18  to the fact that any type of obligation under

19  the -- under the 2017 Dry Lease regarding those specific

20  items would be the responsibility of Jayhawk and the

21  agreement is that any liability -- there will be no

22  shifting of any liability from Jayhawk to WindAirWest

23  with regard to the aircraft.

24       Did -- does that reflect your understanding of the

25  deal?

1  **A.        Yes, it does.**

2            MR. SCHILLINGS:  I'm just going to object.

3        I don't know what you are talking about "deal."

4  Are you talking about the written agreement or something

5  else?

6            MR. MCELGUNN:  Yes, the written agreement.

7  BY MR. MCELGUNN:

8  Q.    At this point in time.  Correct?

9  **A.        That -- yes, that is the written agreement at the**

10 **time.**

11 BY MR. MCELGUNN:

12 Q.    And you don't dispute that, as you said?

13 **A.        I do not.**

14 Q.    Okay.  Now, going to August 22 -- no, let me back

15 up.

16        There's been testimony, and we agree that in the

17 two exhibits regarding whole insurance, and Exhibit B,

18 more particular, the amount of rent, and the other

19 corporate care costs, that there's no dollar figure in

20 the -- on that exhibit, correct?

21 **A.        That's correct.**

22 Q.    And you -- you agree that under the 2017 Dry

23 Lease, as -- as it existed on the day that it was signed,

24 was there any obligation for WindAirWest to pay rent?

25 **A.        No.**

1  Q.    Was there any obligation for WindAirWest to pay

2  the maintenance program -- program costs?

3  **A.    No.**

4  Q.    Was there any obligation at -- with regard to the

5  Dry Lease and the operation of the 910VP or the potential

6  operation of 910VP that would require WindAirWest or

7  reach in to its pocket to pay -- to pay $1 from its

8  funds?

9  **A.    No.**

10 Q.    Now, you testified about the eclipse meeting?

11 **A.    Yes.**

12 Q.    And your -- and what you understood coming away

13 from that meeting on August 21st about what the -- what

14 was the parties' agreement with regard to what would

15 happen with the revenue generated by the operation of

16 910VP if that would go forward?

17 **A.    All the revenues would be retained by Jayhawk**

18 **910VP and -- and, you know, to cover whatever expenses**

19 **that entity, you know, was obligated to pay.**

20 Q.    And did -- in your discussions at the Eclipse

21 meeting did Mr. Simonson say anything that led to that

22 understanding?

23 **A.    Well, there was an acknowledgment.**

24 Q.    And what was the acknowledgment?

25       MR. SCHILLINGS:  Hearsay.

1           THE COURT:  Overruled.

2  **A.      The acknowledgment was that -- that Jayhawk 910VP**

3  **could retain all the revenue generated from charter**

4  **operations so long as all the expenses were covered, you**

5  **know, in the process, which is memorialized many times**

6  **through this process.**

7  BY MR. MCELGUNN:

8  Q.      And based upon that conversation that you came

9  away with the acknowledgment and your understanding, then

10 you signed the -- signed the Side Letter Agreement on

11 August 22nd?

12 **A.      That is correct.**

13 Q.      Now we have a second Side Letter Agreement No. 2

14 that was signed on August -- on September 14th, 2017.

15 Correct?

16 **A.      Correct.**

17 Q.      And in comparing the two documents, one of the

18 differences is there's no reference in the third full

19 paragraph to placing the aircraft on the Part 135

20 Certificate, correct?

21 **A.      Correct.**

22 Q.      But the Side Letter Agreement No. 2 still has the

23 same reference about Jayhawk assuming full risk of loss

24 and obligations with regard to the operation of 910VP?

25 **A.      In terms of liability, my perspective that is**

1  changed.  There is a difference, though, in that

2  paragraph.

3  Q.    And what is the difference?

4  A.    Operational control.

5  Q.    And what is the difference in operational control?

6  A.    It --

7  Q.    In this Side Letter Agreement?

8  A.    Well, in contrast to the first Side Letter it

9  shifted operational control from Jayhawk 910VP to

10  WindAirWest.

11  Q.    Now after September when you signed the Side

12  Letter No. 2, what -- what steps did you take or what

13  happened, from your perspective, for 910VP for you to

14  operate 910 -- or for you -- for 910VP to be operated to

15  generate revenue under the Part 135 Certificate?

16  A.    Well, part of the purpose for being at Van Nuys on

17  the 21st was for the two new pilots, Ted Snipes and Raul

18  Dsouza to have what is referred to as a check ride with

19  the mapping Flight Standards District Office Operational

20  Inspector which, in fact, occurred that morning of the

21  21st at Jet Aviation in Van Nuys.

22  Q.    What happened?  Were the pilots approved?

23  A.    Ultimately they were approved, yes.

24  Q.    What were the -- can you generally tell us what

25  you recall were the next steps that led up to

1  Jayhawk -- I'm sorry, 910VP being flown for revenue

2  purposes?

3  **A.    Well, after the check ride, the morning of the**

4  **21st, there was a process where the FSDO had to document**

5  **the approval process and that took a couple of days but**

6  **somewhere around the 23rd or 24th, that approval for Ted**

7  **Snipes was received and so that cleared the way to**

8  **actually start generating charter revenue under the**

9  **WindAirWest 135 Certificate.**

10  Q.    So pilots had to be recruited and hired, right?

11  **A.    Yes.**

12  Q.    And approved by the FAA?

13  **A.    And by WindAirWest.**

14  Q.    Okay.  And who was responsible for approving the

15  hiring -- the ultimate hiring and retention of

16  those -- of those pilots?

17  **A.    Well, it was a collaboration between Lewis Bell**

18  **and myself.  Lewis would recruit the candidates.  We**

19  **would have conversation together with the pilots,**

20  **sometimes individually, but we were putting forth**

21  **candidates, you know, that we thought were qualified to**

22  **be able to be approved by Steve Lentz as the Director of**

23  **Operations.**

24  Q.    And to your knowledge were all the pilots that

25  Lewis recruited and you and you and Lewis evaluated and

1  then presented to Mr. Lentz for regulatory approval, were

2  there any pilots that were ultimately hired for

3  flying -- flying 910VP that he, as Director of Operations

4  and chief pilot, did not approve?

5  **A.      No.**

6  Q.      Now, there are a number of emails and other

7  information -- other information that shows that you and

8  Lewis were taking actions and -- and doing work with

9  regard to managing the revenue generating flights by

10 910VP and I expect that there will be some discussion

11 about -- about the fact that WindAirWest reflects that

12 you're taking action under the name of WindAirWest?

13 **A.      I -- I would describe it as we were doing the**

14 **necessary steps to prepare for -- for charter operation**

15 **under, you know, the authority of the WindAirWest**

16 **Certificate.  We were using the WindAirWest Certificate**

17 **for operational control and -- and compliance with the**

18 **regulations to be able to hold the airplane out for**

19 **charter revenue.**

20 Q.      And what was your understanding about whether or

21 not operations could be conducted in the name of Jayhawk?

22 **A.      It wasn't possible.**

23 Q.      And why wasn't it possible?

24 **A.      Jayhawk -- Jayhawk 910VP did not hold a 135**

25 **Certificate.**

1  Q.    Now there was an Intrust Bank checking account

2  that was set up here in Wichita, correct?

3  **A.    Yes.**

4  Q.    And was it -- what was the purpose of that -- of

5  that checking account?

6  **A.    Two-fold:  Number one, collect the revenue**

7  **generated by the charter flights; number two, was to pay**

8  **expenses and -- and make purchases, you know, in the name**

9  **of WindAirWest, you know, as dictated by, um, the**

10 **operational control requirements, you know, of the**

11 **regulations.**

12 Q.    And was that setting up that account approved by

13 anyone -- Mr. Simonson or anyone at WindAirWest?

14 **A.    Yes.**

15 Q.    And who approved it?

16 **A.    Mr. Simonson.**

17 Q.    And -- and what was your understanding would

18 happen to any revenue from those -- in that account that

19 wasn't used for payment of expenses?

20 **A.    Uh, ultimately it would be retained by Jayhawk**

21 **910VP.**

22 Q.    Now one of the genesis of the primary dispute that

23 brings us here today is the fact that there were invoices

24 issued and revenue booked in -- as lease payments,

25 correct?

1  A.      Yes.

2  Q.      And -- and payments of the per hour

3  patient -- Proparts program, correct?

4  A.      Yes.

5  Q.      Why did you do it that way?

6  A.      Um, well, I'm a pretty disciplined person and from

7  an accounting practice for ultimate tax return purposes I

8  thought it was for everybody's benefit to have a record

9  of the distribution of funds.

10  Q.      Okay.

11  A.      Rather than -- rather than just making a

12  distribution to Jayhawk 910VP.

13  Q.      Other than bookkeeping considerations did -- was

14  there any other reason that you booked income or revenue

15  against invoices issued for rent or Proparts payments?

16  A.      I didn't book revenue against, you know, expenses.

17  I mean, there was money coming in to the account and we

18  were writing checks to pay for an assortment of expenses.

19          One of the expenses of operating the airplane was

20  a mortgage payment and I set the lease payment to be

21  equivalent to the mortgage payment and thought that was

22  for everybody's benefit to book it that way.  From a

23  depreciation and from a ultimate, you know, income tax

24  purpose, that was the proper way to book it .

25  Q.      And it stands to reason that if you didn't pay the

1  mortgage you would lose the aircraft?

2  A.    It would have stopped immediately.

3  Q.    And you couldn't operate the aircraft for revenue

4  generating purposes?

5  A.    Or mitigate losses.

6  Q.    So your answer is yes?

7  A.    Yes, sir.

8  Q.    To your recollection, what was the first revenue

9  generating flight by 910VP?

10  A.    August 25th, 2017.

11  Q.    I've called up, Mr. Kiser, Exhibit 541.

12        And it's an email from Steve Lentz to Dean Sibley

13  at the FAA.  Who is Dean Sibley.

14  A.    He was a Flight Standards District Office

15  Principal Inspector for the WindAirWest 135 Air Charter

16  Certificate.

17  Q.    And it is dated September 19th, 2017, correct?

18  A.    Yes.

19  Q.    Obviously.  And this is an email by which he was

20  transmitting the lease agreement for 910VP so that the

21  jet Citation, which would be 910VP, would be designated

22  as the primary aircraft on the certificate and it would

23  be for exclusive use.

24        Before -- do you recall actually receiving this

25  email?

05/21/2021     JAYHAWK v. WINDAIRWEST     18-1153     648

1  A.      Not specifically.

2  Q.      But -- but we know that the record shows that it

3  was sent on September -- September 19th.

4        And looking -- and going down, we have a copy of

5  the Dry Lease Agreement and we have your signature and we

6  have exhibits, correct?

7  A.      Yes.

8  Q.      But the Side Letter No. 1 and agreements No. 1 and

9  No. 2 were not submitted to the FAA, at least according

10 to this email?

11 A.      Correct.  Not by me or to my knowledge, not by

12 Steve Lentz.

13 Q.      At any time did you ever check and see whether the

14 lease was on 910VP during operation?

15 A.      On August 21st was one of the first things that

16 the FAA Inspector Dean Sibley asked for.

17 Q.      And later on during operations I think there was

18 some testimony that a copy of the lease needs to be on

19 the aircraft, correct?

20 A.      I believe that's correct and proper.

21 Q.      During the operations of revenue-generating

22 flights, do you recall knowing or checking whether or not

23 a copy of the lease was actually on the aircraft?

24 A.      I believe we put a -- a clear envelope in the AFM

25 or maybe in -- in, you know, some of the, um, WindAirWest

1 **documents that we carried on the airplane and we -- I'm**

2 **pretty certain we carried it in the closet of the**

3 **aircraft.**

4 Q.     Do you have a recollection of whether the copy of

5 that lease included the Side Letters?

6 A.     **I did not see the Side Letters with the lease**

7 **agreement.  We tried to be very careful about that.**

8 Q.     Okay.  Now at any time did -- well,

9 you -- you -- you knew what checks were being cut and

10 paid and what was going on with the funds deposited in

11 the intrust bank here in Wichita.

12        Was there anyone else that ever asked you, Hey, I

13 would like to see the bank statements?  I want to check

14 with you?  What -- what are you spending the money on?

15        Why aren't -- why -- why am I not receiving any

16 revenue?  What are you doing, Mr. Kiser?

17 A.     **No.**

18 Q.     And, in your mind, did -- did you do anything to

19 hide how you -- how you paid expenses against invoices

20 and how you handled those funds?

21        Did you do anything to cover that up, so to speak,

22 and keep so no one could discover it if they looked at

23 your books and records?

24 A.     **Never.**

25 Q.     Now during your -- you had Lewis, you had Tru

1  Pham.  What was Tru Pham's role with regard to 910VP?

2  A.      At one time she was a direct employee, maybe she

3  was a contractor back under the 2016 Dry Lease, she was

4  working.  Lewis had brought her on at WindAirWest and so

5  she was one of the employees that was let go in June.

6  And Lewis wanted to retain her and so we had ongoing

7  discussions about keeping her and she was Lewis's back up

8  to quote charters.

9          And then she also performed what I would call

10 bookkeeping and recordkeeping services where she was one

11 of the primary interfaces with the fuel vendors to

12 collect invoices, list them on a log that we tried to

13 review on a regular basis to make sure we had proper

14 accounting and payment of invoices as they came in.

15         So she was very helpful in that process.

16 Q.    So when 910VP started

17 revenue-generating -- revenue-generating flights she had

18 to be hired?

19 A.      She was -- she -- we actually gave her advance on

20 salary, in I believe July or early August to try and help

21 her out because she was unemployed and so we felt like

22 she was a key part of the operation.

23 Q.      And then you have pilots that you had -- that

24 had -- that had to be hired and approved by -- by

25 Mr. Lentz, correct?

1  **A.      He had to review their qualifications and**

2  **ultimately, you know, recommend them, you know, to the**

3  **Flight Standards District Office Inspector for approval.**

4           **So if he didn't -- if he didn't concur with the**

5  **recommendation of the pilots and their qualifications,**

6  **then it would never have been submitted to the Flight**

7  **Standards Office.**

8  Q.      To your knowledge did Mr. Lentz ever actually

9  recruit pilots?

10 **A.      No.**

11 Q.      Let me put the time frame.

12          During the time frame of August 2017 through

13 February of 2018, to your knowledge, did Mr. Lentz ever

14 recruit a pilot that was retained during that time

15 period?

16 **A.      No.**

17 Q.      I believe there's been some discussion in this

18 case about finding, hiring, or retaining pilots to fly

19 the Ci -- I'm sorry, 910VP during the time frame of

20 August 2017 through February of 2018.  Can you explain to

21 the Court, was there some challenges?  Did you have some

22 problems?

23          How easy was it for you to find pilots?

24 **A.      Well, it wasn't my role in the operation to seek**

25 **out and recruit pilots.  That was a role that Lewis Bell**

05/21/2021    JAYHAWK v. WINDAIRWEST    18-1153    652

1  **took on for the operation and so I, throughout the**

2  **process, you know, from -- from July clear through the**

3  **end of operations, he was the sole individual at**

4  **WindAirWest trying to recruit pilots for the Certificate**

5  **operation.**

6  Q.    But you would be involved in the process of

7  vetting them, correct?

8  **A.    Yes.**

9  Q.    Okay.

10  **A.    And so Lewis would not have even submitted a name**

11  **to me if he didn't -- if Lewis didn't feel like they were**

12  **qualified.**

13  Q.    Exhibit 582, Mr. Kiser, I placed that on the

14  screen.

15        And we had some testimony from Mr. Lentz about --

16  in this time frame about paying for recurrent training

17  and those type of things and at this point in time, had

18  you -- had you -- I'm sorry.

19        At this point in time had there been further

20  difficulty in finding qualified candidates -- Mr. Lewis

21  finding qualified candidates to consider for hire?

22  **A.    Yes.**

23  Q.    And we'll get into Mr. Lentz just real briefly but

24  on February 14th, 2018 you send an email and you tell

25  Lewis, We need three full-time pilots, not

1  part-time -- part-time Steve.  If we were generating more

2  revenue, I would tend to agree with your suggestion but

3  as it stands right now, I cannot justify extending Steve

4  to FSI.  And what is FSI?

5  **A.        FlightSafety International.**

6  Q.      And that would be where Mr. Lentz would have to

7  undergo his recurrent training?

8  **A.        Yes.**

9  Q.      And then Mr. Bell -- I called him Mr. Lewis.

10         Mr. Bell, excuse me.

11         In that email he agrees with you about the

12  full-time pilots.  Why did you need three full-time

13  pilots?

14  **A.        Lewis's business model included pilot, um, work**

15  **schedule which was 14 days on, seven days off and in that**

16  **kind of a rotation you end up with one week per month,**

17  **sometimes two weeks per month where the airplane was**

18  **sitting idle and -- and so under the best of situations,**

19  **you would get three weeks of flying or holding the**

20  **airplane out for charter but, you know, if there's a**

21  **maintenance event, if someone came down sick, then the**

22  **airplane wasn't available to charter and so if you hired**

23  **one more pilot then it facilitated a rotation that**

24  **provided continuous pilot availability for charter.**

25         **Still have, you know, maintenance events to**

1  **contend with, scheduled inspections, but at least we**

2  **would have three crew members available to support**

3  **continuous charter staffing, charter flight crew staffing**

4  **capability on a given month.**

5       **Without that, you could never hit the projections**

6  **that Lewis provided.**

7  Q.    So he agrees that you need three full-time pilots

8  but then he tells you, To say the hiring pool is thin is

9  an understatement.  But he goes on to explain that he had

10  not seen one candidate since early December from a

11  qualified Citation X.  And of course Citation X pilot,

12  correct?

13  A.    **Correct.**

14  Q.    Is that consistent with your recollection of

15  what -- what Mr. -- Mr. Bell was experiencing in his

16  efforts to locate and approve pilots?

17  A.    **Yeah, it absolutely was and this was on top of**

18  **Raul Dsouza becoming unavailable for almost two weeks in**

19  **the first part of February.  He -- he, without notice,**

20  **ended up not being available for two full weeks, which**

21  **was a significant event.**

22  Q.    Exhibit 583.

23       This is further -- this is additional emails from

24  Mr. Bell -- I get his name correct -- and yourself,

25  regarding pilots.

05/21/2021    JAYHAWK v. WINDAIRWEST    18-1153    655

```
1         And this exhibit is actually -- is actually two
2   emails, including emails involve -- between you and
3   Mr. Lentz, and I want to focus on -- excuse me -- on the
4   page Bates stamped ending in 2685.
5         Does -- it tells you in the second -- second and
6   third sentence of his email that when he agreed to fly
7   the line it was only going to be for a short time fix to
8   fill in for Raul and allow Paul some additional time off.
9   Who is Paul?
10  A.    Paul Eddington.
11  Q.    And was he currently employed with -- as a pilot?
12  A.    Yes.
13  Q.    Okay.  Was he second in command or captain?
14  A.    He was PIC.
15  Q.    Okay.  And for the record, PIC?
16  A.    Pilot in command.  Versus second in command or
17  copilot.
18  Q.    And then he said at that time he agreed to a daily
19  rate of $600.  But his availability would be -- would not
20  be more than seven days a month, as you guys discussed.
21        Do you recall discussing that with him?
22  A.    I -- I recall this email and understanding his
23  position.
24  Q.    He references a Sun Air -- he's involved in Sun
25  Air training contract for $800 a day.
```

05/21/2021    JAYHAWK v. WINDAIRWEST    18-1153    656

1          What was your understanding from your discussion

2  with him as to what he is referring to as the Sun Air

3  training contract?

4  **A.     I believe Sun Air is another 135 charter**

5  **certificate company in -- in -- and since Steve didn't**

6  **have full-time employment he was taking on other**

7  **positions for, you know, compensation.**

8  Q.     And he tells you that he's getting $800 a day from

9  Sun Air, so that is what he wanted to charge for flying

10 the 910VP?

11 **A.     Yes.   Effective March 1st.**

12 Q.     And you respond to him on the 14th, and if you

13 would review the email and explain to us, what was your

14 state of mind this time and what were -- what were you

15 trying to convey to Mr. Lentz?

16 **A.     Well, it's -- Steve was -- and Lewis were talking**

17 **about recurrent training for Steve Lentz and I was**

18 **looking at the timing of the training slot, the**

19 **expenditure associated with the training slot and -- and**

20 **Steve had already gotten to the position where he could**

21 **fly SIC but not PIC and so in order for him to fly with**

22 **Raul or a -- another flight crew member who didn't hold**

23 **PIC, we needed to get him back in to training and it was**

24 **a significant cost at that moment in time.**

25 Q.     And what is your understanding with the cost at

05/21/2021    JAYHAWK v. WINDAIRWEST    18-1153    657

1  that point in time for that training?

2  **A.    That would have ranged, you know, between 25 and**

3  **$30,000.**

4  Q.    And -- and he later that day thanked you for the

5  update.

6      Did you have any further conversations with

7  Mr. Lentz on this subject matter that you recall after

8  February 14th?

9  **A.    Uh, no, I don't.**

10 Q.    At some point in time Mr. Eddington resigned his

11 duties, is that accurate?

12 **A.    Correct.**

13 Q.    Do you recall the date?

14 **A.    I believe it was March 26th.  Excuse me, February**

15 **26th, 2017.  2018.**

16 Q.    And do you recall anything about the circumstances

17 surrounding his resignation?

18 **A.    He provided no notice.**

19 Q.    Of his resignation?

20     He -- had he flown the day that he resigned?

21 **A.    Yes, with Steve Lentz.**

22 Q.    And -- and do you recall the mission?

23 **A.    Not off -- yes, I do because it -- it terminated**

24 **in Farmingdale -- no, I don't.  I do not remember, I'm**

25 **sorry.**

1  Q.      Now, Mr. Kiser, during the time period of July of

2  20 -- 2017 up to November of 2017 the parties were

3  discussing negotiating and exchanging drafts of a

4  potential agreement that, if consummated, Jayhawk would,

5  or its designee, would agree a majority membership

6  interest in -- in WindAirWest, correct?

7  **A.      Are you referring to the Interest Purchase**

8  **Agreement?**

9  Q.      Yes, sir.

10  **A.      Yes.**

11  Q.      Okay.  And did you have any understanding that the

12  operation or the operation of 910VP to fly

13  revenue-generating flights was linked in any way to the

14  negotiations that were going on and any ultimate

15  agreement that might be struck concerning the purchase of

16  the membership interest?

17  **A.      Um, no, there was no correlation or relationship.**

18  Q.      Okay.  In your mind if, you know -- strike that.

19         However, did the -- did your involvement with

20  910VP's revenue-generating flights from August through

21  February -- through February provided you any information

22  as to whether or not you would ultimately enter an

23  arrangement or a contract for the purchase of a majority

24  interest in -- in WindAirWest?

25  **A.      It -- it was my desire through that period of time**

1 to acquire the Certificate.

2 Q.    And did you learn anything from -- from the

3 operations of 910VP during that time frame that had

4 weighed -- weighed in on whether or not you were going to

5 go through and ultimately -- ultimately purchase majority

6 interest in WindAirWest?

7 A.    There was any number of things that you observed

8 as you go through time being able to witness firsthand

9 and be a participant getting business decisions about the

10 certificate operation.  It provided a lot of visibility

11 about risk associated with the Certificate; about

12 challenges, but then it also showed you what kind of

13 revenue could be generated by the certificate if it was

14 properly staffed and -- and you didn't stumble along the

15 way.

16 Q.    You were here for testimony of Mr. Dahl who

17 presented an analy -- what I call an income statement

18 analysis of the operation revenue generation and expense

19 occurred during the time period of August of -- August of

20 2017 through February 2018.  Do you recall his testimony?

21 A.    I do.

22 Q.    Do you recall the schedule that was presented in

23 his testimony and presented to the Court?

24 A.    There were multiple schedules, I generally

25 understand them.

05/21/2021    JAYHAWK v. WINDAIRWEST    18-1153    660

1  Q.    And he gave an opinion about perhaps the quality

2  and -- and the -- and the positive aspects of 910VP's

3  revenue generation that led him to -- to an opinion

4  regarding the profit that was generated at the end of the

5  day, at least as through February 2018.  Did you agree

6  with his assessment?

7  **A.    There were aspects of it that were proper and**

8  **correct.  The references out of the Conklin & de Decker,**

9  **that was appropriate.**

10      **But I thought his assessment of what was**

11 **achievable from a flight hour standpoint, um, was**

12 **exaggerated and it didn't take into consideration**

13 **staffing of the airplane and reliability of the airplane.**

14 Q.    What do you mean by the "reliability of the

15 airplane"?

16 **A.    Something breaks and -- and you're at the starting**

17 **line to start a charter and you can't perform and -- and**

18 **the client has paid you a, you know, tens of thousands of**

19 **dollars to charter a flight and the implications of that.**

20 Q.    And he gave some testimony that he did not

21 consider the existence of accounts payable in his

22 analysis, correct?

23 **A.    Yes.**

24 Q.    And is the lack of that consideration significant

25 to you in your assessment of the performance of 910VP?

1  A.      Very significant.

2  Q.      Will you explain that to the Court.

3  A.      We had an agency then in February of 2018, it was

4  a -- during a revenue-generating flight from Carlsbad to

5  the Pittsburgh, Pennsylvania area and in the final 30

6  minutes of the flight one of the air cycle machines which

7  provides cabin pressurization started to fail.

8  Q.      And what was the cost of that -- ultimate cost of

9  that unexpected -- direct -- direct unexpected cost of

10 that maintenance event?

11 A.      Well, it went into the Textron Service Center in

12 Newburgh, New York and during the inspection process they

13 took it upon themselves to not only inspect the air cycle

14 machine that was generating smoke in the cabin but they

15 also decided to inspect the second air cycle machine on

16 their own initiative and found a discrepancy where they

17 deemed it unairworthy and so we ended up in a very

18 difficult situation where we were looking between 100 and

19 $110,000 event to get the airplane back up and flying.

20         MR. MCELGUNN:  Your Honor, if we would want to

21 take a break, this would be a good time.

22         THE COURT:  Okay.  We'll take ten minutes.

23         COURTROOM DEPUTY:  All rise.

24     (Recess taken.)

25         COURTROOM DEPUTY:  All rise.

05/21/2021    JAYHAWK v. WINDAIRWEST    18-1153    662

1          THE COURT:  Thank you.

2       Please be seated.

3       Mr. McElgunn.

4  BY MR. MCELGUNN:

5  Q.    Mr. Kiser, with regard to the 910VP's performance

6  from August 2018 through February 28th of 2018 did you

7  ever do an analysis -- a realization analysis?

8  **A.    I did.**

9  Q.    And what is a -- what is a utilization analysis in

10  your mind?

11  **A.    Um, it's reviewing the flight logs, and looking at**

12  **the month-to-month utilization of the airplane.**

13  Q.    And what did you draw -- what conclusions did you

14  draw in your analysis?

15  **A.    Well, I went back to January of 2017 when**

16  **WindAirWest was operating the airplane under the 2016 Dry**

17  **Lease and I looked at those five months of performance to**

18  **assess how many hours per month the airplane was flying,**

19  **how many of those flights were revenue-generating flights**

20  **versus reposition flights versus maintenance flights to**

21  **draw a conclusion about that period of time and then also**

22  **the -- the period of time that we were operating the**

23  **airplane in the -- under the 2017 Dry Lease Agreement.**

24  Q.    And what was your conclusion in that regard?

25          MR. SCHILLINGS:  I am going to object.  This

 1  crosses over into sort of expert opinion and it wasn't

 2  disclosed.

 3          MR. MCELGUNN:  Your Honor, it's his own analysis

 4  of the performance of the business that factors into his

 5  actions.

 6          THE COURT:  I'm not -- I don't know whether he's

 7  going to be right or not about any of this but if it is

 8  something he thought and did at the time I think it's

 9  relevant, so overruled.

10  **A.      So in that -- in that five-month period under the**

11  **2016 Dry Lease they were averaging around 42 to 43 flight**

12  **hours -- total flight hours per month and then in that**

13  **three or four-month period in the Fall of 2017, it turned**

14  **out that it was almost identical.**

15  **Under the 2017 Dry Lease the airplane was being**

16  **flown about 43 hours to 44 hours per month, which**

17  **included, you know, non-revenue generating flights.**

18  BY MR. MCELGUNN:

19  Q.      Going back then to talk a little bit about the

20  dealings and negotiations between the parties on the

21  potential agreement and acquisition -- and I'm sorry,

22  Jayhawk's acquisition of an interest in WindAirWest --

23  and those discussions started to take place in -- in the

24  spring and summer of 2017 and there were a number of

25  draft agreements and that were exchanged amongst the

1  lawyers, right?

2  **A.      Yes.**

3  Q.      And you had -- did you have ongoing face-to-face

4  or personal discussions either by email, telephone or

5  face-to-face with individuals associated with

6  WindAirWest --

7  **A.      Yes.**

8  Q.      -- during that time period?

9         Who did you speak with?

10 **A.      Well, you know, we had the conversation at the**

11 **beginning of the charter on the 21st and it was talked**

12 **about at some level and then there was drafts being**

13 **exchanged between Ms. McCormick and Mr. Peier which**

14 **culminated in a suggestion by Jeff Peier to meet with**

15 **Clif Simonson and have a meeting of the minds about the**

16 **Interest Purchase Agreement.**

17 Q.      During the -- during the -- during the

18 negotiations, what issues were you concerned -- were the

19 primary issues that you were concerned with addressing?

20 **A.      Well, in the Interest Purchase Agreement, the one**

21 **issue that we could never come together on was the**

22 **diminution claim.**

23 Q.      And -- and what were -- what was your goal in the

24 negotiations?

25 **A.      I wanted to consummate the deal.**

05/21/2021    JAYHAWK v. WINDAIRWEST    18-1153    665

1  Q.    I'm sorry, with regard to the diminution claim?

2  **A.    Well, there -- there was no clear path forward to**

3  **how the diminution was going to be resolved.  You know,**

4  **going to California and litigating the diminution claim**

5  **with Castle & Cooke had its own set of challenges and so**

6  **it was a very difficult situation and I wanted some form**

7  **of -- of minimum, you know, um, performance related to**

8  **the diminution claim.  And -- and that's part of what**

9  **that Side Letter to the Interest Purchase Agreement was**

10 **about.**

11 Q.    The one regarding the escrow?

12 **A.    Yes.**

13 Q.    And do you recall there was discussion about

14 funding that escrow through the sale of the Astra

15 aircraft?

16 **A.    Yes.**

17 Q.    And what was your position on that being an

18 acceptable term?

19 **A.    It -- it was just there was no, um -- there was**

20 **no, I guess, commitment to it.  The airplane wasn't sold,**

21 **there was no commitment about when it was going to be**

22 **sold, um, there was no commitment that the funds from the**

23 **sale of the Astra would, in fact, come -- come to that**

24 **escrow because those -- like Winglet Tech -- excuse me,**

25 **like Jayhawk 910VP, WindAirWest was litigating with**

05/21/2021    JAYHAWK v. WINDAIRWEST    18-1153    666

1  **Castle & Cooke and everybody was -- was struggling to**

2  **finance attorney fees at that time.**

3  Q.      Your recollection, when did Jayhawk file suit

4  against Castle & Cooke in California?

5  **A.      I believe it was in October.**

6  Q.      Okay.

7  **A.      Of 2017.**

8  Q.      Okay.  Was there anything -- there's been some

9  testimony about -- or considerable testimony about

10  Exhibit 113, which is the November 20th, 2017 email and

11  this -- a proposed draft of the various agreements.

12         In your mind, other than the parties coming to a

13  final agreement -- formal agreement as to all the terms

14  and conditions and obligations that -- that were

15  acceptable, was there anything else outstanding in your

16  mind that you needed before you were -- you were

17  comfortable with agreeing or signing off on any

18  agreement?

19  **A.      Just the due diligence that I was relying on my**

20  **counsel to provide in terms of, um, obligations of the**

21  **WindAirWest entity and what the exposure was there.**

22  Q.      Did you feel like you had to -- did you -- did you

23  feel like you had any duty in your position to make sure

24  that no matter what you had adequate information to

25  assess all those -- all those issues?

05/21/2021    JAYHAWK v. WINDAIRWEST    18-1153    667

1  A.      From my perspective, you know, when you're the

2  managing member or president of the company, you have an

3  obligation to lookout for all members' best interests.

4  Q.     And --

5  A.      Winglet Technology, 910VP and all the members

6  beneath those two entities, I had an obligation to look

7  out for their best interests.

8  Q.     Now, there's a reference in -- in Mr. Peier's

9  email that Bob asked to -- asked -- you asked Jeff to

10  remind Ms. McCormick about your request for all tax

11  returns and relevant contracts.

12         Did you ever receive those?

13  A.      No.

14  Q.     There's a reference also about you having a plan

15  to meet with Clif Simonson later today on the 20th to

16  discuss the agreements.

17         Did that -- was a meeting scheduled to do that?

18  A.      Yes.

19  Q.     And tell me about your recollection of the

20  scheduling of that meeting, what you did, how -- what

21  took place, if anything.

22  A.      Well, I remember the -- the date and the effort to

23  do that because that was the date that Paul Eddington was

24  being brought online as a new WindAirWest pilot, that was

25  the day that he was scheduled to do his first check ride

1   with the FAA, and Paul had come to Wichita, along with

2   Raul to pick up 910VP coming out of maintenance and the

3   airplane was flown from Wichita to Van Nuys, and during

4   the course of that day, we wanted to accomplish two

5   things:

6          We wanted to get the crew settled and, you know,

7   get the check ride accomplished; and while I was in Van

8   Nuys, I wanted to speak with Lewis -- um, excuse me, with

9   Mr. Simonson, um, about the ongoing Interest Purchase

10  Agreement and in conversations I had been having with

11  Robert Cherlberg.

12  Q.    Did that -- did that meeting -- actual meeting

13  take place?

14  A.    It did not.

15  Q.    And what happened?

16  A.    Well, on the way to the airport, to LAX Airport, I

17  actually took the call from Robert, and Lewis was driving

18  us to the airport and we talked in length with Robert

19  about the status of where we were with the Interest

20  Purchase Agreement negotiations.

21  Q.    Did you speak with Mr. Simonson?

22  A.    No, I did not see Mr. Simonson on the 20th.

23  Q.    Did you see Mr. Simonson after the 20th?

24  A.    I do not believe I ever saw Clif again in person

25  after, you know, that visit to Van Nuys on the -- back on

1 **August 21st.**

2 Q.    So you're saying from August 21st through November

3 20th that you did not have a face-to-face meeting with

4 Mr. Simonson, is that your testimony?

5 **A.    Yeah, not after August 21st.**

6 Q.    Okay.  And I may have missed it in your testimony,

7 sir, but just to make sure.

8      Was it your understanding that Mr. Simonson was

9 going to attend the meeting on November 20th in

10 California and discuss some issues?

11 **A.    It was.  Part of the purpose of me coming to**

12 **California.**

13 Q.    Now, I want to briefly talk about the maintenance

14 event involving the -- the ACM parts.

15      When did that event take place, do you recall?

16 **A.    Yes, pretty distinctly, it occurred on Friday,**

17 **February 16th, 2018.**

18 Q.    And what were the circumstances of -- what

19 happened?

20 **A.    I got a call from a flight crew that they had had**

21 **smoke in the cabin during a revenue charter flight.  And**

22 **it was a trip from Carlsbad, California to a smaller town**

23 **in the Pittsburgh, Pennsylvania area.**

24 Q.    Was the plane ultimately flown somewhere in New

25 York, is that --

05/21/2021    JAYHAWK v. WINDAIRWEST    18-1153    670

1  **A.      Yeah, there's a Textron Service Center in**

2  **Newburgh, New York and so once the airplane got down on**

3  **the ground and the passengers were, you know, provided**

4  **lift to go to their destination, we worked with Jason**

5  **Cain to ferry the airplane over to the Newburgh, New York**

6  **service center.**

7  Q.      Mr. Cain was the designated director of

8  maintenance for --

9  **A.      WindAirWest Director of Maintenance.**

10 Q.      And I think you testified that you ultimately

11 found out it was going to cost a significant amount of

12 money to replace those two components, right?

13 **A.      Very significant.**

14 Q.      And were there issues about the payments of those

15 repairs so the charter flight could continue?

16 **A.      Well, standard practice would --**

17         MR. SCHILLINGS:  I am going to object on

18 relevancy.  This issue is all cleared up and it is not

19 part of the claim that is before us today.

20         I mean, he has talked about it before and he

21 talked about it in terms of his decision to whether to go

22 forward but it's not really relevant to any issues

23 because the parties resolved it.

24         THE COURT:  Where are you going with this?

25         MR. MCELGUNN:  Well, there is a conversation

05/21/2021    JAYHAWK v. WINDAIRWEST    18-1153    671

1  referenced in a email that I suspect is going to be put

2  in front of my -- my -- my witness and I'm trying to --

3  and that email references an event or conversation that

4  took place during this weekend.

5       Now if there's not going to be -- so I am just

6  trying to put it into context as to what happened.

7       THE COURT:  Well, I just, what's it relevant to

8  in the context of your --

9       MR. MCELGUNN:  Context is that it was referenced

10 as part of the events that ultimately were involved in

11 Mr. Kiser's ultimate decision to -- to terminate

12 operations under the 2017 Dry Lease.

13      THE COURT:  So, go ahead.  Let's try to keep it

14 in line, though.

15      MR. MCELGUNN:  Yeah, you bet.

16 BY MR. MCELGUNN:

17 Q.    Was this a -- a holiday weekend?

18 **A.    Yes, it was.**

19 Q.    Were you having an issue getting funds from your

20 bank to pay?

21 **A.    Banks were closed on Monday, February 19th, so**

22 **there was no way we could do a wire transfer.**

23 Q.    Now, were there discussions with Mr. Simonson

24 about coming to some arrangement to make those -- to make

25 that payment so that revenue-generated charter flight

1  could continue?

2  A.    Once we exhausted, um, options to move the

3  airplane with the single air cycle machine operational

4  and -- and the PIC at the time was demanding that the

5  second air cycle machine be replaced, we were faced the

6  challenge of trying to pay the invoice to get the

7  airplane out of Newburgh, New York to finish that charter

8  segment on the 19th of February.

9  Q.    Okay.  And -- and what conversations or

10  what -- what communications did you have with -- with

11  Mr. Simonson about that?

12  A.    Well, after conversations with Lewis about the

13  options available to us, he proposed calling Clif

14  Simonson and asking to charge a portion of the invoice to

15  the WindAirWest open account with Textron Aviation.

16  Q.    And ultimately what did Mr. Simonson tell you

17  about -- about his willingness to do that?

18  A.    Well, there's an email exchange and in the email

19  exchange, you know, Clif Simonson indicates that he needs

20  to talk to Ted and he would get back with me.

21       We ultimately talked on the 18th, I believe, and

22  in that conversation Mr. Simonson proposed a modification

23  to the obligation -- existing $125,000 obligation.

24  Q.    And what was that proposal?

25  A.    He was going to, um, provide $75,000 payment to

1  **Textron New York in exchange for forgiveness of $50,000**

2  **of the $125,000 guaranteed charter payment that was still**

3  **outstanding.**

4  Q.    Let's -- let's go back to the date that you

5  terminated operations under the 2017 Dry Lease.

6       Do you recall the date?

7  A.    **I believe it was the 26th of February, 2018.**

8  Q.    And that would have been the day that

9  Mr. Eddington -- Mr. Eddington resigned, right?

10 A.    **Yes.**

11 Q.    And did -- at that point in time did you have any

12 pilots available for charter flights?

13 A.    **We had no PIC available because at that time Steve**

14 **could only fly as SIC.**

15 Q.    And so you terminated operations?

16 A.    **Yes.**

17 Q.    Or terminated the Dry Lease, correct?

18 A.    **We provided notice in accordance with the Dry**

19 **Lease Agreement that it was being terminated.**

20 Q.    And what was your understanding of the termination

21 provisions of the -- of the 2017 Dry Lease?

22 A.    **In terms of notice requirements?**

23 Q.    Yes.

24 A.    **There were none.**

25 Q.    Um --

05/21/2021    JAYHAWK v. WINDAIRWEST    18-1153    674

1   **A.      There was no advanced notice required.**

2         MR. MCELGUNN:  I have no further questions, Your

3   Honor.

4         THE COURT:  Thank you.

5      Mr. Schillings or --

6         MR. SCHILLINGS:  Yes, please.

7         THE COURT:  -- Ms. Dalke?  Either way.

8                   CROSS-EXAMINATION

9   BY MR. SCHILLINGS:

10  Q.    How you doing, Mr. Kiser?

11  **A.      I'm good.  It's nice to -- it's been a pleasure to**

12  **get to know you this week.**

13  Q.    Thank you.  I hope you say that later.  It's been

14  nice talking to you.

15        Let's -- why don't we -- my understanding from

16  your testimony, sir, is that on August 21st you reached

17  an oral agreement with Mr. Simonson from which you say

18  you were entitled by that agreement to a rent payment

19  which you then made subsequently every month thereafter,

20  correct?

21  **A.      What -- I believe what I testified was we had**

22  **affirmation about the understanding that had evolved**

23  **through a number of conversations, you know, dating back**

24  **into the first week of June about being able to operate**

25  **the airplane, retain revenue but, you know, the**

1  **obligation for covered expenses resided with Jayhawk**

2  **910VP.**

3  Q.    Okay.  So in other words, you had an oral

4  agreement that's not otherwise reflected in the Dry Lease

5  and Side Letter Agreements that were signed, correct?

6  **A.    Regarding revenue, yes.**

7       MR. SCHILLINGS:  Can you pull up exhibit

8  number -- interrogatory responses, please.  Plaintiff's

9  Exhibit 2.

10      MS. DALKE:  Oh, can you switch?

11 BY MR. SCHILLINGS:

12 Q.    Would you go to the back page verification,

13 please.

14      Is that your signature on the verification page of

15 these responses to interrogatories?

16 **A.    Yes, sir.**

17 Q.    Okay.  And you understand that when you signed

18 that you were signing those interrogatories under oath

19 and representing the answers to be contained therein true

20 to the best of your knowledge?

21 **A.    To the best of my recollection during that**

22 **deposition, yes.**

23 Q.    All right.  Can we go to Interrogatory Number, 5.

24      Interrogatory 5 asks:  Please state whether you

25 entered into any additional and/or subsequent agreements,

05/21/2021    JAYHAWK v. WINDAIRWEST    18-1153    676

1  oral or written, with defendant regarding the lease,

2  charter operations, or any other use of 910VP that are

3  not reflected in the April 26, 2016 [sic] aircraft Dry

4  Lease Agreement.

5        And, if so, please identify all related documents.

6        Your response to that was simply -- and this is

7  subsequent to the 2-16 Dry Lease -- to reference the Dry

8  Lease Agreement, the Side Letter Agreement, and the

9  second Side Letter Agreement, am I reading that

10 correctly?

11 **A.     Yes, sir.**

12 Q.    Did you anywhere in that email -- or, I'm sorry,

13 in that interrogatory response reference this oral

14 agreement that you're now claiming before this Court?

15 **A.     It doesn't appear to.**

16 Q.    Okay.  Did you just forget it?

17 **A.     It wasn't the interrogatory that I was asked.**

18 Q.    You were asked for any agreement subsequent to

19 2016, oral or in writing.

20        And you did not list any oral agreement, correct?

21 **A.     There's no oral agreement listed there, that's**

22 **correct.**

23 Q.    Now, let's talk about the August 21st 2017

24 meeting.  Where -- can you pull up the -- just quickly,

25 the Google thing.

1          I want to make sure we orient ourself to some

2   time.

3          Just so we're clear, the August 21st of 2017 is

4   the date of a solar eclipse which you talked about

5   yesterday and that's how you remember the date of this

6   agreement?

7   **A.     I remember it for other reasons.**

8   Q.     Okay.  But it's -- I'm just trying to establish

9   there's no question that this happened August 21st of

10  2017?

11  **A.     I don't know if there is a question but it stuck**

12  **out in my mind as -- as being correlated.**

13  Q.     Okay.  Now, pull up the Exhibit 5, the Side Letter

14  Agreement.

15         Now, sir, the Side Letter Agreements -- none of

16  the Side Letter Agreements or Dry Lease Agreement are

17  dated as to when they are actually signed, are they?

18  **A.     I -- I don't believe so.  I think if you go down**

19  **to the signature blocks, there's nothing annotated there,**

20  **that's correct.**

21  Q.     Well, you didn't sign -- the Side Letter

22  Agreements which were effective as of August 22nd, the

23  first Side Letter Agreement, you wrote in there August

24  22nd, correct?

25  **A.     That's correct.**

1  Q.    All right.  But that's not the date you signed it,

2  is it?

3  **A.    I --**

4  Q.    Do you recall when you signed the Side Letter

5  Agreements and the Dry Lease Agreement?

6  **A.    Side Letter No.1?**

7  **       Side Letter No. 2?**

8  Q.    Any of them.

9  **A.    I believe I signed it on the 22nd of August.**

10  Q.    Pull up --

11  **A.    They're --**

12  Q.    -- Exhibit 87, please.

13        This is an email from you as of August 29th, 2017.

14        Please find attached the fully executed Dry Lease

15  Agreement dated August 14th, 2017 and Side Letter

16  Agreement dated August 22nd, 2017.

17        Sorry for the delay.  I did not have anyone

18  available last night at the office to sign the Side

19  Letter Agreement.

20        As of Tuesday, August 29th you had not signed the

21  Side Letter Agreement yet, had you?

22  **A.    No, clearly.**

23  Q.    Okay.  So -- 89, please.

24        And here is September 1st -- I can't draw on this

25  thing.

1           Email from you to Mr. Simonson.  The Side Letter

2   and Lease Agreement were signed and sent to you and

3   Heather on 8-29-17.

4           The Side Letter -- well, first of all, Side Letter

5   and Lease Agreement were getting sent on the 29th of

6   August, right?

7           That's when you sent your signed and executed Side

8   Letter Agreement and Dry Lease Agreement.

9   **A.      I believe so.**

10  Q.      Okay.  That's eight days after this agreement that

11  you reference on the solar eclipse day, correct?

12  **A.      It's the email transmitting the documents was**

13  **eight days later, yes.**

14  Q.      Okay.  Well, WindAirWest -- are you -- did

15  WindAirWest get signed agreements at any time before

16  August 29th?

17          Do you have any evidence of that?

18  **A.      They -- they had the August 14th document.**

19  Q.      The August 14th document was the Dry Lease

20  Agreement which you say here you sent on 8-29-2017?

21  **A.      I believe it was sent prior to that.  We certainly**

22  **had it -- we had to have it the day of the check ride or**

23  **else -- and that was one of the reasons that was part of**

24  **the conversation and the source of frustration was the**

25  **representation to Dean Sibley about the primary aircraft**

1  **and we had to have a Dry Lease Agreement to be able to**

2  **make that representation.**

3  Q.    Sir, I'm just reading what you said.

4       The Side Letter and Lease Agreement were signed

5  and sent to you and Heather 8-29-2017.  Did I read that

6  correctly?

7  **A.    That's what the email says, yes.**

8  Q.    All right.  Let's go to the Side Letter Agreement,

9  please.

10       As I under -- I'm sorry, the Dry Lease Agreement.

11       As I understand what you said yesterday, you said

12  the agreements were executed and then you wanted to see a

13  man face-to-face so you know if you had a deal or not.  I

14  can't remember and I'll -- the record will be what it

15  will be, and the judge can read it, but you realize, sir,

16  that paragraph 13.3 of the Dry Lease Agreement provides

17  this:

18       This agreement constitutes the entire agreement,

19  both written and oral, between the parties of their

20  respective representatives with respect to the subject

21  matter hereof and is not intended to confer upon any

22  other person any rights or remedies not expressly granted

23  herein.

24       It shall not be amended or modified unless in

25  writing, duly signed by the parties, and, as of the date

1  of this agreement, terminates and supersedes all prior or

2  independent agreements, understandings between lessee and

3  owner covering the same subject matter.

4         Did I read that correctly?

5  **A.     I believe you did.**

6  Q.    Okay.  So we have two -- there's two things that

7  could have happened here:

8         Number 1, if you reached an agreement August 21st

9  of 2017 with Mr. Simonson on -- in Van Nuys -- Van Nuys,

10  you either subsequently signed this agreement, which

11  eliminates all preceding agreements, oral and

12  writing -- oral and in writing, right?

13        If you signed this on August 29th, that's after

14  you had another agreement?

15  **A.     I didn't sign this on August 29th.**

16  Q.    You sent it to our -- you sent it to our counsel

17  on August 29th, sir?

18  **A.     That's -- that's different --**

19  Q.    Okay.

20  **A.     -- than when I signed it.**

21  Q.    Well, I don't have any evidence of when you signed

22  it.

23        But regardless -- regardless, this -- this clause

24  says this is the entire agreement between the parties,

25  right?

05/21/2021    JAYHAWK v. WINDAIRWEST    18-1153    682

1  **A.      For operational control of the aircraft.**

2  Q.      I --

3  **A.      That's the purpose of the Dry Lease Agreement.**

4  **And it is stated throughout emails prior to this -- to**

5  **you reading this.**

6  Q.      This agreement covers the -- is the Dry Lease

7  Agreement where there's a reference to rent, which you

8  testified not an hour ago there is no obligation to pay

9  rent, maintenance costs, or any costs associated with the

10 plane from -- from WindAirWest under this agreement,

11 correct?

12 **A.      That is correct, yeah.**

13 Q.      And this is to be the entire agreement between the

14 parties and to the extent there are prior agreements, it

15 replaces those agreements, correct?

16 **A.      This is the agreement regarding the Dry Lease**

17 **Agreement and having no liabilities or exposures placed**

18 **on WindAirWest.**

19 Q.      This is the only -- this agreement is signed with

20 the Side Letters and it's the only written agreements

21 that the parties came to during the course of these

22 dealings, correct?

23 **A.      And we also signed Side Letters.**

24 Q.      That's what I mean, the three together.

25 **A.      Yes.**

1  Q.     Okay.  And in sworn interrogatory responses you

2  never referenced an oral agreement, and to the extent you

3  have an oral agreement, it's replaced by this -- by this

4  paragraph?

5  **A.     As it pertains to the Dry Lease, as it pertains to**

6  **the Dry Lease.**

7  Q.     Well, the Dry Lease covers -- I apologize.

8         The Dry Lease covers rent doesn't it, sir?

9  **A.     It does not.**

10 Q.     It has a place for rent?

11 **A.     It places --**

12 Q.     Where there is a zero?

13 **A.     That's right.  Because WindAirWest was not**

14 **obligated to pay Jayhawk 910VP rent.**

15 Q.     Okay.  And to the extent you had a oral agreement,

16 it is superceded by the Dry Lease that covers rent?

17 **A.     Nor did -- nor was there obligation to pay the**

18 **MSB, the Corporate Care, or the Cessna Proparts.  There**

19 **was no financial obligation derived from this agreement.**

20 Q.     Let's go back.  And to the extent you wanted to

21 modify this agreement regarding any of the terms

22 contained therein, it had to be done in writing, duly

23 signed by the parties as of the date of this agreement?

24 **A.     I wasn't trying to modify this agreement.**

25 Q.     I'm just asking you the question.  If you

1  mod -- if you wanted to modify this agreement subsequent

2  to it to add payments, rent for that instance, it would

3  have to be done in writing pursuant to the terms of the

4  agreement?

5  **A.      I had no reason to modify this agreement.**

6  Q.      Sir, your understanding of this agreement is that

7  if you wanted to modify it, it had to be in writing,

8  correct?

9  **A.      That's what the paragraph says, yes.**

10 Q.      Okay.  Thank you.

11         Let's go back to June 2nd of 2016.  Do you agree

12 that that is the date that the plane was returned to

13 Wichita?

14 **A.      I believe it was June 1st.**

15 Q.      Okay.  June 1st or June 2nd the plane was returned

16 to Wichita and you had been noticed that the original Dry

17 Lease was -- was -- was terminated and they weren't going

18 to purchase the plane, right?

19 **A.      Yes.**

20 Q.      At that time you claimed and asserted several

21 times a right to a $250,000 walkaway fee, correct?

22 **A.      It was a guaranteed charter payment.**

23 Q.      Okay.

24 **A.      At least how it was characterized.**

25 Q.      So you asserted in several communications that

1  your demand for a guaranteed -- I'm sorry -- guarantee

2  for the charter payment, correct?

3  **A.      Yes.**

4  Q.      And that was your only claim against WindAirWest

5  at that time?  Correct?

6  **A.      Yes.**

7  Q.      Okay.  And at that time your responsibility

8  regarding Jayhawk and your plane was --

9  **A.      I --**

10  Q.      It was your responsibility?

11  **A.      Can I add something to the previous question?**

12  Q.      Sure.

13  **A.      You said the -- the -- could you repeat the**

14  **previous question, please?**

15  Q.      I don't -- your only claim was to the $250,000

16  guarantee charter payment?

17  **A.      That's not correct.   There was a diminution claim**

18  **also in play.**

19  Q.      There was a diminution, which actually was

20  satisfied subsequently and -- and no -- and that was paid

21  for by Castle & Cooke for $450,000?

22  **A.      Yes, sir.**

23  Q.      Okay.  We'll come back to that in a second.

24          So in addition to the diminution in value claim

25  you had the $250,000 guaranteed charter payment, correct?

1  A.    Yes.

2  Q.    But all of the responsibility for the plane, the

3  operation costs, the ownership costs, everything was now

4  in -- now your responsibility, Jayhawk's responsibility

5  again?

6  A.    Yes.

7  Q.    Okay.  And I think you testified yesterday that

8  there was a downturn in the market with Citations?

9  A.    Yes.

10  Q.    And you didn't have anybody lined up to pay to

11  make any lease payments or any -- any other -- any other

12  charter operation lined up, correct?

13  A.    No, because I was led to believe they were going

14  to purchase the aircraft.

15  Q.    Okay.  But they had the right to terminate the

16  lease, right?

17  A.    Absolutely.

18  Q.    Okay.  So at that juncture you were faced with a

19  plane that you had a two -- high $2 million mortgage on,

20  is that fair?

21  A.    Yes.

22  Q.    Okay.  And you didn't have any way at the time

23  to -- to pay for it, correct?

24  A.    There was no -- there was no, um --

25  Q.    Income coming into Jayhawk?

05/21/2021    JAYHAWK v. WINDAIRWEST    18-1153    687

1   **A.      Or -- or cash sufficient in the account in the**

2   **Jayhawk 910VP checking account to sustain, you know,**

3   **operations for any length of time.**

4   Q.      And you referenced yesterday when talking about

5   WindAirWest's condition at the time that you believed the

6   plane was necessary for them in order to maintain their

7   135 Certificate?

8   **A.      That's what I was led to believe.**

9   Q.      Okay.  Well, if Jayhawk [sic] at that time still

10  had the Astra, and it was still on their Certificate,

11  they could have maintained their Certificate without the

12  Citation X, correct?

13  **A.      Jayhawk didn't have an Astra.**

14  Q.      Well, I -- we'll put on evidence about that in a

15  second.

16          Do you have any specific information that you

17  believe shows that they did not have the Astra?

18          THE COURT:  You said Jayhawk.  I think you

19  mean --

20          MR. SCHILLINGS:  Oh, that's -- pardon me.

21  Pardon me.

22  BY MR. SCHILLINGS:

23  Q.      WindAirWest.  If WindAirWest had the Astra, they

24  could still maintain the 135 Certificate without the need

25  of having the 910VP on there?

05/21/2021    JAYHAWK v. WINDAIRWEST    18-1153    688

```
 1  A.     I -- I don't know.  I don't -- I can't answer that

 2  question about what they were intending to do.

 3  Q.     Okay.  Well, but -- but your belief was in

 4  testifying yesterday that if -- that if you pulled the

 5  910 -- if 910 came off the certificate, they might lose

 6  the Certificate because they didn't have another plane.

 7  A.     Yeah, I was -- I was led to believe that the Astra

 8  was unairworthy and not in a position to go back into

 9  charter revenue flying.

10  Q.     Okay.  Well, I don't -- I'll strike to the extent

11  that is hearsay.

12         But in any event, if they had that Astra, if it

13  was on the Certificate, they could maintain the

14  Certificate without the Citation X?

15  A.     I believe so.

16  Q.     Okay.  So, the relative position of the parties at

17  that time was probably Jayhawk needed WindAirWest a

18  little bit more than WindAirWest needed Jayhawk?

19  A.     Is that a question?

20  Q.     Yes.

21  A.     Uh, I believe WindAirWest was looking, you know,

22  for -- for a way to mitigate litigating with Jayhawk

23  910VP over the diminution claim and so both parties

24  were -- were trying to figure out something that worked

25  both directions.
```

05/21/2021    JAYHAWK v. WINDAIRWEST    18-1153    689

1  Q.    And you guys -- you worked, right?

2      I mean, early on you were trying to accommodate

3  one another and you realized that at least with regard to

4  the claims against Castle & Cooke, you were both in the

5  same boat, right?

6  **A.    No.  We're not in the same boat.**

7  Q.    Well, that's exactly right.  Actually, you're the

8  one with standing as the owner of the airplane to pursue

9  Castle & Cooke for a diminution in value claim, correct?

10 **A.    I'm not going to make a legal representation about**

11 **what my -- the standing in California.**

12 Q.    Well, you're the owner, though, right?

13 **A.    Jayhawk 910VP owned the airplane.**

14 Q.    Okay.  So -- so to the extent that there is a

15 diminution in value claim, that belongs to the owner,

16 however you might have been able to seek it under the

17 contract terms of the 2016 Dry Lease against WindAirWest?

18 **A.    I believe that's correct.**

19 Q.    WindAirWest itself, however, do you know if it was

20 told by Castle & Cooke that you don't have

21 standing -- you can't sue us for the diminution because

22 it's not your plane?

23 **A.    I don't know what Castle & Cooke told WindAirWest.**

24 Q.    So the point being, though, you had referenced

25 yesterday in your testimony that WindAirWest was dragging

1  its feet about diminution in value.  As the owner, that

2  was a claim that belonged to you, correct?

3  **A.       Correct.**

4  Q.    As of June 1st, when the plane was returned

5  to -- when the plane was returned June 1st of 2017, you

6  had no interest in WindAirWest at all?

7  **A.       Correct.**

8  Q.    You didn't have any ability to hire and fire

9  pilots?

10  **A.       Nor desire.**

11  Q.    Nor desire.  I mean you had no role in WindAirWest

12  and really didn't have anything other than someone who

13  used to be under contract with?

14  **A.       In -- and obligations remaining.**

15  Q.    Now, on July 12th -- sorry.

16       On or about July 12th you received $125,000

17  payment from WindAirWest regarding part of the

18  walkaway -- the guaranteed charter fee, correct?

19  **A.       I think it was July 11th or 10th.**

20  Q.    In and around that time?

21  **A.       Yes, sir.**

22  Q.    And then after that you started to take steps to

23  operate your plane on the charter?

24  **A.       Yeah.**

25  Q.    Tried to work out a deal?

1  **A.      That was -- that was an understanding between the**

2  **parties that that was an option that we both wanted to**

3  **explore.**

4  Q.      Sir, wasn't it true that I think you testified in

5  your direct this morning that there was never any

6  correlation between what was going on with the Side

7  Agreements and the Purchase Agreement -- sorry, the Side

8  Agreement and the Lease Agreement and the Purchase

9  Agreement?

10 **A.      I believe they were -- they were two separate and**

11 **distinct activities.**

12 Q.      517, please.

13         This is an -- this is the -- July 17th email we've

14 seen several times, but in this paragraph you talk about

15 the Interim Dry Lease Agreement as being no-cost, and

16 then it says, It's quite common to redact -- and then it

17 says, Once ownership transfer occurs, that Interim Dry

18 Lease will be replaced with an arms-length agreement

19 between WindAirWest and Jayhawk.  We would not operate or

20 fly -- fly or operate the aircraft.

21         Isn't it true, sir, that these documents were

22 being worked on at the same time by Mr. Peier and it was

23 a whole situation by which, number one, you get

24 operational control of the aircraft pursuant to the Dry

25 Lease but also, along with it, ultimately the goal was to

05/21/2021    JAYHAWK v. WINDAIRWEST    18-1153    692

1  transfer the certificate to you as owner of WindAirWest

2  pursuant to a Purchase Agreement?

3  **A.      Would you specify the question, the specific**

4  **question you want me to answer?**

5  Q.    Yeah.  Isn't it true that they were always being

6  considered together?  Those two things?

7  **A.      They were -- they were being worked in parallel**

8  **but one wasn't -- wasn't a prerequisite to the other.**

9  Q.    Well --

10        THE COURT:  If you could get a little closer to

11  the microphone, Mr. Kiser, you are just fading away from

12  us a little bit.

13        I appreciate you getting closer.  Thank you.

14  BY MR. SCHILLINGS:

15  Q.    Well, but, sir, you weren't going to get any right

16  to revenue -- or strike that.

17        You didn't get any right to revenue underneath the

18  Dry Lease Agreement and the Side Letter Agreements, did

19  you?

20  **A.      Not from those two agreements, no.**

21  Q.    Okay.  Your entitlement to revenue and to receive

22  the -- the revenue from the operations of WindAirWest was

23  dependent on completing the Purchase Agreement,

24  which -- which specified that the revenue was there?

25  **A.      I don't know any -- any discussion that said that.**

05/21/2021    JAYHAWK v. WINDAIRWEST    18-1153    693

1   **Ever.**

2   Q.    Well, the -- the discussions are -- I mean we put

3   into evidence all of the discussions back and forth and

4   the judge can read that, but all I'm saying is if you

5   were going to take revenue, it wasn't contained in the

6   Dry Leases, it was someplace else.  Right?

7   **A.    The Dry Lease was intended to define operational**

8   **control to satisfy the regulatory requirements.**

9   Q.    And under operational control, all the risks of

10  loss -- loss and the risks of operation and the costs of

11  operation resided with you in Jayhawk?

12  **A.    That is correct.**

13  Q.    Okay.  And it never mentioned anything about what

14  to do with the revenue or net revenue?

15  **A.    It was never intended to.**

16  Q.    Okay.  And that was going to be covered in the

17  Purchase Agreement to the extent that you could reach an

18  agreement on it?

19  **A.    It was not.**

20  Q.    You didn't have any side agreement -- so, again,

21  are you claiming that there was some oral agreement that

22  entitled you to take revenue that you didn't reference in

23  Interrogatory 5?

24  **A.    Yes.**

25  Q.    Or --

1  **A.    Yes.**

2  Q.    And WindAirWest was going to -- well, let me

3  strike this.

4        So you want -- you're claiming that there was

5  another agreement by which you could take revenue to not

6  just rent, and WindAirWest would let you do that without

7  any guarantee to them of -- of anything.

8        I mean, when you did this, do you have a claim

9  still for the 125?  That's why we're here, right?

10 **A.    Yes.**

11 Q.    What -- what happened was, you operated

12 this -- the WindAirWest for seven months; you took

13 $358,000 in rent and or revenue, correct?

14        MR. MCELGUNN:  Objection.  Form.

15        THE COURT:  Overruled.

16 BY MR. SCHILLINGS:

17 Q.    58,000 was your profit and you had $300,000 in

18 rent payments?

19 **A.    I don't know when you say "take," I didn't take**

20 **any profit.**

21 Q.    You paid to Jayhawk $358,000; $300,000 in cash

22 transfers or checks from WindAirWest, right?

23 **A.    There was any number of payments from**

24 **WindAirWest -- the WindAirWest checking account to**

25 **Jayhawk 910VP to pay for credit card bills, to pay for**

05/21/2021    JAYHAWK v. WINDAIRWEST    18-1153    695

1  **mortgage payments, any number of payments that came out**

2  **of that checking account.**

3  Q.    Sir, we put up the detail from your accounts the

4  other day, and I can pull it up if you would like, where

5  there's $300,000 in rent payments on your -- on

6  your -- on your QuickBooks.

7        Are you disagreeing that you did that?

8  A.    **Um, there is one payment that was booked as a rent**

9  **payment that actually wasn't made.  There was a mistake**

10 **made in terms of payment.**

11       **There should have been September through February**

12 **lease payments out of the account to Jayhawk 910VP.**

13 Q.    Do you disagree with the detail that you produced

14 that that's accurate in terms of rent payments that were

15 booked on your -- on your QuickBooks?

16 A.    **I am sorry, what are you referring to?**

17 Q.    The QuickBook.

18       Pull it up.

19       What is it, 50 --

20        MS. DALKE:  Six.

21 BY MR. SCHILLINGS:

22 Q.    Okay.  Right here, sir, there's aircraft lease

23 payments referenced in your QuickBooks detail.

24       Do you disagree that you booked these payments as

25 aircraft lease payments?

05/21/2021    JAYHAWK v. WINDAIRWEST    18-1153    696

1  **A.      Um, there's at least a -- well, there were two**

2  **payments that were made that were booked improperly in**

3  **QuickBooks.  One was 40,000 and one was 20,000.**

4  Q.     And was that in February?

5  **A.     Yes.**

6  Q.     So the $100,000 that were transferred in February,

7  around the time February 14th when you told Steve Lentz

8  you wouldn't send him the recurring, that 60,000 was

9  booked in --

10  **A.     Those aren't tied together at all.  I don't know**

11  **why --**

12  Q.     I'm just trying to reference --

13  **A.     I don't know why --**

14  Q.     I am trying to orient you.

15  **A.     The 56 doesn't help me orient.**

16  Q.     Okay.  February 14th is the date these things were

17  listed?

18  **A.     Okay.**

19  Q.     What are you telling the Court about them?

20         They're not -- they're not lease payments you

21  made?

22  **A.     So there was a -- a transfer out of the**

23  **WindAirWest account first part of the month, $40,000.**

24  **That was intended to be a lease payment.  The lease**

25  **payment wasn't made to the bank until the 14th of the**

1   month.

2        When it came time to make that lease payment I

3   accidentally, from time to time, printed that payment on

4   a WindAirWest check.  And so it drew an extra $40,000

5   from the WindAirWest account to Rose Hill State Bank.

6   Q.     So even if it was a mistake, you still transferred

7   that month from WindAirWest to Jayhawk $100,000?

8        I'm sorry, you made one payment by check for

9   $40,000?

10  A.     To Rose Hill State Bank.

11  Q.     And then you transferred $60,000 from WindAirWest

12  to Jayhawk that was -- that were mistakes -- that were

13  mistakes?

14  A.     During the course of that month, yes.

15  Q.     All about the time, within two weeks of your

16  terminating the deal, right?

17  A.     More important event was the February 16th, you

18  know, in-flight smoke in the cabin event because

19  that -- that drove $100,000 expenditure to get the

20  airplane out of New York which the check, the miswritten

21  check wouldn't have cleared, I wouldn't have identified

22  the problem until we were into that event and trying to

23  determine how to pay for it.

24  Q.     Now, again, back to your right to revenue, as I

25  understand the Court, you're claiming that is an oral

1 agreement and in exchange for them allowing you --

2 WindAirWest allowing you to maintain operational control

3 and exert the rights you've done hiring and firing, we've

4 talked about it through other witnesses, did they get

5 anything from it, vis-à-vis the $125,000 that still

6 remained owed?

7 **A.      Yes.**

8 Q.     Well, you're -- isn't this lawsuit about them

9 paying the $125,000?

10 **A.      That wasn't the question you asked.**

11 Q.     Okay.  I'm asking it now:  Is this lawsuit -- you

12 brought this lawsuit, correct?

13 **A.      Do you want me to answer the previous question?**

14 Q.     I'll withdraw that one.  I am going to do it this

15 way.

16       You brought this lawsuit and sued WindAirWest for

17 $125,000?

18 **A.      Yes, sir.**

19 Q.     And that's what they owed you after they paid the

20 one payment in July 10th or 11th of 2017?

21 **A.      Yes, sir.**

22 Q.     Okay.  But over the course of your operations of

23 WindAirWest from July or August to February, you made

24 withdrawals that exceeded $125,000, did you not?

25 **A.      Yes.  From the WindAirWest Wichita account.**

1  Q.     From the WindAirWest Wichita account and most of

2  that was booked as rent payments?

3  **A.     No.**

4  Q.     Okay.  Well, you booked $300,000 in rent payments

5  keeping in line with what we talked about about the

6  mistakes?

7  **A.     You said most and all --**

8  Q.     There were others, yeah, sorry.

9         So whatever deal you guys had, you made more than

10 $125,000 from WindAirWest out of it, correct?

11 **A.     No.  You said "made."  That infers there's net**

12 **income.**

13 Q.     You paid yourself more than $125,000 in lease

14 payments pursuant to this oral agreement?

15 **A.     I never paid myself anything.**

16 Q.     Paid Jayhawk?

17 **A.     There were funds transferred from WindAirWest to**

18 **Jayhawk 910VP.**

19 Q.     And can we trust the bank records and detail that

20 you provided with the proviso regarding the mistake made?

21 **A.     Yes.**

22 Q.     From mid-July through February 26th of 2017, you

23 never made any written demand for the remaining $125,000

24 owed on the walkaway -- on the -- guaranteed charter fee?

25 **A.     No, sir.**

1  Q.     You didn't assert that until you terminated the

2  deal February 26th of 2017?

3  **A.     Correct.**

4  Q.     Your termination of the deal on February 26th of

5  2017 --

6  **A.     What deal are you referring to?**

7  Q.     I'm sorry.  The Dry Lease Agreement and all other

8  deals that you're referencing.

9        Your termination of the Dry Lease Agreement

10  and -- and the dry -- or Purchase Agreement

11  negotiations -- strike that.

12        Sir, I thought I heard you testify yesterday that

13  the cost of your mortgage and other payments you had to

14  make was $20,000 a month?

15  **A.     No, I did not say that.**

16  Q.     Well, I think the record will reflect that it was,

17  but to --

18  **A.     The mortgage payment was $20,000 a month.**

19  Q.     I think your payments were 20 -- I believe you

20  testified yesterday that your mortgage payment -- I think

21  there were three things you listed and you listed them as

22  $20,000 a month was your required payments you were

23  making as your ownership costs?

24  **A.     Not the mortgage payment.  The mortgage**

25  **payment -- there were other required payments on top of**

05/21/2021    JAYHAWK v. WINDAIRWEST      18-1153      701

1   the mortgage payment, which you may be getting confused

2   with there was an MSP, there was a Rolls-Royce Corporate

3   Care, and there was a -- a Cessna Proparts program, plus

4   a mortgage payment.

5   Q.     And what was the total of all those payments?

6   A.     I would have to think about that for a moment.

7   Q.     Okay.

8   A.     Probably somewhere between 50 and $60,000 a month.

9   Q.     Have you produced any documents in this litigation

10  or in this case -- in this trial showing those payments

11  you had to make?

12  A.     The -- the MSP, the Corporate Care are -- they're

13  in QuickBooks.

14         You know, one of the -- both -- you know, the

15  payment schedules were all different between the

16  different, uh, program costs.  The mortgage payment, I

17  don't have the exact amount in front of me but I think

18  generally it -- I paid 35 to $40,000 over the course of

19  August 2017 to February 2018.

20  Q.     Would you agree with me that a company can operate

21  a plane on a 135 Certificate and actually own the plane

22  without any mortgage at all?

23  A.     There is any number of scenarios.

24  Q.     Okay.  So in other words, there are ownership

25  costs that, like mortgage, that go along with having a

05/21/2021    JAYHAWK v. WINDAIRWEST      18-1153      702

1  plane, correct?

2  **A.     Yes.**

3  Q.     And there's operational costs that go along with

4  keeping the plane flying, correct?

5  **A.     Yes.**

6  Q.     And they're two different things, correct?

7  **A.     Uh -- in ownership it can come in different forms,**

8  **right?**

9  **     You can have a mortgage or you can fully own the**

10  **airplane and be depreciating it so there is always an**

11  **expense, you know, of owning the asset that comes into**

12  **play.**

13  Q.     Okay.  But -- but what I'm saying is you're always

14  going to have -- if you're trying to keep a plane flying

15  you're always going to have operational costs like those

16  costs covered in the Dry Lease, correct?

17  **A.     The Dry Lease does not cover operational costs.**

18  Q.     Well, it lists costs and it doesn't list ownership

19  costs, does it?

20       It doesn't use those words, does it?

21  **A.     It doesn't impose any cost obligation on anybody.**

22  Q.     With regard to the Purchase Agreement and I think

23  the big -- what we've heard repeatedly is the biggest

24  hang up was the diminution in value claim, is that

25  correct?

1    **A.      Yes.**

2    Q.      Okay.  And -- and I think we heard from Mr. --

3    **A.      And I'm sorry.  And due diligence.  Until Jeff was**

4    **satisfied the deal was never going to happen.**

5    Q.      Okay.  Well, Jeff -- Jeff testified yesterday and

6    we went through with him the due diligence issues,

7    correct?

8    **A.      Yes.**

9    Q.      So I'm not going to revisit that.

10        But Jeff actually testified, though, that with

11   regard to the diminution in value issue, the parties had

12   reached an agreement as to the amount of a backstop at

13   300,000, correct?

14   **A.      There was an amount in the agreement of 300,000,**

15   **yes.**

16   Q.      And that was an amount that Jeff Peier had drafted

17   and sent to Heather Ms. McCormick about -- that he

18   proposed and sent to her, correct?  300,000?

19   **A.      Based on conversations that I had with Robert**

20   **Cherlberg and others.**

21   Q.      Okay.  And as I understand your testimony, the

22   issue that you had with regard to the diminution in value

23   claim that you -- that you assert caused you not to want

24   to sign the Purchase Agreement is the timing and the

25   source of that 300,000, correct?

05/21/2021    JAYHAWK v. WINDAIRWEST    18-1153    704

1  **A.     Could you restate that, please.**

2  Q.    Yeah.  I mean, you weren't in agreement -- they

3  wanted to tie the 300,000 diminution claim backstop, if

4  you will, to a sale of the Astra and that -- you weren't

5  happy about that.  You didn't want it that way, correct?

6  **A.     That is correct.**

7  Q.    Okay.  But did you understand that WindAirWest

8  owned the Astra outright?

9  **A.     No.**

10  Q.    Okay.  Did -- and -- and did you have any belief

11  that if they told you they would backstop it with the

12  proceeds from the sale of the Astra, that you wouldn't be

13  able to collect on any shortcoming of your diminution in

14  value?

15  **A.     I -- yes, yes, I was very concerned.**

16  Q.    Okay.  But did you ask them if they owned the

17  Astra outright?

18  **A.     No.**

19  Q.    Okay.  Do you know what an Astra is worth?

20  **A.     Not very much.**

21  Q.    Okay.  How much is it worth?

22  **A.     I don't know.  I know it's --**

23  Q.    Is it more than $300,000?

24  **A.     I don't know.  Depends on the condition of the**

25  **aircraft.**

05/21/2021    JAYHAWK v. WINDAIRWEST    18-1153    705

1  Q.    Okay.  But you didn't pursue any of that with them

2  in discussing the backstopping with the $300,000?

3  **A.    You asked me if I understood whether they owned it**

4  **outright.  I don't.  I don't understand the condition of**

5  **the airplane so I have no idea if it would really bring**

6  **$300,000 against a mortgage.  I -- I just have no idea.**

7  Q.    Sure.  Your February 26th, 2018 email in which you

8  terminated the Dry Lease Agreement and ended the purchase

9  agreement negotiations doesn't reference anything about

10 any due diligence issues as your reason for terminating

11 the Dry Lease, does it?

12 **A.    They weren't connected.**

13 Q.    When you terminated the Dry Lease you terminated

14 any discussions about the Purchase Agreement, too, didn't

15 you?

16 **A.    That -- that was not the intent of the email.  The**

17 **intent of the email was to terminate the Dry Lease**

18 **Agreement.**

19 Q.    Okay.  Let's talk a little bit about assets of the

20 LLC really quick, real quickly.

21 **A.    Which LLC?**

22 Q.    Your LLC.  Jayhawk.

23       My understanding is that you sold -- eventually

24 sold your plane for?

25 **A.    $3.15 million.**

05/21/2021    JAYHAWK v. WINDAIRWEST    18-1153    706

1  Q.     Okay.  3.15.  And that's Plaintiff's Exhibit 141,

2  you actually have attached the -- or you produced the

3  Aircraft Purchase Agreement, correct?

4  **A.     Can I see my signature, please?**

5         **I believe that is correct.**

6  Q.     Okay.  And -- and, actually, you mention the

7  ownership price in answer to your second interrogatories.

8         What was your mortgage on the plane at that time,

9  sir?

10  **A.     I'm -- I'm not perfectly clear, I think it was the**

11  **high $2 million range, just under 3 million.**

12  Q.     139, please.

13         This is your production, American State Bank

14  showing $2,651,000.  Is that -- is that give or take?

15  **A.     At that point in time, yes.**

16  Q.     Okay.  So you made somewhere in the neighborhood

17  of -- I mean we can do the math but 490 some thousand

18  dollars on the sale?

19         I'll do the math if you would like.  I should have

20  had it done in here.

21  **A.     Not hardly.**

22  Q.     How much did you settle -- well, okay, so 3.15

23  million minus 265,638 is 498,362.

24         Do you have any reason to disagree with that?

25  **A.     No.**

1  Q.    So you settled the diminution in value claim for

2  $450,000?

3  A.    Yes.

4  Q.    So I know there is costs associated with selling

5  an airplane but through those two activities you booked

6  to Jayhawk, LLC close to $950,000?

7  A.    Not correct.

8  Q.    My math's incorrect?

9  A.    No the timing of the payments.

10        The diminution -- the money recovered in the

11  diminution claim is what reduced this down to $2.6

12  million.

13  Q.    Okay.  In any event, when you filed the lawsuit,

14  the LLC had an asset and that was your Citation X,

15  correct?

16  A.    Yes.

17  Q.    And WindAirWest filed a counterclaim against

18  LLC -- against your LLC for damages that they think

19  they've sustained in the agreements between the parties,

20  correct?

21  A.    I'm not sure I understand the --

22  Q.    They filed -- they countersued you?

23  A.    Yes.

24  Q.    Okay.  And my understanding is your testimony

25  before this Court is that during the pendency of this

1  litigation where Jayhawk was a defendant and being sued

2  for breach of contract, and among other things

3  originally, you're saying that the LLC now has no assets

4  at all?

5      During the pendency of the litigation?

6  **A.     That's right.  You did not cover any issue of**

7  **other expenses related to the aircraft in your math of**

8  **determining profitability.**

9  Q.     I'm -- and your counsel can cover that with you.

10 I just, I asked the questions I wanted to ask.

11      THE COURT:  So on that last line of questioning,

12 which was not met by relevance objection but I'm fearing

13 cross-examination to try to talk about that, what I would

14 rather do is strike it as irrelevant.

15      Why do I care about that?  For the purpose of the

16 issues before the Court at this time?

17      MR. SCHILLINGS:  Your Honor, for purposes of

18 this -- for purposes of this trial, I'm not sure you do.

19      THE COURT:  I'm going to strike all that

20 testimony about -- about offloading the assets of Jayhawk

21 during the pendency of litigation.

22      MR. SCHILLINGS:  That's fine.

23      I know you don't need my approval.

24      THE COURT:  But I invited you to tell me why it

25 mattered.

05/21/2021    JAYHAWK v. WINDAIRWEST    18-1153    709

 1              MR. SCHILLINGS:  Well, that's not --

 2              THE COURT:  I don't mean it doesn't matter but

 3  why is it relevant?

 4              MR. SCHILLINGS:  For purposes of today that's

 5  creating a record on something else really.

 6              THE COURT:  Well, don't do that.  Don't create

 7  records on something else.

 8         Let's get stuff that is relevant for what the

 9  Court has to decide in this lawsuit.

10  BY MR. SCHILLINGS:

11  Q.    Sir, did you see the email where Lewis Bell

12  introduced you as the owner of WindAirWest yesterday that

13  was covered during his testimony?

14  **A.    I saw the email, yes.**

15  Q.    Okay.  Do you have -- did you at any time inform

16  anybody in that email or correct Lewis Bell regarding his

17  introduction of you to other third parties as an owner?

18  **A.    Yes.**

19  Q.    Did you -- did you produce that document?

20  **A.    I -- I told him to stop.**

21  Q.    Okay.  Did you tell the person who he represented

22  to -- you as an owner to that that wasn't correct?

23  **A.    The conversation that -- the one pilot that I had**

24  **a conversation with, Alex Ford, explained to him the**

25  **circumstances of where we were in the process and -- and,**

05/21/2021    JAYHAWK v. WINDAIRWEST    18-1153    710

1  **you know, that I was the owner of the airplane and we**

2  **were seeking the acquisition of the interest in the**

3  **WindAirWest Air Charter Certificate.**

4       **I was very open and transparent with all pilots**

5  **about the precise circumstances around the operation of**

6  **the airplane.**

7  Q.    Sir --

8  **A.    They had to be knowledgeable about it.**

9  Q.    561, please.

10      I'm not sure what you're referring to as Alex

11 Ford.

12      Here's the email.  It says it is Dave@jetinsight

13 and Bryant@jetinsight and you're introduced by Lewis Bell

14 as -- as the owner, as our owner, and also the owner of

15 the Citation X.

16      Do you have any -- did you ever correct that

17 record, vis-à-vis the people at JetInsight?

18 **A.    I did not send an email to JetInsight.  I had no**

19 **subsequent conversation or email to my knowledge with**

20 **JetInsight.**

21 Q.    Okay.

22          MR. SCHILLINGS:  I think that's all I have.

23 Thank you.

24          THE COURT:  Redirect, Mr. McElgunn?

25          THE WITNESS:  Your Honor, can we take a moment

1  for -- just a moment break?

2        THE COURT:  Yeah, let's -- we'll take five

3  minutes.

4      Five minutes.

5        THE WITNESS:  Thank you.

6        THE COURT:  Five 60-second minutes.

7      We're in recess.

8      Courtroom deputy:  All rise.

9      (Recess taken.)

10       COURTROOM DEPUTY:  All rise.

11       THE COURT:  Thank you.

12     Please be seated.

13     That was fast.  Good job.

14       THE WITNESS:  Thank you.

15       MR. MCELGUNN:  I'm going to take very little

16  time, Your Honor, but I have got to grab an exhibit.

17                   REDIRECT EXAMINATION

18  BY MR. MCELGUNN:

19  Q.    Mr. Kiser, real briefly, just a couple of

20  questions.

21     I believe that you were asked about the benefit

22  realized by Jayhawk and I believe that counsel started to

23  ask you a question as to what was the benefit to

24  WindAirWest.

25       What would you be -- what was the benefit of the

1  Dry Lease arrangement, in your perspective, for

2  WindAirWest?

3  **A.    The -- the benefit was we were joining the**

4  **litigation in California and, in fact, we filed suit**

5  **against Castle & Cooke in California so there was cost**

6  **avoidance and litigation avoidance and in exchange for**

7  **being allowed to generate revenue and mitigate costs.**

8  Q.    And ultimately what were the terms of the

9  settlement with -- and belief -- it was stipulated but in

10 terms of the settlement with Castle & Cooke vis-a-vis

11 your ability to sue anyone else for claimed damage

12 diminution to the 910VP?

13 **A.    I had no -- no further recourse.**

14 Q.    And so basically the -- the lawsuit with Castle &

15 Cooke, the results of which WindAirWest got off the hook

16 to any liability, if any, for the diminution claim under

17 your contract, right?

18 **A.    That's correct.**

19 Q.    And real briefly, I just want to -- in response to

20 some questions regarding when you -- you may have signed

21 the aircraft Dry Lease Agreement, I think your testimony

22 was the actual physical signature had -- in your mind had

23 to be done so the Dry Lease could be presented at the

24 check flight that you referenced that occurred on the

25 21st?

1  **A.      That's correct.**

2  Q.     Okay.

3  **A.      Signed prior to that.**

4  Q.     And -- and, in fact --

5  **A.      By both parties.**

6  Q.     And, in fact, we know that both parties signed,

7  and there's no date, but it does reflect that the parties

8  agree they have entered into the Dry Lease as of the

9  effective date, correct?

10 **A.      Yes, sir.**

11 Q.     And what's your understanding of the effective

12 date?

13 **A.      August 14th.**

14 Q.     Okay.  So without regard to when it was signed,

15 you understood and it was the agreement of the parties

16 that it was effective -- that the agreement was effective

17 on August 14th, correct?

18 **A.      Correct.**

19 Q.     And to the extent that it ultimately is an issue,

20 the change that you made and initialed to the Side

21 Letter -- Side Letter Agreement, the first Side Letter

22 Agreement changed the effective date to August 22nd,

23 correct?

24 **A.      Yes.**

25 Q.     Okay.  Without regard to when it was signed, that

1  was a change of the effective date?

2  **A.     Um --**

3  Q.     Of the Side Letter?

4  **A.     My signature didn't go on this document until**

5  **August 22nd.**

6  Q.     And -- and the change that you made was to the

7  effective date of the agreement from August 14th, if you

8  look at the exhibit, sir, to -- to August 22nd.

9  You -- you initialed that as a change to the effective

10 date?

11 **A.     Correct.**

12 Q.     And when the -- when the -- when the document was

13 ultimately delivered, was there any question or that was

14 posed to you or anyone else as far as you know, about the

15 change in the effective date?  Which you initialed?

16 **A.     No questions asked.  By anyone.**

17 Q.     Excuse me.  Oh, by anyone?

18 **A.     No questions asked by anyone.**

19        MR. MCELGUNN:  I have no further questions of

20 you, Mr. Kiser today.  Thank you.

21        THE COURT:  Recross.

22                 RECROSS EXAMINATION

23 BY MR. SCHILLINGS:

24 Q.     Sir, I believe your testimony was that the

25 advantage to this August 21st, this oral agreement you

05/21/2021    JAYHAWK v. WINDAIRWEST    18-1153    715

1  reference on the day of the eclipse, the advantage to

2  WindAirWest related to your agreement to pursue the

3  diminution in value claim, right?

4  **A.      I think you're mixing two different conversations,**

5  **Mr. Schillings.**

6  Q.      Well, isn't it true, sir, that you signed a Common

7  Interest Agreement July 14th of 2017 that related to the

8  pursuit of the diminution in value claim against Castle &

9  Cooke?

10  **A.      Correct.**

11  Q.      Okay.  Now, so a month and a week before any oral

12  agreement regarding your entitlement to revenue occurred

13  you had already addressed by the Common Interest

14  Agreement that the parties would work together to go

15  after Castle & Cooke for the diminution in value claim?

16  **A.      I'm sorry, was that a question?**

17  Q.      Yes, it was.

18  **A.      Would you repeat it?**

19  Q.      Sure.  Well, let's pull up Exhibit 66, please.

20          This is the Common Interest Agreement -- go up to

21  the top real quick.

22          And it sets forth the terms and conditions to

23  which the parties -- well --

24          MS. DALKE:  It's not me.

25          MR. SCHILLINGS:  That's not you?

1           MR. MCELGUNN:  Oh, I'm sorry, that's me.  I

2   didn't have it.

3           MR. SCHILLINGS:  Killing me, Chris, you're

4   killing me.

5        Chris, will you please take it up to the top?

6           MR. MCELGUNN:  All right.  Where would you like

7   me to be?

8           MR. SCHILLINGS:  Right there.  That's fine.

9           MR. MCELGUNN:  Right there?

10           MR. SCHILLINGS:  Yeah, that's fine.

11  BY MR. SCHILLINGS:

12  Q.    So the Common Interest Agreement obligated you and

13  the parties to cooperate with each other with respect to

14  the lawsuit and the negotiations relating to the -- to

15  the diminution in value claim?

16  **A.    That's what this agreement is, yes.**

17  Q.    Okay.  And you signed that on -- do you have it

18  now or do you have it?

19           COURTROOM DEPUTY:  I'll get it.

20        Krystle has it.

21           MR. MCELGUNN:  Krystle has it.

22           MR. SCHILLINGS:  Okay.  Go to the signature

23  block.

24           MS. DALKE:  Sorry.

25  BY MR. SCHILLINGS:

1  Q.    You signed that on July 14th of 2017, correct?

2  **A.    Yes.**

3  Q.    Now, sir, paragraph 19 of that agreement provides,

4  The Common Interest Agreement shall not in any way

5  preclude any party from exercising its freedom to

6  negotiate a claim or issue in the action with any other

7  party including, without limitation, settling a claim or

8  defense or litigating its position in a court of law.

9  However, no party may do so without first notifying the

10  remaining parties' counsel in writing.

11      You settled the diminution in value claim for

12  $450,000, we've established that, right?

13  **A.    I don't think I've ever testified to the amount**

14  **but it was ultimately satisfied.**

15  Q.    I think it was put in -- in responses to interrog

16  -- I thought we just covered that a few minutes ago but

17  the record will be what it is.

18  **A.    Yeah.**

19  Q.    Did you ever provide any notice to WindAirWest

20  that you were settling the diminution in value claim?

21  **A.    I don't know -- I can't speak to that, whether**

22  **Mr. Peier or Mr. McElgunn provided notice.**

23  Q.    So you don't have -- you don't have any knowledge

24  that anybody, pursuant to the agreement that you signed,

25  provided notice to WindAirWest before you went ahead and

1  signed -- and settled that claim?

2  **A.      What was the date of the settlement?**

3  Q.      You -- the date of your settlement?  I don't know

4  what the date of your settlement was.  October I think?

5  **A.      So you're asking me the timing question that I'm**

6  **not sure I can answer.**

7  Q.      I'm not -- I'm not actually asking you a timing

8  question.

9         I'm asking you if you have any evidence that any

10  notice was ever provided pursuant to paragraph 19.  I

11  don't care about what the time is.

12  **A.      I -- I don't know.**

13  Q.      Okay.  And then back one more time and then I'm

14  done, I promise, to the lease agreements and Exhibit 87.

15         Well, let's go to 89, I apologize.

16         Again, you state, this is your language, The Side

17  Letter and lease agreement were signed and sent to you

18  and Heather on August 29th, 2017.

19         Did I read that correctly?

20  **A.      I believe you did.**

21  Q.      Okay.  And is that eight days after your meeting

22  with Mr. Simonson in Van Nuys?

23  **A.      The meeting in Van Nuys was on the 21st and this**

24  **is dated September 1st, this email is.  And so what date**

25  **are you asking again?**

05/21/2021    JAYHAWK v. WINDAIRWEST    18-1153    719

1  Q.    I am asking if the 29th, the day you said you

2  signed and sent the letters, is eight days after the

3  21st?

4  **A.    I believe it is.  Yeah, I believe that's eight**

5  **days.**

6         THE COURT:  I take judicial notice that that's

7  eight days.

8         MR. SCHILLINGS:  Yeah, and I'm done.

9         THE COURT:  Redirect?

10         MR. MCELGUNN:  I'm sorry, Your Honor, what I was

11  going to ask is in the stipulation, so I'll pass the

12  witness.

13         THE COURT:  Okay.  So, I have -- I have three

14  questions.

15      I hope.

16      And I'm hoping not to spark an entire other

17  afternoon of redirect and recross but we'll see.

18      Did you at some point make a decision not to

19  continue negotiations for the interests in WindAirWest,

20  LLC.

21         THE WITNESS:  Yes, sir.

22         THE COURT:  Why?

23         THE WITNESS:  The February 18th conversation

24  with Mr. Simonson I felt -- I felt was not a good faith

25  gesture on his part.

05/21/2021     JAYHAWK v. WINDAIRWEST     18-1153     720

```
 1          THE COURT:  Okay.  Anything else you want to add
 2   to the reason why you -- why you discontinued
 3   negotiations?
 4          THE WITNESS:  That -- that played a large role
 5   in it.
 6          Um, the -- the operation was not proving to be a
 7   viable -- from my perspective at that moment in time, and
 8   having to continue to subsidize and fund the operation,
 9   it -- it did not seem like a viable operation to continue
10   on at that moment in time.
11          THE COURT:  And so I think that what you just
12   answered answers my third question.  Was when was the
13   decision made?
14          When did you make the decision not to continue
15   negotiations?
16          THE WITNESS:  I don't know that I ever made the
17   decision not to continue with negotiations.  I
18   made -- I'm sorry, Your Honor, I made the decision not to
19   continue on with the Dry Lease Agreement, you know, right
20   there at the end of February.
21          THE COURT:  And that's really why I asked the
22   question the way I did because the -- this negotiation of
23   the -- you don't think you ever decided to stop
24   negotiations?
25          THE WITNESS:  No, as I think about it then and I
```

1  think about it now, um, the issue was, you know, trying

2  to have a viable operation that could generate revenue

3  and sustain the litigation for the diminution claim.  And

4  I was relying on the operation of the airplane and the

5  revenue generated by the operation of the airplane to

6  fund that litigation.  And -- and to just break even in

7  the operation.

8       And that proved to not be possible as we were

9  entering into the last portion of the month of February.

10       THE COURT:  Okay.  I'll let either side follow

11  up my questions if you want to.

12       Mr. McElgunn, do you want to do redirect on that

13  question?

14            FURTHER REDIRECT EXAMINATION

15  BY MR. MCELGUNN:

16  Q.    After February 28th were there any discussions

17  from either side involving the -- well, let me

18  strike -- let me rephrase that.

19       After February 26, 2018 when you terminated the

20  dry -- the Dry Lease arrangement were there any further

21  discussions about the -- between the parties about the

22  potential agreement to acquire a majority interest in

23  WindAirWest?

24  **A.    Not to my knowledge.**

25       THE COURT:  Mr. Schillings.

05/21/2021    JAYHAWK v. WINDAIRWEST    18-1153    722

1              MR. SCHILLINGS:  Yes, thank you.

2                 FURTHER RECROSS EXAMINATION

3  BY MR. SCHILLINGS:

4  Q.     In your decisionmaking process regarding the

5  termination of the Dry Lease, and ultimately the Purchase

6  Agreement, did you ever take into consideration the value

7  of the Certificate itself if you completed the Purchase

8  Agreement?

9  **A.     The value of the Certificate was -- it was less of**

10 **an issue because it was an enabler and without a crew and**

11 **pilots, nothing was possible.  Just like you couldn't**

12 **generate revenue without the Certificate, without a crew**

13 **and airplane, there was no operation.**

14 Q.     It --

15 **A.     So I would not say the value of the Certificate**

16 **was a deciding factor in terminating the Dry Lease.**

17 Q.     But if you had -- you had -- at the time you

18 terminated the Dry Lease there was a certificate that

19 WindAirWest owned, correct?

20 **A.     Yes.**

21 Q.     There was a director of maintenance?

22 **A.     Yes.**

23 Q.     There was a -- despite the issue with between you

24 and Mr. Lentz, there was a director of operations and

25 chief pilot?

05/21/2021     JAYHAWK v. WINDAIRWEST     18-1153     723

1  **A.      Yes.**

2  Q.     You had a plane?  You owned a plane?  Jayhawk did?

3  **A.      Jayhawk 910VP owned an airplane.**

4  Q.     You had all the elements in place where you could

5  have kept the Certificate alive and the Certificate does

6  have some value, maybe even to sell back to somebody

7  else, correct?

8  **A.      Yes.**

9  Q.     Okay.  And -- all right.

10         MR. SCHILLINGS:  That's all I have.

11         THE WITNESS:  Can I say one thing to that?  I

12  valued -- I valued the Certificate.

13         MR. SCHILLINGS:  Yeah.

14         THE WITNESS:  Even at the 26th of February, I

15  thought there was value to the Certificate.

16         MR. SCHILLINGS:  Okay.

17         THE COURT:  Thank you.

18         Any redirect?

19         MR. MCELGUNN:  No, Your Honor.

20         THE COURT:  I'll let you step down, Mr. Kiser.

21  Thank you.

22         Mr. McElgunn, do you have additional evidence?

23         MR. MCELGUNN:  The only additional evidence is

24  the parties have agreed to submit the deposition

25  designations instead of calling, that we made.

 1         We have a package available that we'll send to you

 2    and in lieu of calling any more witnesses.

 3         THE COURT:  Okay.  Are those all agreed to and

 4    don't require rulings?

 5         MR. SCHILLINGS:  Yes.

 6         MR. MCELGUNN:  Yes.

 7         THE COURT:  Okay.  Well, that's good to hear.

 8         Mr. Schillings, do you have -- is that the

 9    evidence of your evidence, Mr. McElgunn?

10         MR. MCELGUNN:  Yes, Your Honor, please.

11         THE COURT:  Mr. Schillings, do you have

12    rebuttal?

13         MR. SCHILLINGS:  I would like to recall Ms.

14    Heather McCormick to the stand for two questions.

15         THE COURT:  All right.  Ms. McCormick.

16         Ma'am, you're still under oath.

17         THE WITNESS:  Thank you, Your Honor.

18                    **HEATHER MCCORMICK,**

19    recalled as a rebuttal witness on behalf of the

20    Defendant, having been previously and duly sworn,

21    testified further as follows:

22                    DIRECT EXAMINATION

23    BY MR. SCHILLINGS:

24    Q.   Ms. McCormick, after the termination of the 2016

25    Dry Lease and during the negotiations which led to the

05/21/2021    JAYHAWK v. WINDAIRWEST    18-1153    725

1  second Dry Lease, did WindAirWest still own the Astra?

2  **A.     Yes.**

3  Q.     And was WindAirWest in a position during that time

4  period to maintain its 135 Certificate based, in part,

5  with all the other requirements on its ownership of the

6  Astra?

7  **A.     Yes.**

8           MR. SCHILLINGS:  That's all the questions I

9  have.

10  BY MR. SCHILLINGS:

11  Q.     Actually, when did you finally sell the Astra?

12  **A.     We sold the Astra in May of 2018.**

13  Q.     Okay.  And what did you sell it for?

14  **A.     Just shy of a million dollars.**

15           MR. SCHILLINGS:  Thank you.

16           THE COURT:  Cross?

17           MR. MCELGUNN:  Your Honor has already

18  said -- it's already subject -- my question is subject of

19  stipulation, so I won't ask it.

20           THE COURT:  Okay.

21         Thank you, Ms. McCormick.

22           THE WITNESS:  Thank you.

23           THE COURT:  Is everyone done with evidence?

24           MR. SCHILLINGS:  WindAirWest rests.

25           THE COURT:  So, you don't have any cross

05/21/2021    JAYHAWK v. WINDAIRWEST    18-1153    726

1  rebuttal to that, I assume?

2          MR. MCELGUNN:  Uh, unless I can call

3  Mr. Schilling, no, Your Honor.

4          MR. SCHILLINGS:  Can we arm wrestle?

5          THE COURT:  So, we've agreed I think in this

6  matter that rather than closing arguments the parties

7  would submit proposed finding and conclusions of law.

8          Let me find out from the lawyers how -- how long

9  you think you need to get those -- get that into me?

10         Why are you looking at Ms. Dalke about that,

11 Mr. Schillings?

12         MR. SCHILLINGS:  Oh, did you see that?

13         I really don't know.

14         MS. DALKE:  Judge, it doesn't matter.  I'll get

15 them in when you tell me to get them in.

16         THE COURT:  Monday morning.  I don't know if you

17 need two weeks or 30 days, I don't know.

18         What do you need?

19         MR. MCELGUNN:  Your Honor, I would like to note

20 that I have no one to look to when you asked that

21 question.

22         THE COURT:  I noticed that.

23         MR. MCELGUNN:  So two weeks, please.  I think we

24 can do that, if that's okay with everyone.

25         THE COURT:  I'll give you two weeks from Monday.

05/21/2021   JAYHAWK v. WINDAIRWEST   18-1153   727

1   Just so that you can start off fresh next week.  And two

2   weeks, so whatever that is.

3        That's -- what's that?  June 7th.  So proposed

4   findings and conclusions of law will be due June 7th.

5        A lot of interesting issues, I won't get a chance

6   to talk to the witnesses or attorneys again because I

7   will issue a written ruling, so just in case you are

8   continuing in conversations about resolving this matter,

9   let me -- a couple of comments, both of which -- all of

10  which I reserve the right to completely deviate from

11  after studying the evidence more.

12       I mean I really do have to look a lot at the facts

13  that have come into this trial which have been helpful,

14  and of course counsel in preparing trial briefs for me in

15  the trial, and I will be seeing some more law in their

16  later submissions and I have several legal and factual

17  questions in my own mind yet about this matter.

18       But, the way this kind of case gets to court is

19  that the parties in this matter completely

20  failed -- completely failed to paper the agreement that

21  led to the operation of the aircraft by -- through

22  Mr. Kiser's efforts in that -- during that last period

23  during the second Dry Lease.  It's almost the parties

24  completely failed at paperwork.

25       In other words, what the Court has to look at in

05/21/2021    JAYHAWK v. WINDAIRWEST    18-1153    728

1  this is not the written contracts, and it is not whether

2  or not the Court can look beyond them or anything else,

3  but that causes litigation and creates substantial

4  uncertainty for the parties, I think, how this may come

5  out.

6       I will have to parse through what's happened here,

7  decide what -- what either outside or inside the

8  agreements even matters to some of the questions in this

9  case.

10      The legal theories are, um, to some extent

11 creative and I'll have to figure out whether any of those

12 make any sense.  But I think the parties need to

13 understand that between now and the time that I make a

14 ruling on this, is you'll still have an opportunity to

15 resolve it if you want to.

16      And I have considerable uncertainty about how some

17 of the issues in this case ought to come out yet while I

18 work on what I have learned during this week and -- and

19 we review this for later submissions by counsel.

20      This is caused by the way that you papered this

21 transaction and failed to and at the time the parties

22 were trying to accomplish certain things that ended up

23 not being what we're here for, some of those things were

24 accomplished successfully through the work you did do but

25 the things that we're arguing over here today, I don't

05/21/2021    JAYHAWK v. WINDAIRWEST    18-1153    729

1  know.

2      So I think I'll kind of leave it at that for now.

3      Again, it is a bane -- and I say this for you, Ms.

4  McCormick, and you can pass it along to your partner,

5  Mr. McElgunn, is the bane of transaction lawyers that

6  their contracts end up getting interpreted and ruled upon

7  by litigators, which is where we are today.  And the

8  counsel and the Court as litigators, we're the ones who

9  have to figure this stuff out when it falls apart.  And

10 there's where we are.  But that's the way these kinds of

11 disputes end up.

12      I look forward to seeing the -- the submissions.

13 I thank the parties for their presentations this week

14 and -- and counsel for the presentations, and the parties

15 for their cooperation during the trial.

16      Apologize for how cold the courtroom has been and

17 look forward to seeing the submissions.

18      Thank you all.

19      We are adjourned.

20      (Proceedings conclude at 11:55 p.m.)

21

22      *********************************************

23

24              C E R T I F I C A T E

25      I, Jana L. McKinney, United States Court

1 Reporter in and for the District of Kansas, do hereby

2 certify:

3          That the above and foregoing proceedings were

4 taken by me at said time and place in stenotype;

5          That thereafter said proceedings were

6 transcribed under my discretion and supervision by means

7 of transcription, and that the above and foregoing

8 constitutes a full, true and correct transcript of

9 requested proceedings;

10          That I am a disinterested person to the said

11 action.

12          IN WITNESS WHEREOF, I hereto set my hand on

13 this, the 26th day of May, 2021.

14

15          s/ Jana L. McKinney
           Jana L. McKinney, RPR, CRR, RMR
16          United States Court Reporter

17

18

19

20

21

22

23

24

25

```
 1                          I N D E X
                                                      PAGE
 2

 3
     WITNESSES
 4       FOR THE PLAINTIFF
         ROBERT KISER
 5         Continued Direct Examination            626
         By Mr. McElgunn
 6         Cross-Examination                        674
         By Mr. Schillings
 7         Redirect Examination                     711
         By Mr. McElgunn
 8         Recross Examination                      714
         By Mr. Schillings
 9         Further Redirect Examination             721
         By Mr. McElgunn
10         Further Recross Examination              722
         By Mr. Schillings
11       REBUTTAL BY DEFENSE:
         HEATHER MCCORMICK
12         Direct Examination                       724
         By Mr. Schillings
13
     EXHIBITS                                       ADMD
14   For the Plaintiff:
     No. 2        Plaintiff's Responses to          675
15                Defendant's First
                  Interrogatories to Plaintiff
16   No. 66       Common Interest Agreement         634
     No. 87       Bob Kiser email to Clif           678
17                Simonson dated August 29,
                  2017 re Dry Lease Agreement
18                & Side Letter
     No. 89       Bob Kiser email to clif           678
19                Simonson dated September 1,
                  2017 re Side Letter
20   No. 139      American State Bank Records       706
     No. 141      Aircraft Purchase Agreement       706
21   No. 422      Email chain re Jayhawk            628
                  910VP, LLC Damage June 21,
22                2016
     No. 541      Steve Lentz email re              647
23                Citation X 910VP Lease
                  Agreement with attachments
24   No. 582      Email chain re Steve Lentz        652
                  Update February 14, 2018
25
```

No. 583      Email chain re Update                    654
             February 14, 2018


REPORTER'S CERTIFICATE                                730