IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

JAYHAWK 910VP, LLC,           )
                              )
            Plaintiff,        )
                              )   No. 18-1153-KGG
    v.                        )
                              )
WindAirWest, LLC,             )
                              )
            Defendant.        )
_____)

## MEMORANDUM OF DECISION

On May 18, 2021, this matter came on for trial. Plaintiff appeared through its attorney, Christopher McElgunn. Defendant appeared through its attorneys, Scott Shillings and Krystle Dalke. The parties presented their evidence and rested. The Court received and considered trial briefs before the trial, and received and considered proposed findings of fact and conclusion of law after the trial. Being fully advised in the premises, the Court makes the following Findings of Fact and Conclusions of Law pursuant to Rule 52, Federal Rules of Civil Procedure.

## Findings of Fact

WindAirWest, LLC ("WAW") is a small commercial air charter company based in California. WAW operates under a "Part 135 Certificate" from the Federal Aviation Administration ("FAA"), which permits its charter business. The principal owners of WAW are Spider Investments, Inc. ("Spider") and Ceson FH,

1

LLC ("Ceson"). Spider's principal is Clifton Simonson ("Simonson"). Ceson's principal is Theodore Bentley ("Bentley"). Simonson is the manager of WAW.

In 2015, WAW was operating a single airplane, an Astra business jet. WAW became interested in acquiring a Cessna Citation business jet because it was considered a better fit for the WAW charter business.

Jayhawk 910VP, LLC ("Jayhawk") was a Kansas Company formed for the sole purpose of owning, refurbishing, and selling a used Cessna Citation X Business Jet, known by its tail number N910VP (referred to here as "910VP"). Jayhawk was managed by Robert Kiser ("Kiser"), who is also a principle in one of Jayhawk's owners, the company that makes "Winglets." Winglets are the upturned wingtips designed to improve the appearance and performance of airplanes. Kiser hoped that refurbishing 910VP with Winglets would help demonstrate the use of that product in the Citation X.

In 2016, Jayhawk and WAW negotiated an agreement for WAW to lease 910VP with an option to buy. The "2016 Dry Lease" was executed in April of 2016. A "Dry Lease" is a term for the lease of an aircraft without services or crew. The term of the lease ended on May 31, 2017, at which time WAW was required to decide whether to exercise the option to buy. The lease provided that if WAW elected not to exercise the option, an additional $250,000 charter fee was due.

Under the 2016 Dry Lease, WAW had the right and duty of operational control of the aircraft. This was required under the Part 135 Certificate and reflected the parties' intent concerning the operations of the aircraft. The lease required rental and other payments from WAW to Jayhawk. The lease placed the risk of loss to the 910VP with WAW. The lease specifically provided that all charter income would be retained by WAW.

A separate Aircraft Services Agreement was entered into between the parties which required and permitted WAW to provide all the necessary services to 910VP to support the charter operations.

The Dry Lease agreement is a critical document required to satisfy WAW's obligations under the Part 135 Certificate. It establishes WAW's "operational control" of the aircraft. Operational control requires that all charter flights be approved by WAW and requires three operational positions – chief pilot, operations manager, and maintenance manager. The lease is so important that a copy of it is required be in the aircraft and may be reviewed by the FAA inspector.[1]

910VP was delivered to WAW under the lease agreement in April 2016.

---

[1] The comments made in this Order about the FAA requirements are not findings of law by the court but are based on factual testimony at trial reflecting the understanding of the parties. The Court makes no finding whether any agreement or practice of the parties complied with FAA rules and regulations.

In June 2016, before actual charter operations began, 910VP was hangered at the facilities of Castle & Cooke Aviation Services, Inc. ("Castle & Cooke"), a fixed-base operator in Van Nuys, California, undergoing final inspections. 910VP was seriously damaged when it rolled into another aircraft (the "Castle & Cooke incident"). Eventually, 910VP was sent to the Cessna factory in Wichita, Kansas for repairs. Those repairs were completed and the aircraft was returned to service on December 22, 2016.

In October 2016, WAW filed a lawsuit against Castle & Cooke in California for damages arising out of the accident. WAW claimed damages for business losses, as well as damage for repairs and the diminution of value of 910VP. In December 2016, WAW and Castle & Cooke participated in a mediation which resulted in a payment of $300,000 to WAW by Castle & Cooke's insurer. This did not resolve the lawsuit. Most of this recovery was paid by WAW to Jayhawk for amounts due under the 2016 Dry Lease. One of the positions Castle & Cooke took in the on-going lawsuit was that any claims for the diminution in value of 910VP had to be brought by Jayhawk as the owner of the aircraft. Jayhawk, however, was not yet a party to that lawsuit.

WAW returned 910VP to service and conducted charter operations until the end of the lease period in May 2017. At that time, WAW returned the aircraft to Jayhawk and informed Jayhawk that it would not exercise the option to purchase.

Although WAW expected and intended to exercise the option when the 2016 Dry Lease was signed, in May of 2017, WAW felt that the value of the aircraft had been reduced enough by the accident that the option price was no longer appropriate. Jayhawk demanded payment of the $250,000 additional charter fee under the agreement.

The aftermath of the 2016 Dry Lease and the Castle & Cooke litigation left both parties with problems. Jayhawk demanded that WAW pay the $250,000 additional charter fee due under the agreement. Jayhawk also believed it had a substantial claim against WAW under the risk-of-loss provision in the 2016 Dry Lease for the diminution in the value of 910VP caused by the accident. WAW was also concerned about this potential claim. Jayhawk now had an aircraft it could not use for charter flights because Jayhawk did not have a 135 Certificate, and Jayhawk was obligated to make continued payments to service the secured loan on the aircraft and incur other costs of upkeep. WAW needed Jayhawk to participate in the lawsuit against Castle & Cooke in California so that Jayhawk could recover its diminution loss there, rather than against WAW. Jayhawk was reluctant to become involved in a lawsuit in California and considered bringing an action for loss of value of the aircraft against WAW in Kansas.

In June and July 2017, the parties entered into discussions in an attempt to reach an agreement to address these problems. Jayhawk rejected a proposal that

5

WAW purchase 910VP at a reduced price and WAW rejected a proposal to extend the lease.  On June 8, 2017, WAW issued a proposed "Letter of Intent," which represented a proposal from WAW.  The letter proposed that (1) Kiser acquire an unspecified majority interest in WAW, (2) WAW pay one-half ($125,000) of the additional charter fee, (3) the parties would negotiate and execute an acceptable LLC Membership Purchase Agreement and an amended Operating Agreement for the WAW LLC, (4) the agreement would apportion some WAW assets to Spider and Ceson, including the Astra aircraft and the Castle & Cooke lawsuit claim (except the diminution in value claim), and (5) Jayhawk would work cooperatively to intervene in and resolve the diminution of value claim in the California case.

The letter contemplated that as the new majority owner of WAW, Kiser would operate and manage the charter operation, that 910VP would remain on WAW's 135 Certificate while the parties negotiated the agreement, and that the parties would enter into a managed operation agreement for use during negotiations.  The proposal provided that the cost of operations and the revenue would belong to Kiser.  This proposal would resolve the risk of loss claim under the previous agreement and the remaining additional charter fee claim.  There were other details in the Letter of Intent.  However, a final Letter of Intent was never agreed or executed.  The parties continued negotiations outside the Letter of Intent.

On July 11, 2017, WAW paid Jayhawk $125,000 (one-half of the additional charter fee).

On July 14, 2017, the parties completed and executed a Common Interest Agreement which was effective May 1, 2017. This agreement provided for litigation cooperation between the parties in the California litigation against Castle & Cooke and recognized that Jayhawk intended to intervene in that action. The agreement also stated a purpose to "cooperate with each other" with respect to the "negotiation and potential agreement for the sale of all or part of the membership interests in WindAirWest to Jayhawk or its principals." Beyond this recitation of purpose, however, this agreement contains no promises about the negotiation or transfer of interests in WAW.

On August 21, 2017, Kiser (Jayhawk) and Simonson (WAW) met in California during final inspection of 910VP and pilot test flights, preliminary to placing 910VP back in service. They orally agreed that the revenue from charter flights under the 2017 Dry Lease would belong to Jayhawk.[2]

The parties entered into the 2017 Dry Lease purportedly leasing 910VP from Jayhawk to WAW. This document was a heavily edited and redacted version of

---

[2] This is based on Kiser's testimony. Kiser was cross-examined concerning an interrogatory answer in which he stated that the written agreements were the only agreements reached to impeach this testimony. Simonson, who did testify and was present throughout the trial, did not offer testimony that Kiser's account was untrue. The Court finds this account credible and that this conversation occurred.

7

the form used for the 2016 Dry Lease. The rent portion of the agreement, like the 2016 version, referenced an attachment which had the amount redacted. There was no rent required under this agreement. The paragraph from the 2016 Lease which specified who was entitled to charter revenue was completely removed. The agreement makes no effort to address that issue. It was a lease agreement to lease 910VP from Jayhawk to WAW but provided for no rent from WAW to Jayhawk and no obligations of WAW beyond having "operational control" of the aircraft, which is required under the 135 Certificate.

This agreement had an effective date of August 14, 2017. This agreement was signed by Kiser on behalf of Jayhawk and delivered to WAW on August 29, 2017. The purpose of this agreement was to satisfy the FAA that the charter business was under the operational control of WAW.

The 2017 Dry Lease had a twelve-month term but could be terminated by Jayhawk at any time. It also included an integration clause which recited that the agreement was the entire agreement on the "subject matter," superseded all previous agreement(s), and prohibited amendment or modification except in writing.

Also on August 29, 2017, but dated August 22, the parties completed Side Letter Agreement Number 1. Side Letter Agreement Number 2 followed on

September 14, 2017.  These agreements were intended to clarify that the costs, expenses, and liabilities for operating 910VP were Jayhawk's.

Side letter 1 recognized that the 2017 Dry Lease was for the purpose of placing 910VP on WAW's 135 Certificate and agreed that the aircraft would remain in the "custody and control" of Jayhawk until the majority ownership of WAW was transferred.  Side letter 2 included an agreement that the parties "shall continue to work in good faith to timely conclude the transfer or majority ownership of WindAirWest, LLC to Jayhawk Aviation, LLC."

The first charter flight under the 2017 Dry Lease occurred on August 25, 2017.  These operations were run almost entirely from Wichita by Kiser in the name of WAW.  Bell, the WAW employee who worked with brokers to charter flights, worked directly for Kiser.  The three FAA-required officers – WAW's chief pilot, operations manager, and maintenance manager – performed duties required under the 135 Certificate, including approving flights.  Otherwise, Kiser ran the charter operations.

WAW and Jayhawk agreed that Kiser would open a bank account in the name of WAW at a bank in Wichita.  Kiser and Simonson were signatories on the account, but Simonson never accessed the account or reviewed bank statements.  Revenue from operations were deposited into the account and the expenses of operations were paid out of the account.  Funds totaling $300,000 were paid out of

the account to Jayhawk or to its lender on the bank loan for 910VP. In the bank and company accounts these were designated as "rent" payment on the aircraft. Kiser ran charter operations under the WAW name from August 25, 2017, until February 26, 2018, when Kiser terminated the 2017 Dry Lease agreement. Kiser then demanded payment of the remaining additional charter payment in the amount of $125,000.

During the fall of 2017, negotiations for the transfer of interest of WAW continued. Several details were negotiated, and Jayhawk required the production of financial documents. Around November 22, 2017, the parties' attorneys took a pause in their work to allow time for Simonson and Kiser to meet in an attempt to work out remaining issues. This meeting never took place. Some of the required "due diligence" documents were never produced, although other major issues had been at least preliminarily resolved. However, both parties understood that no final agreement for the transfer of WAW interest to Jayhawk or Kiser was ever reached.

In the meantime, Kiser was running the charter operations of WAW in what this Court can only describe as a "test drive." Financially the operations were producing revenue largely in step with projections made by WAW's Bell and shared with Kiser the previous summer. However, the practical problems with running the charter were a challenge for Kiser. He had trouble getting along with

10

WAW's Chief Pilot, who was a critical player in overseeing the operations under the 135 Certificate. He had problems with other pilots, who quit or were fired. In fact, the cancellation of the lease in February was the same day the last pilot resigned. Whatever the exact cause, it is clear that the experience of running WAW's charter operation was not what Kiser had hoped and in February he cancelled the 2017 Dry Lease to end the operation. Although Kiser did not expressly terminate negotiations for the purchase of the WAW interest, the renewal of his demand for the remaining additional charter fee made it clear that those negotiations had ended.

During the operation of the charter under the Dry Lease, Jayhawk failed to pay three vendor claims. One was for an unexpected repair bill in February of 2018, part of which Kiser had placed on WAW's account with the vendor. This was later paid by Jayhawk, as was an outstanding bill from Textron. A charge of $39,652.08 from a fuel vendor was later paid by WAW to avoid threatened litigation. A payment due to Chief Pilot Lentz for services was paid by Jayhawk during the trial of this case.

On May 30, 2018, Jayhawk settled its diminution claim against Castle & Cooke for $450,000. As part of that settlement, Jayhawk agreed not to make that claim against any additional parties, including WAW. Jayhawk eventually sold 910VP.

In November of 2018, WAW secured a jury verdict against Castle & Cooke in the amount of $2,464,560 plus attorney fees. The verdict was appealed and the verdict, but not the fees award, was affirmed. WAW has secured the use of another aircraft and remains in the charter business.

This Court is now left to untangle the Gordian knot of contracts, practices, and partial deals the parties created to address the problems they perceived arising out of the 2016 Dry Lease termination. Each parties' actions were consistent with their own interests and, for the most part, achieved their aims. They created a fictional branch of WAW, based in Wichita and operated by Kiser for Jayhawk. WAW allowed Jayhawk to operate as WAW. This allowed Kiser to operate the aircraft under WAWs 135 Certificate and, for a time, generate some income to pay Jayhawk's bank loan. It also allowed Kiser to "test drive" WAW's charter business while he was negotiating the purchase of the interest in WAW.

WAW was concerned about Jayhawk's diminution claim. The 2017 arrangement involved Jayhawk in the California litigation, which ultimately relieved WAW from exposure for the diminution claim. The 2017 Dry Lease and the WAW bank account were intended by the parties to create the appearance to the FAA that WAW was operating the charter business as required by regulations. WAW may have done enough operationally during the charter operations to satisfy regulatory requirements, but both the 2017 Dry Lease and the WAW-Wichita

12

operation were intended to permit Kiser to conduct charter operations under WAW's Certificate.

Both parties knew that there had not yet been a deal made for the transfer of WAW interests to Kiser or Jayhawk. WAW saw a chance to escape the payment of half of the additional charter fee due after cancelling the lease and it took that chance. Both parties worked in good faith on details to complete that transaction, but negotiations ceased in late November of 2020. By early the next year, Kiser had decided that running the WAW charter business was not in his interest. He made a business decision to get out.

There is no evidence that Kiser intentionally misled WAW about his intentions during the negotiations to "string them along." Every indication is that Kiser intended to work the deal out until his experiences in late 2017 and early 2018 soured him on the deal. Both parties are operated by sophisticated business executives, and both understood, or should have, that because there was no deal there might not be a deal.

It is certainly not established that WAW would have been better off if the deal had been consummated. It would have saved the last $125,000 fee, but 90% of the company would now be owned by Kiser who demonstrated little aptitude for managing the WAW charter business. WAW eventually received a substantial judgment against Castle & Cooke and is now back in business. There is no

13

evidence, even if Jayhawk's failure to complete the deal was some sort of breach, that WAW has suffered any net damages or loss.

## Conclusions of Law

1. **The additional charter fee was due under the 2016 Dry Lease.**

The basis for the $125,000 dry lease debt is the 2016 Dry Lease. There is no evidence, and no claim, that Jayhawk breached any of its duties under that agreement. There is no argument that the additional fee did not become due after WAW elected not to exercise the option under the contract. At least as of the termination of that agreement, the fee was owing. WAW's arguments for avoidance of this liability are based on subsequent events.

2. **The 2016 Dry Lease was not amended by agreement to forgive the additional fee.**

WAW argues that the 2016 Dry Lease was modified concerning the additional charged fee or that there was a new contract between the parties excusing the payment of the fee. WAW's theory is that a new agreement was entered into between the parties in which the remaining fee would be forgiven in exchange for an interest in WAW.

The terms of a written contract can be modified by a subsequent agreement between the parties. ***Saddlewood Downs. L.L.C. v. Holland Corp.***, 33. Kan. App. 2d 185, 99 P.3d 666, 646 (2004); ***Thoroughbred Assoc., L.L.C. v. Kansas City Royalty Co., L.L.C.***, 58 Kan.App.2d 306, 317, 469 P.3d 666, 676 (2020) (citation

14

omitted).  WAW has the burden to prove the creation of a new contract.  In Kansas, a contract may be made in any manner sufficient to show agreement.  It may be oral, written, or implied from the conduct of the parties.  Pattern Instructions for Kansas, Civil 4th 124.03; *see also* **Thoroughbred Assoc.**, 58 Kan.App.2d at 317, 469 P.3d at 676.  The issue of whether a modification occurred is a factual determination measured by an objective standard.  **Thoroughbred Assoc.**, 58 Kan.App.2d at 317, 469 P.3d at 676, 678 (citing ***O'Neill v. Herrington***, 49 Kan. App. 2d 896, Syl. ¶¶ 8, 317 P.3d 139 (2014)).

There was no subsequent contract between WAW and Jayhawk modifying the obligation to pay the additional charter fee.  From June through November of 2017, the parties engaged in extensive, frequent, and detailed efforts to get to a contract.  During that time, however, both parties' efforts stalled in the press of other concerns.  It is true that the parties combined to allow Jayhawk and Kiser to operate a part of WAW as if they were the owners, and the wisdom of this decision may now be in doubt.  But the extensive effort put into negotiation of the new contract, both before and after Kiser began managing charter operations, is good evidence that no actual agreement was reached.  Additionally, the provisions in the Common Interest Agreement in July and the Second Side Letter Agreement concerning the on-going negotiations evidence the lack of a completed agreement between the parties.

### 3. Jayhawk did not breach its agreement to consummate the purchase of the WAW interest in good faith.

WAW presented no evidence that Jayhawk (Kiser) failed to make good-faith efforts to complete the contract for the purchase of the interest in WAW. Of course, an "agreement to agree" is classically unenforceable. ***Phillips & Easton Supply Co., Inc. v. Eleanor International, Inc.***, 212 Kan. 730, 734, 512 P.2d 379, 383 (1973) (citation omitted) (holding that an agreement to make a contract in the future is not binding unless there is a meeting of the minds as to all the essential terms and conditions and nothing essential remains dependent on future negotiations).

In this case, there is no evidence that Kiser was sandbagging or stringing WAW along so he could use their Certificate to operation 910VP as a charter. Jayhawk and WAW appear to have been equally active in negotiating the exchange. Final terms simply were never set. *Id*. Additional issues appear to have intervened when Kiser learned the realities of running the business. Changing his mind based on these developing business considerations, however, does not constitute bad faith. *Cf*. ***U.S. ex rel. Quality Trust, Inc. v. Cajun Contractors, Inc.***, 2008 WL 410121, *6 (D. Kan. Feb. 13, 2008) (citing ***Lewis v. Gilbert***, 14 Kan.App.2d 201, 203, 785 P.2d 1367 (1990) (holding that a party ultimately changing his or her mind about terms of a settlement agreement does not constitute fraud or bad faith)).

16

Even if Jayhawk breached an agreement to complete the purchase, or the agreement to proceed in good faith, there is no evidence that WAW suffered any damages as a result of such a breach. Damages resulting from the breach are a necessary element of any breach of contract claim.[3] **Stechschulte v. Jennings**, 297 Kan. 2, 23, 298 P.3d 1083 (2013).

Certainly if the deal that was developing had been completed, WAW would not owe Jayhawk the remaining additional charter fee. But Kiser or Jayhawk would now own 90% of WAW. WAW is not requesting the court specifically enforce any agreement. It remains unclear which assets and liabilities would have changed hands in the event of a final agreement. Further, it is certainly unknown what the present net financial affect would have been on WAW, which now, after receiving a substantial judgment against Castle & Cooke remains a viable charter business.

### 4. Jayhawk did not commit any actions which estop it from collecting the remaining additional charter fee.

The parties' agreement for the operation of the charter operation during the period of the 2017 Dry Lease was that Jayhawk would pay the expenses and retain

---

[3] "The elements of a breach of contract claim are: (1) the existence of a contract between the parties; (2) sufficient consideration to support the contract; (3) the plaintiff's performance or willingness to perform in compliance with the contract; (4) the defendant's breach of the contract; and (5) damages to the plaintiff caused by the breach." **Stechschulte**, 297 Kan. at 23.

the revenue from charter operations. There was no written agreement between the parties concerning how their quasi-notional "WAW-East" operation would be run beyond some cryptic promises in the Side Letter Agreements providing that Jayhawk would pay expenses on the aircraft. The 2017 Dry Lease is completely silent on anything relevant to this operation except to document the "operational control" of the aircraft to satisfy the FAA. There is nothing in that agreement about the charter operations. The provision concerning which party is entitled to revenue is completely excised. Although the contract has an integration clause, it is clear that the agreement concerning this trial operation of the charter by Jayhawk is outside of the subject of the 2017 Dry Lease and, therefore, not within the integration clause.

There is ample parole evidence concerning this arrangement. Jayhawk (Kiser) was allowed and authorized to act as WAW in running the charter, as evidenced by the charter operation, the bank account in WAWs name, and the payment of expenses out of that account. Simons and Kiser agreed orally that Jayhawk would retain the revenues from the operations. There was no effort by WAW to monitor or access the revenue from those operations. In the Castle & Cooke litigation, WAW took the position that WAW was obligated to pay $40,000 monthly lease payments to Jayhawk. (Plaintiff's Exh. 143, at pp. 17-22, 45.) Because Jayhawk was entitled to the revenue from operations, it is irrelevant that

18

payments taken out of the Kansas WAW account from revenues were designated as "rent."

5. **Jayhawk breached its agreement under the 2017 Side Letter agreements by failing to pay expenses incurred during charter operations. The breaches have been cured except for $39,652.08 paid by WAW.**

Jayhawk was obligated under the side agreements to pay expenses during operations under the 2017 Dry Lease. This obligation was breached three times, with one obligation remaining unsatisfied at the end of the trial. That claim for $39,652.08 is uncontested factually and legally by Jayhawk. (*See* Doc. 116, at 27.) WAW is entitled to a judgment and offset for that breach.

## Conclusion

Jayhawk is entitled to judgment in the amount of $125,000 against WAW for non-payment of the additional charter fee. WAW is entitled to judgment against Jayhawk for failing to pay charter expenses in the amount of $39.652.08. With the offset, this results in a net judgment to Jayhawk against WAW in the amount of $85,347.92.

Final judgment requires the Court's ruling the parties' claims for attorney's fees under the agreements. The parties are ordered to file simultaneous memoranda on or before August 20, 2021, addressing whether fees are due either party in light of the above rulings. Responses may be filed by September 3, 2021.

No Replies shall be filed without leave of Court.  The actual dollar amount of the fees requested shall not be addressed in these memoranda.

**IT IS SO ORDERED**.

Dated this 14th day of July, 2021.

S/ KENNETH G. GALE
KENNETH G. GALE
United States Magistrate Judge
